ACCEPTED
05-15-00369-CV
FIFTH COURT OF APPEALS
DALLAS, TEXAS
9/8/2015 6:10:20 PM
LISA MATZ
CLERK

# FIFTH DISTRICT COURT OF APPEALS
## DALLAS, TEXAS

_____

## No. 05-15-00369-CV

_____

FILED IN
5th COURT OF APPEALS
DALLAS, TEXAS
9/8/2015 6:10:20 PM
LISA MATZ
Clerk

# MORGAN KEEGAN & CO., INC. MORGAN ASSET MANAGEMENT INC.,
*Appellants/Cross-Appellees,*

## VS.

# PURDUE AVENUE INVESTORS LP, MARY ANN HOWARD AND DANA HOWARD, AS TRUSTEE OF THE MOLLY A HOWARD TRUST,
*Appellees/Cross-Appellants.*

_____

## APPEAL FROM THE 101ST JUDICIAL DISTRICT COURT
## DALLAS COUNTY, TEXAS
### Cause No. DC-09-14448

_____

## APPENDIX SUPPORTING BRIEF FOR APPELLEES
## PART ONE OF THREE

_____

**ORAL ARGUMENT REQUESTED**

Braden W. Sparks
S.B.N. 18874500
8333 Douglas Avenue, Ste. 1000
Dallas, TX 75225
214.750.3372 – Tel.
214.696-5971 -- Fax
brady@sparkslaw.com

*Attorney for Appellees*

| Tab | Title of Document | Date |
|---|---|---|
|  |  |  |
|  |  |  |
| 1 | Plaintiffs' First Amended Petition (excerpts) (CR 3288-3307) |  |
| 2 | Overstated ABS – Understated MBS Chart (CR 4397-4400) |  |
| 3 | Email dated July 23, 2014 from Peter Fruin to Brady Sparks regarding underlying prospectus (CR 4454) |  |
| 4 | Defendants Request for Amended and Additional Findings of Facts and Conclusions of Law (excerpts) (CR 8378, 8381-8382) |  |
| 5 | Affidavit of Peter Fruin dated January 21, 2015 (CR 8446-8447) |  |
| 6 | 2005 Annual Report (excerpts) (Jt. 13) |  |
| 7 | Strategic Underwriting Agreement (excerpts) (Jt. 20) |  |
| 8 | Strategic Administration Agreement (excerpts) (Jt. 22) |  |
| 9 | Strategic Additional Compensation Agreement (Jt. 21) |  |
| 10 | Advantage Underwriting Agreement (excerpts) (Jt. 23) |  |
| 11 | Advantage Additional Compensation Agreement (Jt. 24) |  |
| 12 | Advantage Administration Agreement (excerpts) (Jt. 25) |  |
| 13 | *Regions Morgan Keegan: The Abuse of Structured Finance,* Craig McCann, PhD, CFA (excerpts) (Jt. 43) |  |
| 14 | Ace Securities Corp. Home Equity Loan Trust, Series 2004-HE3 (excerpts) (Jt. 45) |  |
| 15 | Corrected Order Making Findings And Imposing Remedial Sanctions And A Cease-And-Desist Order Pursuant To Section 15(B) Of The Securities Exchange Act Of 1934, Sections 203(E), 203(F) And 203(K) Of The Investment Advisers Act Of 1940, And Sections 9(B) And 9(F) Of The Investment Company Act Of 1940, And Imposing Suspension Pursuant To Section 4c Of The Securities Exchange Act Of 1934 And Rule 102(E)(1)(Iii) Of The Commission's Rules Of Practice (excerpts) (Pl. 12) |  |
| 16 | Joint Notice of Intention to Revoke (excerpts) (Pl. 17) |  |
| 17 | MBS Listed as ABS – 2005 Annual Report for RSF and RMA (Pl. 23) |  |

| | | |
|---|---|---|
| 18 | Expert Report of Craig McCann, Phd, CFA, (excerpts) (Pl. 25) | |
| 19 | Curriculum Vitae of Craig McCann, PhD, CFA (Pl. 25a) | |
| 20 | Powerpoint Presentation of Craig McCann (Pl. 26) | |
| 21 | Organizational Chart (excerpts) (Pl. 54) | |
| 22 | Damage Analysis of Craig McCann, (excerpts) (Pl. 106) | |
| 23 | Trial Transcript, Vol. 5 (excerpts) | |
| 24 | Trial Transcript, Vol. 6 (excerpts) | |
| 25 | Trial Transcript, Vol. 7 (excerpts) | |
| 26 | *1001 McKinney Ltd. v. Credit Suisse First Boston Mortg. Capital*, 192 S.W.3d 20, 28 (Tex. App.—Houston [14th Dist.] 2005, pet. denied). | |
| 27 | *Aguilar v. Anderson*, 855 S.W.2d 799, 801 (Tex.App.--El Paso 1993, writ denied). | |
| 28 | *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 448, 102 L.Ed.2d 445 (1988) | |
| 29 | *Brown v. Am. Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex. 1980), cert. denied, 449 U.S. 1015 (1980)). | |
| 30 | *Burrow v. Arce*, 997 S.W.3d 229 (Tex. 1999) | |
| 31 | *Chapa v. Wells Fargo Brokerage Servs., LLC*, 315 S.W.3d 109, 119 (Tex. App.-Houston [1st Dist.] 2010) | |
| 32 | *Childs v. Haussecker*, 974 S.W.2d 31, 44 (Tex. 1998)); | |
| 33 | *City of Brownsville v. Alvarado*, 897 S.W.3d 750 (Tex. 1995) | |
| 34 | *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). | |
| 35 | *Darocy v. Abildtrup*, 345 S.W.3d 129, 137 (Tex. App.-Dallas 2011, no pet.). | |
| 36 | *Davis v. Jordan*, 305 S.W.3d 895 (Tex. App.—Amarillo, 2010, pet. denied) | |
| 37 | *Dow Chemical Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001). | |
| 38 | *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex.1985). | |
| 39 | *Duperier v. Tx. State Bank*, 28 S.W.3d 740, 745 (Tex. App. – Corpus Christi 2000, pet. dism'd by agr.). | |
| 40 | *Edgar v. K.L.*, 93 F.3d 256, 258-59 (7th Cir. 1996). | |

| | | |
|---|---|---|
| 41 | *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867 (Tex. 2012) | |
| 42 | *FDIC v. Lenk*, 361 S.W.3d 602, 604 (Tex. 2012). | |
| 43 | *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). | |
| 44 | *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex. App.-Houston [14th Dist.] 2000, pet. denied) | |
| 45 | *Galvan v. Downey,* 933 S.W.2d 316, 321 (Tex. App.-Houston [14th Dist.] 1996, writ denied) | |
| 46 | *Gee v. Liberty Mutual Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989) | |
| 47 | *Gould v. American-Hawaiian S.S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976). | |
| 48 | *Greil v. Geico*, 184 F. Supp. 2d 541, 544-45 (N.D. Tex. 2002 | |
| 49 | *Highland Capital Mgmt., L.P. v. Ryder Scott Co.*, 402 S.W.3d 719, 743 (Tex. App.-Houston 2012, no pet.). | |
| 50 | *In re Blech Secs. Litig.*, No. 94 Civ. 7696, 2003 U.S. Dist. LEXIS 559, at *29 (S.D.N.Y. Mar. 26, 2003). | |
| 51 | *In re Enron Corp. Sec., Derivative & ""ERISA" Litig.*, 490 F. Supp. 2d 784 (S.D. Tex. 2007) | |
| 52 | *In re Merrill Lynch & Co., Inc. Research Report Secs. Litig.*, 218 F.R.D. 76 (S.D.N.Y. 2003) | |
| 53 | *In re Tenet Healthcare Corp. Secs. Litig.*, No. 02-8426, 2007 U.S. Dist. LEXIS 97821, at *9 (C.D. Cal. Dec. 5, 2007) | |
| 54 | *Intec Sys., Inc. v. Lowrey*, 230 S.W.3d 913 (Tex. App.—Dallas 2007, no pet.) | |
| 55 | *Kniatt v. State*, 239 S.W.3d 910, 920 (Tex. App.-Waco 2007); | |
| 56 | *Koral Industries, Inc. v. Security-Connecticut Life Ins. Co.*, 788 S.W.3d 136, 142 (Tex. App. – Dallas (holding failure to exercise due diligence is not a defense to fraud), *writ denied*, 802 S.W.2d 650 (Tex. 1990) (per curiam). | |
| 57 | *Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex. 2001). | |

| | | |
|---|---|---|
| 58 | *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887 (2d Cir. 1976) | |
| 59 | *Lozano v. State*, 359 S.W.3d 790 (Tex. App.—Fort Worth 2012, pet. ref'd) | |
| 60 | *McCullough v. Scarbrough, Medlin & Associates, Inc.*, 435 S.W.3d 871 (Tex. App. – Dallas 2014, pet. denied) | |
| 61 | *McGuire v. Commercial Union Ins. Co. of New York*, 431 S.W.2d 347, 352 (Tex. 1968) | |
| 62 | *Nairn v. Killeen Indep. Sch. Dist.*, 366 S.W.3d 229, 250 (Tex. App.-El Paso 2012, no pet.) | |
| 63 | *New Jersey Turnpike Authority v. PPG Indus., Inc.*, 197 F.3d 96 (3rd Cir. 1999) | |
| 64 | *Option Resource Group v. Chambers Development Co., Inc.*, 967 F. Supp. 846 (W.D. Pa. 1996) | |
| 65 | *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996). | |
| 66 | *Pagare v. Pagare*, 344 S.W.3d 575, 582 (Tex. App.-Dallas 2011) | |
| 67 | *Rubinstein v. Collins*, 20 F.3d 160, 167-68 (5th Cir. 1994)). | |
| 68 | *Santiagos v. Novastar Mortg., Inc.*, 443 S.W.3d 462, 472 (Tex. App. -- Dallas 2014). | |
| 69 | *SEC v. Pentagon Capital Mgmt. PLC*, 722 F.Supp.2d 440 (S.D.N.Y. 2010) | |
| 70 | *Service Corp. Intern. v. Guerra*, 348 S.W.3d 221, 235 (Tex. 2011). | |
| 71 | *Sommers v. Concepcion*, 20 S.W.3d 27, 43 (Tex. App.-Houston [14th Dist.] 2000); | |
| 72 | *Spoljaric v. Percival Tours*, 708 S.W.2d 432, 434 (Tex. 1986) | |
| 73 | *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 839 (Tex. 2005) ( | |
| 74 | *Summers v. WellTech, Inc.*, 935 S.W.3d 228, 234 (Tex. App. – Houston [1st Dist.] 1996, no writ) | |

| | | |
|---|---|---|
| 75 | Tex. R. Evid. 803 | |
| 76 | *Texas Dept. of Pub. Safety v. Kaspar*, 369 S.W.3d 172 (Tex. 2012) | |
| 77 | *Texas Dept. of Pub. Safety v. Todd*, 05-13-01198-CV, 2014 WL 2628139 (Tex. App.—Dallas June 12, 2014, no pet.) | |
| 78 | *Texas Dept. of Public Safety v. Caruana* 363 S.W.3d 558, 559 (Tex. 2012). . | |
| 79 | *Texas Dept. of Transp. v. Able*, 35 S.W.3d 608 (Tex. 2000) | |
| 80 | Texas Securities Act, art. 581-33, TEX. REV. STAT. ANN. | |
| 81 | *Venegas v. State*, 2015 BL 19080 (Tex. App.-Dallas Jan. 27, 2015) | |
| 82 | *WordPerfect Corp. v. Financial Services Marketing Corp.*, 85 F.3d. 619 (1996) (unpublished opinion), 1996 WL 254830 (5th Cir. 1996 | |
| 83 | *Yeldell v. Goren*, 80 S.W.3d 634, 637 (Tex. App.-Dallas 2002, no pet.) | |

Respectfully submitted,

BRADEN W. SPARKS, P.C.

*/s/ Braden W. Sparks*
Braden W. Sparks
S.B.N 18874500

8333 Douglas Avenue
Suite 1000
Dallas, TX 75225

(214)750-3372
(214) 696-5971 Facsimile
brady@sparkslaw.com

S<small>HEPHERD</small>, S<small>MITH</small>, E<small>DWARDS</small> & K<small>ANTAS</small>, L.L.P.

*/s/ Samuel B. Edwards*
Samuel B. Edwards
Texas Bar No. 24031634
California Bar No. 237500
Michigan Bar No. P72583

1010 Lamar, Suite 900
Houston, TX 77002
(713) 227-2400
(713) 227-7215 Facsimile
sedwards@sseklaw.com

*Attorneys for Appellees*

**Certificate of Service**

I certify that a true and correct copy of the foregoing has been served on counsel for the parties to this appeal on this the 8th day of September, 2015.

Kenneth C Johnston
Kane Russell Coleman & Logan PC
1601 Elm Street, Ste 3700
Dallas, TX 75201
214-777-4200                                              Via eservice, email
214-777-4299 (fax)                                      and/or facsimile
kjohnston@krcl.com

*Attorney for Cross-Appellee Morgan*
*Keegan & Co., Inc.*


Peter S. Fruin
Maynard Cooper & Gale, PC
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
205-254-1068                                              Via eservice, email
205-254-1999 (fax)                                      and/or facsimile
pfruin@maynardcooper.com

*Attorney for Cross-Appellee Morgan*
*Asset Management Inc.*




/s/ Braden W. Sparks_____
Braden W. Sparks

# TAB 1

FILED
DALLAS COUNTY
6/16/2014 4:48:16 PM
GARY FITZSIMMONS
DISTRICT CLERK

CAUSE NO. DC-09-14448

| | | |
|---|---|---|
| PURDUE AVENUE INVESTORS LP, | § | IN THE DISTRICT COURT |
| MARY ANN HOWARD, AND DANA | § | |
| HOWARD, AS TRUSTEE OF THE | § | |
| MOLLY A. HOWARD TRUST, | § | |
| *PLAINTIFFS,* | § | |
| | § | |
| VS. | § | DALLAS COUNTY, TEXAS |
| | § | |
| MORGAN KEEGAN & CO., | § | |
| INC., MORGAN ASSET MANAGEMENT, | § | |
| INC., JAMES C. KELSOE, JR. AND | § | |
| THOMAS ORR. | § | |
| *DEFENDANTS.* | § | 101ST JUDICIAL DISTRICT |

---

## PLAINTIFFS' FIRST AMENDED ORIGINAL PETITION

---

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs, Purdue Avenue Investors, L.P., Mary Ann Howard, and Dana Howard, Trustee of the Molly A. Howard Trust (collectively, "Plaintiffs"), and file this, their First Amended Original Petition, and in support, would show the Court as follows:

### I.

### DISCOVERY CONTROL PLAN

1.    Plaintiffs intend to conduct discovery under Level 3 of the Texas Rules of Civil Procedure 190.4 because this is a relatively document-intensive case.

### II.

### NATURE OF THE CASE

2.    This is an action by family members and family-owned entities - a husband's and wife's family limited partnership, their daughter's educational trust, and the estate of the husband's

3288

TAB 1, p.1 of 14

Defendants will surely now claim, but rather, because of the funds' concentrated holdings of low-priority tranches in risky structured finance deals, backed by uncertain assets, which were acquired by the funds without full disclosure to investors.

13.    Defendants knew or should have known of the truth, yet they omitted, concealed, failed to disclose and/or misrepresented many material facts regarding the funds, including: 1) the nature of the risk being assumed by an investment in the funds; 2) the illiquidity of the securities in which the funds were invested; 3) that the funds were so over-invested in the securities at issue that they were devalued, over-priced or could not be accurately priced or "fair valued"; 4) that the funds were not sufficiently or properly subjected to "fair value" procedures; 5) the extent to which the values of such securities, and consequently, the Net Asset Values ("NAVs") of the funds were based on erroneous estimates, as well as failing to disclose the uncertainties and illogical assumptions inherent in such estimates; 6) the unrevealed and inappropriately high concentrations of investments in the mortgage industry, and in derivatives and other structured securities related thereto, which amplified the risks even further; 7) that the six funds sold to investors had the same overlapping, underlying investments, thereby further increasing risk, rendering "fair valuation" difficult or impossible, and reducing or eliminating true diversification between funds; and 8) as time went on, that the funds began using principal rather than interest to pay dividends, exacerbating the funds' losses while keeping investors in the dark.

14.    Morgan Keegan failed to disclose to the Plaintiffs and other investors the funds' high allocations of collateralized bond obligations ("CBOs"), collateralized loan obligations ("CLOs"), and collateralized mortgage obligations ("CMOs"), collectively called collateralized debt obligations ("CDOs"), and other Asset Backed Securities. The CDOs lost substantial value when the sub-prime market collapsed. This event caused the value of the Morgan Keegan bond funds to

plummet, resulting in significant losses for anyone who held interests in these funds, including Plaintiffs. Further, more losses were revealed when MAM sold the RMK Funds to Hyperion in July 2008. Upon taking over day-to-day management and pricing, a large percentage of the bonds were written down to zero in market value by Hyperion, underscoring the ongoing over-valuation and false representations made to investors by the Defendants prior to the sale.

15.     Investors have lost over $2 billion in the six proprietary RMK bond funds (four closed-end and two open-end funds) (collectively herein, the "RMK Funds") during the last few years. The four closed-end funds began with a cumulative value of $1.6 billion in net assets as of December 21, 2006. Morgan Keegan was lead underwriter for these funds and was responsible to the investing public, including the Plaintiffs, for full disclosure of all material risks. Together, the closed-end funds lost $1 billion in market value in 2007 and more in 2008. Plaintiffs invested in two of the closed-end funds – the RMK Advantage Income Fund ("RMA") and the RMK Strategic Income Fund ("RSF"). RMA lost over $281 million and RSF lost almost $377 million in market value in 2007, more in 2008. Virtually all of the losses were in the funds' holdings of low-priority asset-backed securities and resulted from risks not adequately disclosed to investors. The continuation of losses throughout 2008 resulted in even larger losses, a change in fund managers and in the value of each of the funds falling below $1 per share in NAV.

16.     As their value fell, Defendants attempted to claim that the losses were from a "flight to quality" or a "mortgage meltdown" in the industry. These assertions were material and false. A comparison between the values of the RMK Funds with the RMK Funds' claimed benchmarks shows that RMK's closed-end funds' precipitous losses in value, including RMA and RSF, were clearly not the result of a collapse in the high yield bond market or a "mortgage meltdown."

17.     The RMK Funds, including RMA and RSF, were represented and sold as high-yield bond

3293

addition to being understated, the asset-backed securities held by the funds were subordinated for almost all securities held. RMK misrepresented preferred shares and CDOs as preferred stock. For example, in the case of Webster CDO I Preferred Shares, and as corporate bonds in the case of Eirles Two Ltd. 263. Defendants also misclassified others, five of which were reclassified as below-investment-grade on March 31, 2008. The undisclosed risks to Plaintiffs and other investors included the funds' purchases of illiquid, low-priority preference shares, purchase of all or almost all of lower-level tranches, purchases of notes with face values far in excess of market value, and acquisition of highly leveraged investments in other highly leveraged investments subordinated to other indebtedness.

23.     The RMK Funds' prospectuses contained other material misrepresentations, including a comparison of the RMK Funds' performance to the Lehman Ba index, an index that is not a valid benchmark because it contains only corporate bonds, and none of the structured finance securities that were the Funds' primary holdings. These materials also failed to disclose that at least 47.3% to 59.4% of the RMK Funds' portfolios' holdings were asset-backed or other structured finance based on the Funds' annual reports; that almost all of these holdings were at or near the bottom of the investment's capital structure; failed to reflect the true NAV of portfolio holdings; failed to disclose the misleading nature of the prospectuses' diversification claims; failed to disclose that the funds were leveraged up many times over by complex capital structures; and failed to disclose that the funds were actually exposing investors to ten or more times the credit risk of the underlying, already risky debt, in exchange for only 1% or 2% higher returns than a diversified, transparent high-yield bond portfolio would have earned.

24.     Defendants made false material representations of fact to Plaintiffs, investors and the U.S. Securities & Exchange Commission ("SEC") by telling them that it did "in-depth evaluations" of

3295

false emphasis on the credit markets, widening spreads, economic uncertainty, the deteriorating housing market, high energy prices, investor uncertainty, downgrades, uncertainty in the real estate market in general, illiquidity and value perceptions. These claims merely masked the primary reasons for the RMK Funds' deterioration.

30. In a January 24, 2008 release to shareholders, Kelsoe was still advising investors that outside forces were to blame, and he took no responsibility for the poor choices that he and the other Defendants made in creating, selecting investments for, marketing and administering the RMK Funds.

31. The intended effect of these and other of Kelsoe's statements after losses were incurred in the funds was to give Plaintiffs false assurances, *i.e.,* to provide them with false hope and reason to believe that the RMK Funds' investments were likely to rebound along with other corporate bonds as the market rebounded.

## VII.

## PLAINTIFFS' INVESTMENTS IN RMA AND RSF

32. Based on the aforementioned misrepresentations and omissions made by the Defendants, Plaintiffs invested approximately $120,552 in RMA and $2,464,854 in RSF from April 2004 through August 2005, as follows:

|  | Shares | Purchase Date | Unit Cost | Cost Basis |
|---|---|---|---|---|
|  |  |  |  |  |
| **Purchased by Purdue Avenue Investors LLP:** |  |  |  |  |
| RMA | 4500 | 01/20/05 | 15.926 | 71,668 |
| RSF | 60,000 | 07/08/05 | 16.453 | 987,150 |
|  | 20,000 | 07/27/05 | 16.298 | 325,950 |
|  | 30,000 | 07/27/05 | 16.295 | 488.841 |
|  | 10,000 | 08/02/05 | 16.415 | 164,150 |
|  | 15,000 | 08/02/05 | 16.42 | 246,300 |
| **Total** |  |  |  | **$2,284,059** |
|  |  |  |  |  |

| Purchased by Mary Ann Howard | | | | |
|---|---|---|---|---|
| RSF | 6,400 | 04/23/04 | 14.8820 | 95,245 |
| | 7,000 | 07/29/04 | 15.422 | 107,954 |
| Total | | | | **$203,199** |
| | | | | |
| | | | | |
| Purchased by Molly A. Howard Trust | | | | |
| RMA | 3,000 | 07/06/05 | 16.295 | 48,884 |
| RSF | 3,000 | 07/06/05 | 16.442 | 49,264 |
| Total | | | | **$98,148** |

As a result of the actions referred to hereinabove, Plaintiffs have incurred cumulative realized losses of **$2,423,481**, including **$2,142,110** (Purdue), **$91,433** (Molly's Trust) and **$198,938** (Mary Ann's Estate).

## VIII.

## MISREPRESENTATIONS AND OMISSIONS

33. In connection with these inappropriate and unsuitable actions, Morgan Keegan used sales and marketing materials including prospectuses and updates that were misleading, marketed the funds with inadequate and misleading risk disclosures, was complicit in manipulating the pricing and return data of the funds, made claims of stable NAV values that were misleading, and marketed the funds using exaggerated credit rating averages. Morgan Keegan, MAM, Kelsoe and others made numerous misrepresentations and omissions of material facts necessary in order to make the statements that were made, in light of the circumstances under which they were made, not misleading. Such statements or omissions were made to the Plaintiffs and/or their agents and included, but were not limited to, the following:

a) Failure to disclose the true risks and speculative natures of the securities sold to them in the RMK Funds;

b) Investing at least 47.3% to 59.4% of RMK Funds' assets in the "same industry" (ABS) in direct violation of the prospectuses' Investment Limitation clause which stated that no more than 25% of the Funds' assets would be invested in "companies whose principal business activities are in the same industry"

3299

c) Failure to disclose that the RMK Funds' manager would not be properly supervised;

d) Failure to disclose that the RMK Funds contained a substantial amount of over-lapping and duplicative collateral;

e) Failure to disclose the extent of leverage involved in the RMK Funds;

f) Failure to fully and properly disclose the full extent of fees, commissions and profits being realized by Defendants in the sale of the proprietary bond funds and in the sale of the RMK Funds sold to the Plaintiffs;

g) Failure to disclose in its SEC filings the risks to which it was exposing investors by investing the majority of its bond funds' portfolios in subordinated tranches of asset-backed securities;

h) Misrepresenting hundreds of millions of dollars of asset-backed securities as corporate bonds and preferred stocks in its SEC filings, thereby making the funds seem less risky;

i) Using the same method, making the funds seem more diversified than they really were;

j) Misleading investors in its SEC filings and marketing materials by comparing its funds to the Lehman Brothers Ba Index, which contains only corporate bonds and no asset-backed securities;

k) Claiming that the funds were "diversified;"

l) Failing to disclose the illiquid nature of many of its investments;

m) Failing to disclose that the funds were not sufficiently subjected to fair value procedures;

n) Failing to disclose that the NAV values of the securities were based on inaccurate estimates or estimates with undisclosed uncertainties, resulting in faulty or unreliable NAVs;

o) Failing to reveal the high concentration of investments in the mortgage industry and in derivatives and other structured securities related thereto;

p) Failing to disclose the impact of the six funds' investments in the same overlapping underlying investments, thereby reducing or eliminating diversification;

q) Blaming the loss in value of the funds on a "market meltdown," a "mortgage meltdown" or a "flight to quality," or other market factors, in order to induce investors not to sell, or to purchase more shares as values plummeted;

r) Failing to use reasonable estimates of market prices in calculations of value;

3300

s) Mischaracterizing the funds as corporate bond funds, and misrepresenting the amount of structured finance securities held in the funds by comparing them to such funds;

t) Failing to disclose the impact of the funds' purchase of all or most of subordinated tranches in various already risky investments; and

u) Failing to disclose that the funds were using principal to pay interest, thereby falsely inducing investors into believing they were getting a higher rate of return; and

v) Misrepresenting and misreporting to the SEC the impact of structured debt obligations, low-priority tranches, risk calculations, and their effect in causing redistribution of credit risks.

34.    Defendants also violated NASD Rule 2310 (Suitability Considerations), NASD Notice to Members 93-73 (Members' Obligations to Customers When Selling Collateralized Mortgage Obligations), NASD Notice to Members 04-30 (reminder from NASD of sales practice obligations related to sale of bonds and bond funds), FINRA Notice to Members 08-81 (reminder from FINRA as to sales practice obligations in a high yield environment), NASD Rule 2210 (Communications with the Public), NASD IM 2310-2 (Fair Dealing with Customers), and ignored the obvious import of NASD Investor Literacy Research which advised members that 71% of investors understood the concept of a bond, only about half (51%) knew the definition of a "junk bond," and only 40% understood the relationship between bond prices and interest rates. Defendants also ignored NASD Rule 3010 (supervisory duties) and NASD NTM 04-30 (supervisory duties related to the sale of bonds and bond funds).

## IX.

## CLAIMS

### COUNT ONE

(Violations of Texas Securities Act; Aiding and Abetting; Control Persons)

35.    Plaintiffs re-allege all preceding paragraphs herein.

36.    The Defendants' offer and sale of the RMK Funds constitutes the offer and sale of a

security under the Texas Securities Act (the "State Act"). Defendants' statements, as set forth above, constitute untrue statements of material facts and omissions of material facts necessary in order to make the statements that were made, in light of the circumstances under which they were made, not misleading. These statements and omissions included the prospectuses, statements of additional understanding, public statements of the Defendants, including Kelsoe and others, and marketing materials and other materials submitted to the Plaintiffs which contain or were based upon further untrue statements of material facts, and which omit to state material facts necessary in order to make the statements that were made, in light of the circumstances under which they were made, not misleading.

37. The Defendants controlled, conspired with and aided and abetted one another in connection with the misrepresentations made by them.

38. Defendants are jointly and severally liable to Plaintiffs under the Texas Securities Act ("TSA"), art. 581-33, TEX. REV. STAT. ANN. Plaintiffs are entitled to recover the consideration paid by them, plus interest. Alternatively, Plaintiffs are entitled to damages, interest, and attorneys' fees.

<div align="center">

**COUNT TWO**

(Aider and Abettor Liability)

</div>

39. Plaintiffs re-allege all preceding paragraphs herein.

40. Defendants are persons who "materially aid[ed] a seller, buyer, or issuer of a security" having acted "with intent to deceive or defraud or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. art. 581-33F(2) (Vernon Supp.2004-2005). Each rendered assistance in the face of a perceived risk that his or its assistance would facilitate untruthful or unlawful activity by the primary violator(s) and each possessed a general awareness that his role was part of an

overall activity that is improper. Although neither had direct contact with the Plaintiffs, "the TSA does not require the aider to have had direct dealing with the defrauded party; indeed, a person who 'materially aids the seller' may have had no contact at all with investors." *Sterling Trust Co. v. Adderly*, 168 S.W.3d 835, 843 (Tex. 2005), *citing* TEX. REV. STAT. ANN. art. 581-33F(2). As a result, Defendants are jointly and severally liable for the offer, sale and delivery of the securities in issue and the losses that ensued.

41.     Defendants are jointly and severally liable to Plaintiffs under the Texas Securities Act ("TSA"), art. 581-33, TEX. REV. STAT. ANN. Plaintiffs are entitled to recover the consideration paid by them, plus interest. Alternatively, Plaintiffs are entitled to damages, interest, and attorneys' fees.

<div align="center">

**COUNT THREE**

(Control Person Liability)

</div>

42.     Defendants are liable as control persons.  Under art. 581-33F(1) of the TSA, "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist."

43.     Under the TSA, control "is used in the same broad sense as in federal securities law" and means "the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." Tex. Rev. Civ. Stat. Ann. art. 581-33F cmt.; *Barnes v. SWS Financial Services*, 97 S.W.3d 759, 763 (Tex.App.—Dallas 2003). The rationale for control person liability

is that "a control person is in a position to prevent the violation and may be able to compensate the injured investor when the primary violator (e.g. a corporate issuer which has gone bankrupt) is not." *Summers v. WellTech, Inc.,* 935 S.W.2d 228, 231 (Tex.App. —Houston [1 Dist.] 1996) (quoting commentary to art. 581-33F); *Texas Capital Securities Management, Inc. v. Sandefer*, 80 S.W.3d 260, 268 (Tex.App. —Texarkana 2002). ). Defendants had the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of the sellers and issuer of the securities, whether through the ownership of voting securities, by contract, or otherwise.

44.     Defendants are jointly and severally liable to Plaintiffs under the Texas Securities Act ("TSA"), art. 581-33, TEX. REV. STAT. ANN. Plaintiffs are entitled to recover the consideration paid by them, plus interest. Alternatively, Plaintiffs are entitled to damages, interest, and attorneys' fees.

<div align="center">

**COUNT FOUR**

(Common Law Fraud)

</div>

45.     Plaintiffs re-allege all preceding paragraphs herein.

46.     Defendants misrepresented material facts or failed to disclose material facts or conspired with persons misrepresenting material facts in order to cause the Plaintiffs purchase the RMA and RSF bond funds. Plaintiffs relied upon Defendants' representations to their detriment and were damaged thereby. Plaintiffs are entitled to recover from Defendants the consideration paid by them, plus interest. Alternatively, Plaintiffs are entitled to damages.

47.      The Defendants controlled, conspired with and aided and abetted one another in connection with the misrepresentations made by them.

Defendants' conduct is of the type that should be punished by an award of exemplary damages to

Plaintiffs.

48.    Defendants are jointly and severally liable.

## X.

## PRAYER

WHEREFORE, Plaintiffs pray that Defendants be cited to appear and answer, and, upon the trial hereof, that Plaintiffs have and recover from each of the Defendants, jointly and severally, each of the following:

1.    Actual consequential damages;
2.    Exemplary damages;
3.    Attorney's fees;
4.    Costs of court; and
5.    General relief.

Respectfully submitted,

SPARKS MACLEOD, PLLC

*/s/ Braden W. Sparks*
Braden W. Sparks
S.B.N 18874500
8333 Douglas Avenue
Suite 1000
Dallas, TX 75225
(214)750-3372
(214) 696-5971 Facsimile
brady@sparkslaw.com

SHEPHERD, SMITH, EDWARDS & KANTAS, L.L.P.

*/s/ Samuel B. Edwards*
Samuel B. Edwards
Texas Bar No. 24031634
California Bar No. 237500
Michigan Bar No. P72583

3305

1010 Lamar, Suite 900
Houston, TX 77002
(713) 227-2400
(713) 227-7215 Facsimile
sedwards@sseklaw.com

THE FRANKOWSKI FIRM


Richard S. Frankowski
S.B.N. ASB-1734H70F
231 22nd Street South
Suite 203
Birmingham, AL 35233
(205) 533-1968
(205) 390-1001 Facsimile
Richard@frankowskifirm.com


ATTORNEYS FOR PLAINTIFFS


## CERTIFICATE OF SERVICE


I hereby certify that on the 16th day of June, 2014, I served a copy of this document upon the individuals listed below as indicated.


Kenneth C Johnston
Kane Russell Coleman & Logan PC
1601 Elm Street, Ste 3700
Dallas, TX 75201
214-777-4200
214-777-4299 (fax)
kjohnston@krcl.com

Via ECF System, email
and/or facsimile

*Attorney for Morgan Keegan & Company
Inc and Thomas Orr*

3306

Peter S. Fruin
Maynard Cooper & Gale, PC
1901 Sixth Avenue North
2400 Regions Harbert Plaza
Birmingham, AL 35203
205-254-1068
205-254-1999 (fax)
pfruin@maynardcooper.com

*Attorney for Morgan Asset Management
Inc. and James C. Kelsoe, Jr.*

Via ECF System, email
and/or facsimile

*/s/ Braden W. Sparks*
Braden W. Sparks

3307

# TAB 2

# OVERSTATED ABS-UNDERSTATED MBS

## 2005 RMK Advantage Income Fund, Inc.

| # of Assets | Asset Category[1] | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 2 | Commercial Loans | 7.7% | | | | |
| 4 | Home Equity Loans (Non-High Loan to Value) | 4.9% | | | | |
| 7 | Manufactured Housing Loans | 7.3% | **70.8%** | **35.4%** | **1.9%** | **37.3%** |
| 14 | Home Equity Loans (Non-High Loan to Value) | 14.5% | | | | |
| 1 | Manufactured Housing Loans | 1.0% | | | | |
| **28** | | **35.4%** | | | | |

## 2005 RMK Strategic Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 11 | Home Equity Loans (Non-High Loan to Value | 9.2% | | | | |
| 1 | Manufactured Housing Loans | 1.3% | | | | |
| 13 | Commercial Loans | 14.9% | **87.3%** | **34.9%** | **3.3%** | **55.7%** |
| 20 | Home Equity Loans | 15.4% | | | | |
| 18 | Manufactured Housing Loans | 11.6% | | | | |
| **63** | | **52.4%** | | | | |

---

[1] In each chart in the Asset Category column please note these assets are claimed as ABS but in actuality they are MBS.

# OVERSTATED ABS-UNDERSTATED MBS

## 2006 RMK Advantage Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 6 | Home Equity Loans (Non-High Loan to Value) | 4.6% | | | | |
| 1 | Manufactured Housing | 0.4% | | | | |
| 17 | Home Equity Loans (Non-High Loan to Value | 12.2% | **64.4%** | **46.4%** | **3.3%** | **49.7%** |
| 5 | Manufactured Housing Loans | 0.5% | | | | |
| **29** | | **17.7%** | | | | |

## 2006 RMK Strategic Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 9 | Home Equity Loans (Non-High Loan to Value) | 4.6% | | | | |
| 1 | Manufactured Housing Loans | 0.5% | | | | |
| 3 | Commercial Loans | 1.2% | **55.1%** | **36.1%** | **20.8%** | **56.9%** |
| 17 | Home Equity Loans (Non-High Loan to Value) | 9.6% | | | | |
| 9 | Manufactured Housing Loans | 3.3% | | | | |
| **39** | | **19.2%** | | | | |

# OVERSTATED ABS-UNDERSTATED MBS

## 2007 RMK Advantage Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 8 | Home Equity Loans (Non-High Loan to Value) | 4.0% | | | | |
| 15 | Home Equity Loans (Non-High Loan to Value) | 6.5% | **19.7%** | **8.7%** | **19.5%** | **28.2%** |
| 1 | Manufactured Housing Loans | 0.1% | | | | |
| **24** | | **10.6%** | | | | |

## 2007 RMK Strategic Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 10 | Home Equity Loans (Non-High Loan to Value) | 3.6% | | | | |
| 1 | Manufactured Housing | 0.25% | | | | |
| 17 | Home Equity Loans (Non-High Loan to Value) | 4.7% | **54.2%** | **45.2%** | **9.6%** | **54.8%** |
| 2 | Manufactured Housing Loans | 0.1% | | | | |
| **30** | | **8.65%** | | | | |

EXHIBIT 18, page 3
Tab 2, p. 3 of 4
4399

# OVERSTATED ABS-UNDERSTATED MBS

## 2008 RMK Advantage Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 4 | Home Equity Loans (Non-High Loan to Value) | 1.9% | | | | |
| 1 | Manufactured Housing Loans | 2.7% | | | | |
| 8 | Home Equity Loans (Non-High Loan to Value) | 2.1% | **41.4%** | **34.4%** | **22.1%** | **56.5%** |
| 1 | Manufactured Housing Loans | 0.1% | | | | |
| **14** | | **6.8%** | | | | |

## 2008 RMK Strategic Income Fund, Inc.

| # of Assets | Asset Category | Asset Percentage | Claimed ABS | Actual ABS | Claimed MBS | Actual MBS |
|---|---|---|---|---|---|---|
| 3 | Home Equity Loans | 3.4% | | | | |
| 1 | Manufactured Housing Loans | 2.1% | | | | |
| 10 | Home Equity Loans | 0.7% | **39.2%** | **29.4%** | **35.4%** | **64.8%** |
| 1 | Manufactured Housing Loans | 0.1% | | | | |
| **15** | | **6.3%** | | | | |

EXHIBIT 18, page 4
Tab 2, p. 4 of 4
4400

# TAB 3

**Deborah Beaty**

| | |
|---|---|
| **From:** | Peter Fruin <PFruin@maynardcooper.com> |
| **Sent:** | Wednesday, July 23, 2014 6:08 PM |
| **To:** | Brady Sparks; Kenneth Johnston; Katy Eldridge; Sam Edwards; Henry Simpson (hsimpson@buschllp.com); Robert W. Gifford (RGifford@krcl.com); Michelle MacLeod |
| **Cc:** | Deborah Beaty |
| **Subject:** | RE: PUrdue |

Brady,

Are you asking for all the Prospecti and offering circulars for all the underlying holding of the funds? Assuming we had these, it would be several thousand documents many of which are more than 500 pages in length.

Kelsoe has testified on numerous occasions that hard copies of these documents were not kept as they were available electronically at the time. See for example footnotes 2-5 of McCann's expert report which demonstrates that some are still available on Edgar today. Moreover, McCann has testified many many time that he already has these documents.

If I am mistaken as to what you are requesting, please let me know.

Thanks

Peter


Peter S. Fruin
Office 205.254.1068
Cell 205.563.1068


-----Original Message-----
From: Brady Sparks [mailto:brady@sparkslaw.com]
Sent: Wednesday, July 23, 2014 1:49 PM
To: Peter Fruin; Kenneth Johnston; Katy Eldridge; Sam Edwards; Henry Simpson (hsimpson@buschllp.com); Robert W. Gifford (RGifford@krcl.com); Michelle MacLeod
Cc: Deborah Beaty
Subject: RE: PUrdue

Peter,

I'll ask Craig when he is available. Would you please (quickly) produce PDFs of the prospectuses, offering circulars, promissory notes and other instruments evidencing the underlying assets held by Advantage and Strategic? Not all the documents, just the offering documents or promissory notes, CDOs, CMOs, CLO These may all be in your 6.7 mil. Documents of production, but if so, we can't find them all. I'd appreciate it if you could do so right away, in part because Craig may need some of them. I don't know for sure, but he may.

Brady

Tab 3

EXHIBIT 27, page 1

4454

# TAB 4

Q. Did you have any set ideas as to how much of the fund would be invested in -- other than the parameters of the fund, the fund had certain parameters of where you could be with regards to stocks and things of that nature. Was there any set amount that you believed or ideas you had with regard to how much would be in corporate bonds versus how much would be in asset-backed securities?

A. No.

Testimony of James Kelsoe, 15:2-15, attached hereto as Exhibit D. Therefore, the statement that "Kelsoe knew and intended that the Funds would pursue a strategy of investing primarily in deeply subordinated tranches of structured, asset-based securities such as mortgage-backed securities, collateralized mortgage obligations, and collateralized debt obligations" cannot be true. Thus, the Court should eliminate the first sentence of Finding of Fact No. 19.

**Finding of Fact No. 20.** The Court should amend Finding of Fact No. 20 because it is contrary to the evidence presented at trial for two reasons. First, for the reasons set forth above regarding No. 19, a finding that "Mr. Kelsoe intended to invest the Funds" in "asset-backed securities" is contrary to the testimony of Mr. Kelsoe. Second, the evidence does not support the finding that the asset-backed securities in which the Funds invested were "far riskier than even 'junk'-grade corporate bonds." The evidence in the record demonstrated that prior to the financial crisis, the default rate for below investment grade asset-backed securities was lower than the default rate for below investment grade corporate bonds. Thus, the Court should eliminate Finding of Fact No. 20 as it is contrary to the evidence.

**Findings of Fact Nos. 21 and 22.** The Court should amend Findings of Fact Nos. 21 and 22 to remove the phrase "the quantities Kelsoe would purchase" from each of the findings. As set forth above, Mr. Kelsoe testified that at the time the prospectuses were issued he did not know the specific securities he was going to purchase. Therefore, it would be impossible to know the exact quantities of securities that were going to be purchased. The Court acknowledged

finding of fact is inadequate in that it fails to identify the specific material information that was misrepresented, omitted and concealed. Finally, this finding must be amended because it assumes Defendants were the issuers of the prospectuses, which as set forth above, is factually inaccurate and a fact that Plaintiffs do not dispute. Thus, based upon the facts in evidence, the Court should eliminate Finding of Fact No. 25.

**Finding of Fact No. 26.** The Court should amend Finding of Fact No. 26 as there is no evidence in the record that Defendants caused Plaintiffs' damages. Thus, the Court should eliminate this finding.

**Findings of Fact Nos. 27 and 28.** The Court should remove or amend Findings of Fact Nos. 27 and 28. First, the findings are unnecessary to support the judgment. Second, to categorically suggest that all of Defendants' expert's testimony was not credible, not relevant, and not reliable is wholly inappropriate and contrary to the record. There can be no dispute that the testimony provided by Defendants' expert was relevant to the claims in controversy as it related directly to issues in dispute and dealt in significant part with statements made by Plaintiffs' expert. Moreover, to categorically suggest that the testimony was not credible or reliable when much of that testimony was the introduction and explanation of industry accepted and/or government reports makes the categorization unsupportable. Thus, to the extent the Court does not remove the inappropriate and unnecessary findings, it should amend them to identify those specific portions of the testimony that the Court found to be not relevant, not credible, or not reliable.

## II. CONCLUSIONS OF LAW

### A. Additional Conclusion of Law.

Defendants request that the Court make the following additional conclusion of law:

1.  Plaintiffs' claims are barred by the statute of limitations.

As set forth above, Mr. Howard testified that he knew or should have known that the Funds invested more than 70% in asset-backed and mortgage-backed securities by the time the 2004 Semi-Annual report for the Funds was issued. Plaintiffs did not file their Original Petition until October 23, 2009—approximately five years later. Under the Texas Securities Act, "[n]o person may sue under Section 33A(2), 33C, or 33F so far as it relates to 33A(2) or 33C: (a) more than three years after discovery of the untruth or omission, or after discovery should have been made by the exercise of reasonable diligence." Tex. Rev. Civ. Stat. art. 581-33H(2)(a). Without question, Mr. Howard should have made discovery of the alleged omission more than three years prior to the filing of the Petition, and this conclusion of law should be added.

**B.      Amended Conclusions of Law.**

**Conclusion of Law No. 29.** The Court should amend Conclusion of Law No. 29 because it is not supported by the evidence. First, a primary violation of the securities laws under the Texas Securities Act Section 33C is not supported because the clear evidence—as noted above—was that the Funds, not Defendants, were the issuers of the securities and thus are the only entities that could be held liable under this section. Second, there are no findings of fact and no evidence in the record necessary to support a finding of secondary liability. Accordingly, the Court should eliminate this Conclusion of Law.

**Conclusion of Law No. 30.** The Court should amend and eliminate Conclusion of Law No. 30 because there are no findings of fact to support this conclusion, and the evidence did not support this conclusion.

**Conclusion of Law No. 31.** The Court should amend and eliminate Conclusion of Law No. 31 because there are no findings of fact to support the conclusion that Defendants were

# TAB 5

| PURDUE AVENUE INVESTORS, LP, | ) | IN THE DISTRICT COURT OF |
|---|---|---|
| MARY ANN HOWARD, INDIVIDUALLY, | ) | |
| AND DANA HOWARD, AS TRUSTEE OF | ) | DALLAS COUNTY, TEXAS |
| THE MOLLY A. HOWARD TRUST, | ) | |
| | ) | 101ST JUDICIAL DISTRICT |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MORGAN KEEGAN & COMPANY, INC., | ) | |
| MORGAN ASSET MANAGEMENT, INC., | ) | |
| JAMES C. KELSOE, JR., and | ) | |
| THOMAS ORR, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF PETER FRUIN

THE STATE OF ALABAMA      )

COUNTY OF JEFFERSON      )

BEFORE ME, the undersigned Notary Public, on this day personally appeared Peter Fruin, a person whose identity is known to me. After I administered an oath to him, upon his oath he said:

1. My name is Peter Fruin. I am over 18 years of age and am competent to make this affidavit. I have personal knowledge of the facts set forth herein, and those facts are true and correct to my personal knowledge.

2. I am currently an attorney at Maynard, Cooper & Gale PC, the law firm retained to represent Defendants in this litigation. I represented Defendants at the trial, including on the first day of trial, Tuesday, October, 14, 2014.

3. At the close of the first day of trial, on October 14, 2014, Judge Lowy called counsel of record to his office. During that meeting, I personally heard the Judge

03130889.1
AFFIDAVIT OF PETER FRUIN          Page 1

state, "I will not say this on the record but I am a student of the financial crisis. I would not spend much time talking about credit ratings because the rating agencies are part of the problem, no one should have relied upon their ratings."

Further, affiant sayeth not.

_____
Peter Fruin

SUBSCRIBED AND SWORN TO by Peter Fruin before me, the undersigned authority, on this the 21st day of January, 2015.

_Sheila S. Carden_____
Notary Public
In and For the State of _Alabama_

Exp.: 9-17-2017

03130889.1
AFFIDAVIT OF PETER FRUIN          Page 2

Tab 5, p. 2 of 2

EXHIBIT F          8447

# TAB 6



RMK

Advantage Income Fund, Inc.
High Income Fund, Inc.
Strategic Income Fund, Inc.

# RMK ADVANTAGE INCOME FUND, INC.
## Portfolio of Investments
### March 31, 2005

| Principal Amount/ Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| **ASSET BACKED SECURITIES – INVESTMENT GRADE - 15.6% OF NET ASSETS** | | | | |
| | *Collateralized Bond Obligation - 2.5%* | | | |
| 2,000,000 | E-Trade 2004-1A COM1, 2.00% 1/10/40 | BBB | $ 1,990,062 | $ 1,990,000 |
| 4,200,000 | Restructured Asset Backed 2003-3A A3, 2.56% 1/29/22 (a) | AA- | 3,356,057 | 3,344,250 |
| 5,000,000 | Witherspoon 2004-1A COM1, 11.50% 9/15/39 | BBB+ | 5,000,000 | 5,000,000 |
| | | | $10,346,119 | $10,334,250 |
| | *Commercial Loans - 0.4%* | | | |
| 2,000,000 | FFCA Secured Lending 1998-1 D1, 7.81% 1/18/17 (a) | BBB- | 1,581,650 | 1,580,000 |
| | *Equipment Leases - 6.8%* | | | |
| 8,586,169 | AERCO 2A A3, 2.863% 7/15/25 | BBB | 6,408,440 | 6,343,033 |
| 11,750,000 | Aircraft Finance Trust 1999-1A A1, 2.883% 5/15/24 | BBB | 8,208,671 | 8,136,875 |
| 3,000,000 | Aviation Capital 2000-1A A1, 3.07% 11/15/25 (a) | BBB | 2,251,788 | 2,272,080 |
| 15,000,000 | Lease Investment Flight Trust 1 A1, 2.49% 7/15/31 | BBB | 10,356,145 | 10,575,000 |
| | | | $27,225,044 | $27,326,988 |
| | *Home Equity Loans (Non-High Loan-To-Value) - 4.9%* | | | |
| 7,613,000 | Ace Securities 2004-HE3 M11, 5.46% 11/25/34 | BBB- | 6,240,150 | 6,927,830 |
| 3,000,000 | Ace Securities 2004-HE4 M11, 5.694% 12/25/34 | BBB- | 2,405,756 | 2,807,820 |
| 2,000,000 | First Franklin 2004-FF5, 8.594% 8/25/34 (a) | BBB | 2,000,000 | 2,000,000 |
| 8,375,214 | Long Beach Mortgage 2001-1 M2, 2.91% 4/21/31 | A | 8,132,764 | 8,097,827 |
| | | | $18,778,670 | $19,833,477 |
| | *Manufactured Housing Loans - 1.0%* | | | |
| 4,500,000 | Green Tree Financial 1996-9 M1, 7.63% 1/15/28 | BBB | 4,045,739 | 4,097,295 |
| **Total Asset Backed Securities - Investment Grade** | | | $61,977,222 | $63,172,010 |
| **ASSET BACKED SECURITIES – NON-INVESTMENT GRADE - 55.2% OF NET ASSETS** | | | | |
| | *Certificate-Backed Obligations - 2.4%* | | | |
| 5,000,000 | INCAPS Funding 2003-2A SIN, 10.00% 1/15/34 (a) | Non-rated | 4,851,929 | 4,850,000 |

6

# RMK ADVANTAGE INCOME FUND, INC.
## Portfolio of Investments
### March 31, 2005

| Principal Amount/ Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| 15,664,982 | Pegasus Aviation 2000-1 A1, 3.275% 3/25/15 (a) | B- | $ 8,388,683 | $ 8,282,859 |
| 18,000,000 | Pegasus Aviation 2001-1A A2, 2.667% 5/10/31 (a) | BB+ | 9,297,734 | 9,225,000 |
| | | | $38,743,571 | $38,502,429 |
| | *Franchise Loans - 7.4%* | | | |
| 5,000,000 | ACLB Business Trust 1999-1 A3, 7.385% 8/15/20 (a) | B+ | 4,389,886 | 4,475,450 |
| 2,723,041 | Captec Franchise 1999-1 A2, 7.278% 4/25/11 (a) | BB | 2,607,099 | 2,704,633 |
| 5,000,000 | Captec Franchise 2000-1 A2, 8.155% 6/15/13 (a) | BB- | 4,432,205 | 4,331,200 |
| 1,617,000 | Falcon Franchise 2001-1 F, 6.50% 1/5/23 | B | 1,204,639 | 1,066,137 |
| 12,927,024 | FMAC Loan Trust 1996-B A1, 7.629% 11/15/18 (a) | D | 9,593,456 | 9,303,980 |
| 1,425,163 | FMAC Loan Trust 1998-A A2, 6.50% 9/15/20 (a) | C | 934,177 | 932,655 |
| 10,289,956 | FMAC Loan Trust 1998-BA A2, 6.74% 11/15/20 (a) | C | 7,414,985 | 7,080,550 |
| | | | $30,576,447 | $29,894,605 |
| | *Home Equity Loans (Non-High Loan-To-Value) - 14.5%* | | | |
| 9,950,000 | Ace Securities 2004-HE3 B, 5.459% 11/25/34 (a) | BB+ | 7,535,031 | 8,557,000 |
| 2,000,000 | Ace Securities 2004-HE4 B, 5.694% 12/25/34 (a) | Non-rated | 1,426,391 | 1,722,820 |
| 4,463,000 | Ace Securities 2005-HE2 B1, 6.06% 4/25/35 (a) | Non-rated | 3,709,858 | 3,709,646 |
| 2,000,000 | Equifirst Mortgage 2004-3 B1, 5.708% 12/25/34 (a) | BB+ | 1,651,725 | 1,800,000 |
| 7,038,000 | Equifirst Mortgage 2004-3 B2, 5.708% 12/25/34 (a) | BB | 5,502,491 | 6,123,060 |
| 1,000,000 | Equifirst Mortgage 2005-1 B3, 6.08% 4/25/35 (a) | BB- | 827,626 | 827,500 |
| 1,757,000 | Equifirst Mortgage 2005-1 B4, 6.08% 4/25/35 (a) | Non-rated | 1,453,041 | 1,452,828 |
| 6,778,000 | First Franklin 2004-FF11 B1, 5.431% 1/25/35 (a) | Non-rated | 5,500,496 | 6,134,090 |
| 6,778,000 | First Franklin 2004-FF11 B2, 5.431% 1/25/35 (a) | Non-rated | 5,302,262 | 5,947,695 |
| 2,000,000 | GSAMP Trust 2004-AR1 B5, 5.00% 6/25/34 (a) | Non-rated | 1,552,348 | 1,550,000 |
| 4,097,781 | Long Beach Mortgage 2001-4 M3, 4.683% 3/25/32 | CCC+ | 3,658,258 | 3,483,114 |

MK/PURDUE00546

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| | *Tobacco - 0.9%* | | | |
| 4,715,000 | North Atlantic Trading, 9.25% Bond 3/1/12 | CCC | $ 4,533,054 | $ 3,536,250 |
| | *Transportation - 0.4%* | | | |
| 1,630,000 | Greyhound Lines, 11.50% Bond 4/15/07 | CCC- | 1,630,549 | 1,638,150 |
| | *Travel - 0.5%* | | | |
| 2,000,000 | Worldspan Financial, 9.024% Bond 2/15/11 (a) | CCC+ | 1,990,124 | 1,940,000 |
| **Total Corporate Bonds - Non-Investment Grade** | | | $113,901,251 | $109,015,385 |

## MORTGAGE BACKED SECURITIES - 1.9% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| | *Collateralized Mortgage Obligation - 1.9%* | | | |
| | Harborview Mortgage 2004-8 X, 1.446% 11/19/34 interest-only strips | AAA | 5,662,626 | 5,637,941 |
| 2,310,000 | Sasco Net Interest 2004-6XS B, 5.00% 3/28/34 (a) | BB+ | 2,110,401 | 2,107,875 |
| **Total Mortgage Backed Securities** | | | $ 7,773,027 | $ 7,745,816 |

## MUNICIPAL SECURITIES - 0.2% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| 1,250,000 | Pima County Arizona IDA Health Care, 8.50% 11/15/32 | Non-rated | 781,291 | 774,825 |

## COMMON STOCKS - 7.9% OF NET ASSETS

| Principal Amount / Shares | Description | Cost | Market Value (b) |
|---|---|---|---|
| 48,400 | American Capital Strategies, Ltd. | 1,552,413 | 1,520,244 |
| 61,710 | Andrx Corporation (c) | 1,246,878 | 1,398,966 |
| 54,600 | Anthracite Capital, Inc. | 605,776 | 608,244 |
| 6,100 | Bank of America Corporation | 276,281 | 269,010 |
| 7,000 | Best Buy Co., Inc. | 371,416 | 378,070 |
| 17,300 | Cimarex Energy Co. (c) | 663,081 | 674,700 |
| 51,800 | Cisco Systems, Inc. (c) | 929,234 | 926,702 |
| 4,600 | Cooper Cameron Corporation (c) | 256,469 | 263,166 |
| 14,000 | Cree, Inc. (c) | 300,495 | 304,500 |
| 15,300 | Exxon Mobil Corporation | 818,697 | 911,880 |
| 7,400 | First Data Corporation | 296,338 | 290,894 |
| 13,800 | Frontline Ltd. | 668,511 | 676,200 |
| 34,900 | Intersil Corporation | 526,478 | 604,468 |
| 44,000 | iShares Russell 3000 Value Index Fund | 3,668,540 | 3,766,840 |
| 14,600 | Kerr-McGee Corporation | 909,871 | 1,143,618 |
| 10,100 | Kinder Morgan Energy Partners, L.P. | 448,617 | 454,500 |
| 47,800 | Limited Brands, Inc. | 1,133,666 | 1,161,540 |

| Principal Amount/ Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| **ASSET BACKED SECURITIES – INVESTMENT GRADE - 26.2% OF NET ASSETS** | | | | |
| | *Collaterized Debt Obligation – 5.0%* | | | |
| 11,398,932 | Diversified Asset Securitization 1A A1, 7.873% 9/15/35 | AA | $11,762,181 | $11,940,381 |
| 4,000,000 | E-Trade 2004-1A COM1, 2.00% 1/10/40 | BBB | 3,980,105 | 3,980,000 |
| 2,400,000 | Restructured Asset Backed 2003-3A A3, 2.56% 1/29/22 (a) | AA- | 1,917,747 | 1,911,000 |
| | | | $17,660,033 | $17,831,381 |
| | *Commercial Loans - 4.3%* | | | |
| 11,483,386 | Atherton Franchisee 1999-A A2, 7.23% 4/15/12 (a) | A+ | 11,633,639 | 11,660,839 |
| 1,000,000 | FFCA Secured Lending 1998-1 D1, 7.81% 1/15/17 (a) | BBB- | 790,825 | 790,000 |
| 3,000,000 | GMAC Commercial Mortgage 1998-C1 F, 7.096% 5/15/30 | BBB- | 2,949,149 | 3,048,630 |
| | | | $15,373,613 | $15,499,469 |
| | *Equipment Leases - 4.9%* | | | |
| 8,586,169 | AERCO 2A A3, 2.86% 7/15/25 | BBB | 6,408,440 | 6,343,033 |
| 6,000,000 | Aircraft Finance Trust 1999-1A A1, 2.883% 5/15/24 | BBB | 4,193,875 | 4,155,000 |
| 3,000,000 | Aviation Capital Group 2000-1A A1, 3.07% 11/15/25 (a) | BBB | 2,251,788 | 2,272,080 |
| 7,000,000 | Lease Investment Flight Trust 1 A1, 2.87% 7/15/31 | BBB | 4,900,605 | 4,935,000 |
| | | | $17,754,708 | $17,705,113 |
| | *Franchise Loans - 1.5%* | | | |
| | FMAC Loan Trust 1997-C AX, 2.355% 12/15/19 interest-only strips (a) | BBB | 2,778,749 | 2,719,888 |
| 3,000,000 | Franchise Loan Trust 1998-I A3, 6.74% 7/15/20 (a) | BBB | 2,716,093 | 2,776,320 |
| | | | $ 5,494,842 | $ 5,496,208 |
| | *Home Equity Loans (Non-High Loan-To-Value) - 9.2%* | | | |
| 1,336,869 | Aames Mortgage Trust 2001-3 B, 7.13% 11/25/31 | BBB | 1,229,177 | 1,296,763 |
| 3,450,000 | Ace Securities 2004-HE2 B1, 5.311% 10/25/34 | BBB | 2,761,803 | 3,346,500 |
| 2,000,000 | Ace Securities 2004-HE4 M11, 5.694% 12/25/34 | BBB- | 1,603,838 | 1,871,880 |

*36*

| Principal Amount/ Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| 1,487,000 | Ace Securities 2004-HS1 M6, 4.59% 2/25/34 | BBB- | $ 1,446,598 | $ 1,486,976 |
| 2,057,073 | Amresco Residential Securities 1999-1 B, 5.09% 11/25/29 | BBB | 1,950,824 | 1,946,505 |
| 2,700,000 | First Franklin Mortgage 2004-FF2 N3, 8.835% 4/25/34 (a) | BBB | 2,700,000 | 2,713,500 |
| 2,750,000 | First Franklin Mortgage 2004-FF5 M9, 4.47% 8/25/34 | BBB- | 2,446,713 | 2,557,500 |
| 5,000,000 | Long Beach Mortgage 2004-4 M10, 4.615% 10/25/34 | BBB+ | 4,607,452 | 5,050,000 |
| 1,700,000 | NovaStar Home Equity 2004-3 B4, 5.238% 12/25/34 | BBB | 1,562,857 | 1,627,750 |
| 10,500,000 | Option One Mortgage 2004-2 M7, 4.65% 5/25/34 | BBB | 8,910,197 | 9,975,000 |
| 1,417,882 | Sail Net 2004-5A B, 6.75% 6/27/34 (a) | BBB | 1,383,703 | 1,382,846 |
| | | | $30,603,162 | $33,255,220 |
| | *Manufactured Housing Loans - 1.3%* | | | |
| 4,995,000 | Green Tree Financial 1996-9 M1, 7.63% 1/15/28 | BBB | 4,403,379 | 4,547,997 |
| **Total Asset Backed Securities - Investment Grade** | | | $91,289,737 | $94,335,388 |

## ASSET BACKED SECURITIES – NON-INVESTMENT GRADE - 61.1% OF NET ASSETS

| | | | | |
|---|---|---|---|---|
| | *Certificate-Backed Obligations - 3.3%* | | | |
| 1,000,000 | MM Community Funding II, 3.50% 12/15/31 (a) | Non-rated | 938,903 | 937,500 |
| 2,000,000 | MM community Funding IX, 10.00% 5/1/33 (a) | Non-rated | 1,941,063 | 1,940,000 |
| 2,000,000 | Preferred Term Securities IV, 6.98% 6/24/34 (a) | BB | 2,029,762 | 2,030,000 |
| 1,000,000 | Preferred Term Securities XV, 9/26/34 (a) (f) | Non-rated | 1,000,000 | 1,055,900 |
| 4,000,000 | Preferred Term Securities XVI, 3/23/35 (a) (f) | Non-rated | 4,000,000 | 4,079,440 |
| 1,000,000 | US Capital Funding II, 6.90% 8/1/34 | Non-rated | 1,000,000 | 1,000,000 |
| 1,000,000 | US Capital Funding III, 14.00% 12/1/35 | Non-rated | 1,000,000 | 1,000,000 |
| | | | $11,909,728 | $12,042,840 |
| | *Collaterized Debt Obligation - 4.1%* | | | |
| 2,000,000 | Crest 2000-1A D, 10.00% 8/31/36 | BB | 1,400,295 | 1,405,000 |
| 3,000,000 | Hewett's Island 2004-1A COM, 12/15/16 (f) | BB | 3,000,000 | 3,000,000 |

*37*

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| | *Travel - 0.3%* | | | |
| 1,000,000 | Worldspan Financial, 9.024% Bond 2/15/11 (a) | CCC+ | $ 997,620 | $ 970,000 |
| **Total Corporate Bonds - Non-Investment Grade** | | | $97,306,977 | $93,078,045 |

## MORTGAGE BACKED SECURITIES – INVESTMENT GRADE - 3.3% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| | *Collateralized Mortgage Obligation - 3.3%* | | | |
| | Harborview Mortgage 2004-1 X, 1.90% 4/19/34 interest-only strips | AAA | 2,736,980 | 1,841,475 |
| | Harborview Mortgage 2004-8 X, 0.50% 11/19/34 interest-only strips | AAA | 2,864,456 | 2,818,971 |
| | Mellon Residential 2004-TBC1 X, 0.716% 2/26/34 interest-only strips (a) | AAA | 1,384,555 | 1,222,989 |
| 2,960,648 | Structured Asset Securities 1999-SP1, 9.00% 5/25/29 | BBB | 3,003,256 | 2,962,919 |
| 3,651,000 | Structured Asset Securities 2004-8 B2, 5.00% 9/25/34 | BBB- | 3,105,982 | 3,075,164 |
| **Total Mortgage Backed Securities - Investment Grade** | | | $13,095,229 | $11,921,518 |

## GOVERNMENT AGENCY SECURITIES - 2.1% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| | Fannie Mae 1998-M7 N, 1.057% 5/25/36 interest-only strips (c) | Non-rated | 3,707,404 | 2,553,225 |
| | GNMA 2003-64 XA, 1.20% 8/16/43 interest-only strips (c) | Non-rated | 9,699,772 | 4,873,072 |
| **Total Government Agency Securities** | | | $13,407,176 | $ 7,426,297 |

## MUNICIPAL SECURITIES - 0.2% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| 1,000,000 | Pima County Arizona IDA Health Care, 8.50% 11/15/32 | Non-rated | 625,032 | 619,860 |

## COMMON STOCKS - 13.1% OF NET ASSETS

| Principal Amount / Shares | Description | NRSRO Rating (Unaudited) | Cost | Market Value (b) |
|---|---|---|---|---|
| 75,562 | American Capital Strategies, Ltd. | | 2,284,869 | 2,373,402 |
| 87,000 | Andrx Corporation (d) | | 1,729,944 | 1,972,290 |
| 85,800 | Anthracite Capital, Inc. | | 974,214 | 955,812 |
| 8,800 | Bank of America Corporation | | 350,245 | 388,080 |
| 10,800 | Best Buy Co., Inc. | | 572,234 | 583,308 |
| 2,400 | BP Prudhoe Bay Royalty Trust | | 94,360 | 167,520 |
| 27,000 | Cimarex Energy Co. (d) | | 1,035,565 | 1,053,000 |
| 79,900 | Cisco Systems, Inc. (d) | | 1,429,540 | 1,429,411 |
| 6,900 | Cooper Cameron Corporation (d) | | 384,521 | 394,749 |
| 21,800 | Cree, Inc. (d) | | 467,913 | 474,150 |
| 10,800 | Devon Energy Corporation | | 389,070 | 515,700 |
| 24,200 | Exxon Mobil Corporation | | 1,299,447 | 1,442,320 |

# TAB 7

CONFIDENTIAL

**RMK Strategic Income Fund, Inc.**
(a Maryland Corporation)
21,000,000 Shares of Common Stock
Par Value $.0001 Per Share

UNDERWRITING AGREEMENT

March 18, 2004

Morgan Keegan & Company, Inc.
50 North Front Street, 19ᵗʰ Floor
Memphis, TN 38103

Ladies and Gentlemen:

RMK Strategic Income Fund, Inc., a Maryland corporation (the "Fund"), and the Fund's investment adviser, Morgan Asset Management, Inc., a Tennessee corporation (the "Adviser"), each confirms its agreement with Morgan Keegan & Company, Inc. ("Morgan Keegan") and Advest, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Ferris, Baker Watts, Incorporated, Legg Mason Wood Walker, Incorporated, McDonald Investments Inc., a KeyCorp Company, Oppenheimer & Co. Inc., RBC Capital Markets Corporation, Stephens Inc., Sterne, Agee & Leach, Inc., Stifel, Nicolaus & Company, Incorporated, SunTrust Capital Markets, Inc., C.E. Unterberg, Towbin and Wedbush Morgan Securities Inc. and each of the other Underwriters named in Schedule A hereto (collectively, the "Underwriters"), for whom Morgan Keegan and Advest, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Ferris, Baker Watts, Incorporated, Legg Mason Wood Walker, Incorporated, McDonald Investments Inc., a KeyCorp Company, Oppenheimer & Co. Inc., RBC Capital Markets Corporation, Stephens Inc., Sterne, Agee & Leach, Inc., Stifel, Nicolaus & Company, Incorporated, SunTrust Capital Markets, Inc., C.E. Unterberg, Towbin and Wedbush Morgan Securities Inc. are acting as representatives (in such capacity, the "Representatives"), with respect to the issue and sale by the Fund and the purchase by the Underwriters, acting severally and not jointly, of the respective number of shares of common stock, par value $.0001 per share, of the Fund ("Common Shares") set forth in Schedule A hereof, and with respect to the grant by the Fund to the Underwriters, acting severally and not jointly, of the option described in Section 2(b) hereof to purchase all or any part of 3,150,000 additional Common Shares to cover over-allotments, if any. The aforesaid 21,000,000 Common Shares (the "Primary Shares") to be purchased by the Underwriters and all or any part of the 3,150,000 Common Shares subject to the option described in Section 2(b) hereof (the "Option Shares") are collectively referred to as the "Shares."

The Fund understands that the Underwriters propose to make a public offering of the Shares as soon as the Representatives deem advisable after this Agreement has been executed and delivered.

The Fund has filed with the Securities and Exchange Commission (the "Commission") a registration statement on Form N-2 (File Nos. 333-111990 and 811-21487) covering the

1

registration of the Shares under the Securities Act of 1933, as amended (the "1933 Act"), including the related preliminary prospectus or prospectuses, and a notification on Form N-8A of registration of the Fund as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations of the Commission under the 1933 Act and the 1940 Act (the "Rules and Regulations"). Promptly after execution and delivery of this Agreement, the Fund will either (i) prepare and file a prospectus in accordance with the provisions of Rule 430A ("Rule 430A") and paragraph (c) or (h) of Rule 497 ("Rule 497") of the Rules and Regulations or (ii) if the Fund has elected to rely upon Rule 434 ("Rule 434") of the Rules and Regulations, prepare and file a term sheet (a "Term Sheet") in accordance with the provisions of Rule 434 and Rule 497. The information included in any such prospectus, that was omitted from such registration statement at the time it became effective but that is deemed to be part of such registration statement at the time it became effective, if applicable, (a) pursuant to paragraph (b) of Rule 430A is referred to as "Rule 430A Information" or (b) pursuant to paragraph (d) of Rule 434 is referred to as "Rule 434 Information." Each prospectus used before such registration statement became effective, and any prospectus that omitted, as applicable, the Rule 430A Information or the Rule 434 Information, that was used after such effectiveness and prior to the execution and delivery of this Agreement, including in each case any statement of additional information incorporated therein by reference, is herein called a "preliminary prospectus." Such registration statement, including the exhibits and schedules thereto at the time it became effective and including the Rule 430A Information or the Rule 434 Information, as applicable, is herein called the "Registration Statement." Any registration statement filed pursuant to Rule 462(b) of the Rules and Regulations is herein referred to as the "Rule 462(b) Registration Statement," and the term "Registration Statement" shall include any Rule 462(b) Registration Statement that shall have been filed. The final prospectus in the form first furnished to the Underwriters for use in connection with the offering of the Shares, including the statement of additional information incorporated therein by reference, is herein called the "Prospectus." If Rule 434 is relied on, the term "Prospectus" shall refer to the preliminary prospectus dated February 24, 2004, including the statement of additional information incorporated therein by reference, together with the Term Sheet and all references in this Agreement to the date of the Prospectus shall mean the date of the Term Sheet. For purposes of this Agreement, all references to the Registration Statement, any preliminary prospectus, the Prospectus or any Term Sheet or any amendment or supplement to any of the foregoing shall be deemed to include the copy filed with the Commission pursuant to its Electronic Data Gathering, Analysis and Retrieval system ("EDGAR").

All references in this Agreement to financial statements and schedules and other information which is "contained," "included" or "stated" in the Registration Statement, any preliminary prospectus or the Prospectus (or other references of like import) shall be deemed to mean and include all such financial statements and schedules and other information which are incorporated by reference in the Registration Statement, any preliminary prospectus or the Prospectus, as the case may be.

SECTION 1.    REPRESENTATIONS AND WARRANTIES.

(a) Representations and Warranties by the Fund and the Adviser. The Fund and the Adviser represent and warrant to each Underwriter as of the date hereof, as of the Closing

2

Time referred to in Section 2(c) hereof, and as of each Date of Delivery (if any) referred to in Section 2(b) hereof, and agree with each Underwriter, as follows:

(i) <u>Compliance with Registration Requirements</u>. Each of the Registration Statement and any Rule 462(b) Registration Statement has become effective under the 1933 Act and no stop order suspending the effectiveness of the Registration Statement or any Rule 462(b) Registration Statement has been issued under the 1933 Act, or order of suspension or revocation of registration pursuant to Section 8(e) of the 1940 Act, and no proceedings for any such purpose, have been instituted or are pending or, to the knowledge of the Fund or the Adviser, are contemplated by the Commission, and any request on the part of the Commission for additional information has been complied with.

At the respective times the Registration Statement, any Rule 462(b) Registration Statement and any post-effective amendment thereto (filed before the Closing Time) became effective and at the Closing Time, as hereinafter defined (and, if any Option Shares are purchased, at the Date of Delivery), the Registration Statement, the Rule 462(b) Registration Statement, the notification of Form N-8A and all amendments and supplements thereto complied and will comply in all material respects with the requirements of the 1933 Act, the 1940 Act and the Rules and Regulations and did not and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Neither the Prospectus nor any amendment or supplement thereto, at the time the Prospectus or any such amendment or supplement was issued and at the Closing Time (and, if any Option Shares are purchased, at the Date of Delivery), included or will include an untrue statement of a material fact or omitted or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. If Rule 434 is used, the Fund will comply with the requirements of Rule 434 and the Prospectus shall not be "materially different," as such term is used in Rule 434, from the prospectus included in the Registration Statement at the time it became effective. The representations and warranties in this subsection shall not apply to statements in or omissions from the Registration Statement or Prospectus made in reliance upon and in conformity with information furnished to the Fund by or on behalf of any Underwriter for use in the Registration Statement or Prospectus.

Each preliminary prospectus and the prospectus filed as part of the Registration Statement as originally filed or as part of any amendment thereto, or filed pursuant to Rule 497 under the 1933 Act, complied when so filed in all material respects with the Rules and Regulations and each preliminary prospectus and the Prospectus delivered to the Underwriters for use in connection with this offering was identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

If a Rule 462(b) Registration Statement is required in connection with the offering and sale of the Shares, the Fund has complied or will comply with the requirements of Rule 111 under the 1933 Act and the rules and regulations relating to the payment of filing fees thereof.

3

(ii) <u>Independent Accountants</u>. The accountants who certified the statement of assets and liabilities included in the Registration Statement have confirmed to the Fund their status as independent public accountants as required by the 1933 Act and the Rules and Regulations and the Fund and the Adviser have no reason to believe that they are not independent public accountants.

(iii) <u>Financial Statements</u>. The statement of assets and liabilities included in the Registration Statement and the Prospectus, together with the related notes, presents fairly in accordance with generally accepted accounting principals ("GAAP") in all material respects the financial position of the Fund at the date indicated and has been prepared in conformity in all material respects with GAAP.

(iv) <u>No Material Adverse Change</u>. Since the respective dates as of which information is given in the Registration Statement and the Prospectus, except as otherwise stated therein, (A) there has been no material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Fund, whether or not arising in the ordinary course of business (other than as a result of changes in market conditions generally) (a "Material Adverse Effect"), (B) there have been no transactions entered into by the Fund, other than those in the ordinary course of business, which are material with respect to the Fund, and (C) there has been no dividend or distribution of any kind declared, paid or made by the Fund on any class of its capital stock.

(v) <u>Good Standing of the Fund</u>. The Fund has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Maryland and has the corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Prospectus and to enter into and perform its obligations under this Agreement; and the Fund is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure so to qualify or to be in good standing would not result in a Material Adverse Effect.

(vi) <u>No Subsidiaries</u>. The Fund has no subsidiaries.

(vii) <u>Investment Company Status</u>. The Fund is duly registered with the Commission under the 1940 Act as a diversified, closed-end management investment company, and no order of suspension or revocation of such registration has been issued or proceedings therefor initiated or, to the Fund's knowledge, threatened by the Commission.

(viii) <u>Officers and Directors</u>. No person is serving or acting as an officer, director or investment adviser of the Fund except in accordance with the provisions of the 1940 Act and the Rules and Regulations and the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and the rules and regulations of the Commission promulgated under the Advisers Act (the "Advisers Act Rules and Regulations"). Except as disclosed in the Registration Statement or Prospectus, to the Fund's knowledge after due inquiry, no director of the Fund is an "interested person" (as defined in the 1940 Act)

4

each amendment (except any post-effective amendment required by Rule 8b-16 of the 1940 Act which is filed with the Commission after the later of (x) one year from the date of this Agreement or (y) the date on which the distribution of the Shares is completed) thereto (without exhibits) for each of the Underwriters. The copies of the Registration Statement and each amendment thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(iv) <u>Delivery of Prospectuses</u>. The Fund has delivered to each Underwriter, without charge, as many copies of each preliminary prospectus as such Underwriter reasonably requested, and the Fund hereby consents to the use of such copies for purposes permitted by the 1933 Act. The Fund will furnish to each Underwriter, without charge, during the period when the Prospectus is required to be delivered under the 1933 Act or the 1934 Act, such number of copies of the Prospectus (as amended or supplemented) as such Underwriter may reasonably request. The Prospectus and any amendments or supplements thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(v) <u>Continued Compliance with Securities Laws</u>. If at any time when a prospectus is required by the 1933 Act to be delivered in connection with sales of the Shares, any event shall occur or condition shall exist as a result of which it is necessary, in the reasonable opinion of counsel for the Underwriters or for the Fund, to amend the Registration Statement or amend or supplement the Prospectus in order that the Prospectus will not include any untrue statements of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances existing at the time it is delivered to a purchaser, or if it shall be necessary, in the opinion of such counsel, at any such time to amend the Registration Statement or amend or supplement the Prospectus in order to comply with the requirements of the 1933 Act or the Rules and Regulations, the Fund will promptly prepare and file with the Commission, subject to Section 3(a)(ii), such amendment or supplement as may be necessary to correct such statement or omission or to make the Registration Statement or the Prospectus comply with such requirements, and the Fund will furnish to the Underwriters such number of copies of such amendment or supplement as the Underwriters may reasonably request.

(vi) <u>Blue Sky Qualifications</u>. The Fund will use its best efforts, in cooperation with the Underwriters, to qualify the Shares for offering and sale under the applicable securities laws of such states and other jurisdictions of the United States as the Representatives may designate and to maintain such qualifications in effect so long as required for the distribution of the Shares; provided, however, that the foregoing shall not apply to the extent that the Shares are "covered securities" that are exempt from state regulation of securities offerings pursuant to Section 18 of the 1933 Act; and provided, further, that the Fund shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or as a dealer in securities in any jurisdiction in which it is not so qualified or to subject itself to taxation in respect of doing business in any jurisdiction in which it is not otherwise so subject.

13

CONFIDENTIAL

If the foregoing is in accordance with your understanding of our agreement, please sign and return to us a counterpart hereof, whereupon this instrument, along with all counterparts, will become a binding agreement among the Underwriters, the Fund and the Adviser in accordance with its terms.

Very truly yours,

**RMK STRATEGIC INCOME FUND, INC.**

By: *Charles A Maxwell*

Name: Charles D. Maxwell
Title: Secretary and Assistant Treasurer

**MORGAN ASSET MANAGEMENT, INC.**

By: *Charles D Maxwell*

Name: Charles D. Maxwell
Title: Secretary and Treasurer

CONFIRMED AND ACCEPTED,
as of the date first above written:

Morgan Keegan & Company, Inc.
Advest, Inc.
BB&T Capital Markets, a division of Scott & Stringfellow, Inc.
Ferris, Baker Watts, Incorporated
Legg Mason Wood Walker, Incorporated
McDonald Investments Inc., a KeyCorp Company
Oppenheimer & Co. Inc.
RBC Capital Markets Corporation
Stephens Inc.
Sterne, Agee & Leach, Inc.
Stifel, Nicolaus & Company, Incorporated
SunTrust Capital Markets, Inc.
C.E. Unterberg, Towbin
Wedbush Morgan Securities Inc.

By: **MORGAN KEEGAN & COMPANY, INC.**

By: *Susan Brown*

Authorized Signatory

For itself and as Representatives of the other
Underwriters named in Schedule A hereto.

25

# TAB 8

CONFIDENTIAL

## ADMINISTRATION AGREEMENT

THIS ADMINISTRATION AGREEMENT ("Agreement") is made this 18th day of November 2004 by and between RMK STRATEGIC INCOME FUND, INC. (the "Fund"), a Maryland corporation, having its principal place of business at Fifty North Front Street, Memphis, Tennessee 38103, and MORGAN KEEGAN & COMPANY, INC. (the "Administrator"), a Tennessee corporation, having its principal place of business at Fifty North Front Street, Memphis, Tennessee 38103.

WHEREAS, the Fund, a closed-end, diversified management investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act"), wishes to retain the Administrator to provide administrative services to the Fund; and

WHEREAS, the Administrator is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1.  Appointment of the Administrator. The Fund hereby appoints the Administrator to act as the administrator for the Fund for the period, in the manner, and on the terms set forth in this Agreement. The Administrator hereby accepts such appointment and agrees during such period to render the services and to assume the obligations herein set forth. The Administrator shall for all purposes herein be deemed to be an independent contractor and shall, except as expressly provided or authorized (whether herein or otherwise), have no authority to act for or represent the Fund in any way or otherwise be deemed an agent of the Fund

2.  Administrative Services. As administrator, and subject to the supervision and control of the Board of Directors of the Fund, the Administrator shall perform (or supervise the performance by others) and will provide facilities, equipment and personnel to carry out the following administrative services for operation of the business and affairs of the Fund:

    (i)   furnish without cost to the Fund, or pay the cost of, such office space, office equipment and office facilities as are adequate for the needs of the Fund;

    (ii)  provide, without remuneration from or other cost to the Fund, the services of individuals competent to perform all of the executive, administrative and clerical functions of the Fund that are not performed by employees or other agents engaged by the Fund or by the Administrator acting in some other capacity pursuant to a separate agreement or arrangement with the Fund;

    (iii) assist the Fund in selecting and coordinating the activities of the other agents engaged by the Fund, including the Fund's dividend disbursing agent, custodian, independent public accountants and legal counsel;

    (iv)  authorize and permit the Administrator's directors, officers or employees who

DC-618049 v2 0307615-0100

CONFIDENTIAL

may be elected or appointed as officers of the Fund or directors of the Fund to serve in such capacities, without remuneration from or other cost to the Fund;

(v)    assure that all financial, accounting and other records required to be maintained and preserved by the Fund are maintained and preserved by it or on its behalf in accordance with applicable laws and regulations;

(vi)    assist in the preparation of (but not pay for) all periodic reports by the Fund to stockholders of the Fund and all reports and filings required to maintain the registration, qualification and listing on a national securities exchange of the Fund and the shares of the Fund, or to meet other regulatory or tax requirements applicable to the Fund or the shares of the Fund, under federal and state securities and tax laws;

(vii)    respond to telephonic and in-person inquiries from existing stockholders or their representatives requesting information regarding matters such as stockholder account or transaction status, net asset value of Fund shares, and Fund performance, Fund services, plans and options, Fund investment policies, Fund portfolio holdings, and Fund distributions and classification thereof for tax purposes;

(viii)    handle stockholder complaints and correspondence directed to or brought to the attention of the Administrator; generate or develop and distribute special data, notices, reports, programs and literature required by large stockholders, by stockholders with specialized informational needs, or by stockholders generally in light of developments, such as changes in tax laws; and

(ix)    provide such other services required by the Fund as the parties may from time to time agree in writing are appropriate to be provided under this Agreement.

3.    Books and Records. The Administrator shall maintain customary records in connection with its duties as specified in this Agreement. Any records required to be maintained and preserved pursuant to Rules 31a-1 and 31a-2 under the 1940 Act which are prepared or maintained by the Administrator on behalf of the Fund shall be the property of the Fund and will be made available or surrendered to the Fund promptly upon request. In the case of any request or demand for the inspection of such records by another party, the Administrator shall notify the Fund and follow the Fund's instructions as to permitting or refusing such inspection.

4.    Reports. The Administrator shall furnish to or place at the disposal of the Fund such information, evaluations, analyses and opinions formulated or obtained by the Administrator in the discharge of its duties as the Fund may, from time to time, reasonably request. The Fund shall furnish the Administrator with such documents and information with regard to its affairs as the Administrator may, at any time or from time to time, reasonably request in order to discharge its obligations under this Agreement.

5.    Fund Personnel. The Administrator agrees to permit individuals who are

2

CONFIDENTIAL

directors, officers or employees of the Administrator to serve (if duly appointed or elected) as directors, officers or employees of the Fund, without remuneration from or other cost to the Fund.

6.    Expenses.   The Administrator shall be responsible for expenses incurred in providing office space, equipment and personnel as may be necessary or convenient to provide administrative services to the Fund, including the payment of all fees, expenses and salaries of the directors, officers or employees of the Fund who are directors, officers or employees of the Administrator.   The Fund shall bear the expense of its operation, except those specifically allocated to the Administrator under this Agreement or under any separate agreement between the Fund and the Administrator.   Subject to any separate agreement or arrangement between the Fund and the Administrator, the expenses hereby allocated to the Fund, and not to the Administrator, include, but are not limited to:  (i) organizational expenses; (ii) legal and audit expenses; (iii) borrowing expenses; (iv) interest; (v) taxes; (vi) governmental fees; (vii) fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; (viii) the cost (including brokerage commissions or charges, if any) of securities purchased or sold by the Fund and any losses incurred in connection therewith; (ix) fees of custodians, transfer agents, registrars or other agents; (x) expenses of preparing share certificates; (xi) expenses relating to the redemption or repurchase of shares; (xii) expenses of registering and qualifying shares for sale under applicable federal law and maintaining such registrations and qualifications; (xiii) expenses of preparing, setting in print, printing and distributing prospectuses, proxy statements, reports, notices and dividends to stockholders; (xiv) cost of stationery; (xv) costs of stockholders and other meetings of the Fund; (xvi) compensation and expenses of the independent directors of the Fund; (xvii) the Fund's portion of premiums of any fidelity bond and other insurance covering the Fund and its officers and directors; and (xviii) the fees and other expenses of listing and maintaining the Fund's shares on the New York Stock Exchange or any other national stock exchange.

7.    Compensation.   As compensation for the services performed hereunder, the Administrator shall receive from the Fund an administration fee at the annual rate of 0.15% of the Fund's average daily total assets minus liabilities (other than the aggregate indebtedness entered into for purposes of leverage) ("Managed Assets").   This administration fee shall be payable monthly as soon as practicable after the last day of each month based on the average of the daily values placed on the Managed Assets of the Fund as determined at the close of business on each day throughout the month.  The Managed Assets of the Fund will be valued as of the close of regular trading on the New York Stock Exchange (currently 4:00 p.m., Eastern time) on each business day throughout the month or, if the Fund lawfully determines the value of its Managed Assets as of some other time on each business day, as of such time.  The first payment of such fee shall be made as promptly as possible at the end of the month next succeeding the effective date of this Agreement.   In the event that the Administrator's right to such fee commences on a date other than the first day of the month, the fee for such month shall be based on the average daily Managed Assets of the Fund in that period from the date of commencement to the last day of the month.  If the Fund determines the value of its Managed Assets more than once on any business day, the last such determination on that day shall be deemed to be the sole determination on that day. The value of the Managed Assets shall be determined pursuant to the applicable provisions of the Fund's Articles of Incorporation, its By-Laws and the 1940 Act. If,

3

CONFIDENTIAL

IN WITNESS WHEREOF the parties have caused this instrument to be signed on their behalf by their respective officers thereunto duly authorized all as of the date first written above.

RMK STRATEGIC INCOME FUND, INC.

By: *[signature]*

    Name:  Charles D. Maxwell
    Title:  Secretary and Assistant Treasurer

MORGAN KEEGAN & COMPANY, INC.

By: *[signature]*

    Name:  Charles D. Maxwell
    Title:  Assistant Treasurer and Assistant Secretary

7

# TAB 9

CONFIDENTIAL

# ADDITIONAL COMPENSATION AGREEMENT

ADDITIONAL COMPENSATION AGREEMENT (the "Agreement"), dated as of March 18, 2004, between Morgan Asset Management, Inc. (the "Investment Advisor") and Morgan Keegan & Company, Inc. ("Morgan Keegan").

WHEREAS, RMK Strategic Income Fund, Inc. (the "Fund") is a newly-organized, diversified, closed-end management investment company registered under the Investment Company Act of 1940, as amended, and its common shares are registered under the Securities Act of 1933, as amended;

WHEREAS, Morgan Keegan is acting as lead underwriter in an offering (the "Offering") of the Fund's common shares;

WHEREAS, the Investment Advisor desires to provide additional compensation to Morgan Keegan for acting as lead underwriter in the Offering; and

WHEREAS, the Investment Advisor desires to retain Morgan Keegan to provide after-market support services designed to maintain the visibility of the Fund on an ongoing basis, and Morgan Keegan is willing to render such services.

NOW, THEREFORE, in consideration of the mutual terms and conditions set forth below, the parties hereto agree as follows:

SECTION 1.

(a)     The Investment Advisor hereby employs Morgan Keegan, for the period and on the terms and conditions set forth herein, to provide the following services at the reasonable request of the Investment Advisor: (i) to provide after-market support services designed to maintain the visibility of the Fund on an ongoing basis; (ii) to provide relevant information, studies or reports regarding general trends in the closed-end investment company and asset management industries, if reasonably obtainable, and consult with representatives of the Investment Advisor in connection therewith; and (iii) to provide information to and consult with the Investment Advisor with respect to applicable strategies designed to address market value discounts, if any.

(b)     At the request of the Investment Advisor, Morgan Keegan shall limit or cease any action or service provided hereunder to the extent and for the time period requested by the Investment Advisor; provided, however, that pending termination of this Agreement as provided for in Section 5 hereof, any such limitation or cessation shall not relieve the Investment Advisor of its payment obligations pursuant to Section 2 hereof.

(c)     Morgan Keegan will promptly notify the Investment Advisor if it learns of any material inaccuracy or misstatement in, or material omission from, any written information, as of the date such information was published, provided by Morgan Keegan to the Investment Advisor in connection with the performance of services by Morgan Keegan under this Agreement.

SECTION 2.     The Investment Advisor shall pay Morgan Keegan a fee payable quarterly at an annualized rate of 0.10% of the Fund's managed assets (the "Additional Fee") for a term as described in Section 5 hereof; provided that, the total amount of the Additional Fee payable by the Investment Advisor hereunder, plus the amount of any expense reimbursement payable by the Investment Advisor or the Fund to the Underwriters pursuant to the Underwriting Agreement (defined below), will not exceed 4.5% of the total price to the public ("Maximum Compensation Amount") of the Fund's common shares (including all

1

IN WITNESS WHEREOF, the parties hereto have duly executed this Additional Compensation Agreement as of the date first above written.

MORGAN KEEGAN & COMPANY, INC.

By _____
Name: Charles D. Maxwell
Title: Managing Director

MORGAN ASSET MANAGEMENT, INC.

By: _____
Name: Carter E. Anthony
Title: President

4

5053595.2

# TAB 10

# RMK Advantage Income Fund, Inc.
(a Maryland Corporation)
24,000,000 Shares of Common Stock
Par Value $.0001 Per Share

UNDERWRITING AGREEMENT

November 8, 2004

Morgan Keegan & Company, Inc.
Legg Mason Wood Walker, Incorporated
Oppenheimer & Co., Inc.
RBC Capital Markets Corporation
Stifel, Nicolaus & Company, Incorporated
SunTrust Capital Markets, Inc.
Advest, Inc.
BB&T Capital Markets, a division of Scott & Stringfellow, Inc.
Stephens Inc.
Wedbush Morgan Securities, Inc.
 c/o Morgan Keegan & Company, Inc.
  50 North Front Street, 19th Floor
  Memphis, TN 38103

Ladies and Gentlemen:

RMK Advantage Income Fund, Inc., a Maryland corporation (the "Fund"), and the Fund's investment adviser, Morgan Asset Management, Inc., a .Tennessee corporation (the "Adviser"), each confirms its agreement with Morgan Keegan & Company, Inc. ("Morgan Keegan") and Legg Mason Wood Walker, Incorporated, Oppenheimer & Co., Inc., RBC Capital Markets Corporation, Stifel, Nicolaus & Company, Incorporated, SunTrust Capital Markets, Inc., Advest, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Stephens Inc., Wedbush Morgan Securities, Inc. and each of the other Underwriters named in Schedule A hereto (collectively, the "Underwriters"), for whom Morgan Keegan and Legg Mason Wood Walker, Incorporated, Oppenheimer & Co. Inc., RBC Capital Markets Corporation, Stifel, Nicolaus & Company, Incorporated, SunTrust Capital Markets, Inc., Advest, Inc., BB&T Capital Markets, a division of Scott & Stringfellow, Inc., Stephens, Inc., Wedbush Morgan Securities, Inc. are acting as representatives (in such capacity, the "Representatives"), with respect to the issue and sale by the Fund and the purchase by the Underwriters, acting severally and not jointly, of the respective number of shares of common stock, par value $.0001 per share, of the Fund ("Common Shares") set forth in Schedule A hereof, and with respect to the grant by the Fund to the Underwriters, acting severally and not jointly, of the option described in Section 2(b) hereof to purchase all or any part of 3,600,000 additional Common Shares to cover over-allotments, if any. The aforesaid 24,000,000 Common Shares (the "Primary Shares") to be purchased by the Underwriters and all or any part of the 3,600,000 Common Shares subject to the option described in Section 2(b) hereof (the "Option Shares") are collectively referred to as the "Shares."

The Fund understands that the Underwriters propose to make a public offering of the Shares as soon as the Representatives deem advisable after this Agreement has been executed and delivered.

1

CONFIDENTIAL

The Fund has filed with the Securities and Exchange Commission (the "Commission") a registration statement on Form N-2 (File Nos. 333-118846 and 811-21631) covering the registration of the Shares under the Securities Act of 1933, as amended (the "1933 Act"), including the related preliminary prospectus or prospectuses, and a notification on Form N-8A of registration of the Fund as an investment company under the Investment Company Act of 1940, as amended (the "1940 Act"), and the rules and regulations of the Commission under the 1933 Act and the 1940 Act (the "Rules and Regulations"). Promptly after execution and delivery of this Agreement, the Fund will either (i) prepare and file a prospectus in accordance with the provisions of Rule 430A ("Rule 430A") and paragraph (c) or (h) of Rule 497 ("Rule 497") under the 1933 Act or (ii) if the Fund has elected to rely upon Rule 434 ("Rule 434") under the 1933 Act, prepare and file a term sheet (a "Term Sheet") in accordance with the provisions of Rule 434 and Rule 497. The information included in any such prospectus, that was omitted from such registration statement at the time it became effective but that is deemed to be part of such registration statement at the time it became effective, if applicable, (a) pursuant to paragraph (b) of Rule 430A is referred to as "Rule 430A Information" or (b) pursuant to paragraph (d) of Rule 434 is referred to as "Rule 434 Information." Each prospectus used before such registration statement became effective, and any prospectus that omitted, as applicable, the Rule 430A Information or the Rule 434 Information, that was used after such effectiveness and prior to the execution and delivery of this Agreement, including in each case any statement of additional information incorporated therein by reference, is herein called a "preliminary prospectus." Such registration statement, including the exhibits and schedules thereto at the time it became effective and including the Rule 430A Information or the Rule 434 Information, as applicable, is herein called the "Registration Statement." Any registration statement filed pursuant to Rule 462(b) under the 1933 Act is herein referred to as the "Rule 462(b) Registration Statement," and the term "Registration Statement" shall include any Rule 462(b) Registration Statement that shall have been filed. The final prospectus in the form first furnished to the Underwriters for use in connection with the offering of the Shares, including the statement of additional information incorporated therein by reference, is herein called the "Prospectus." If Rule 434 is relied on, the term "Prospectus" shall refer to the preliminary prospectus, including the statement of additional information incorporated therein by reference, together with the Term Sheet and all references in this Agreement to the date of the Prospectus shall mean the date of the Term Sheet. For purposes of this Agreement, all references to the Registration Statement, any preliminary prospectus, the Prospectus or any Term Sheet or any amendment or supplement to any of the foregoing shall be deemed to include the copy filed with the Commission pursuant to its Electronic Data Gathering, Analysis and Retrieval system ("EDGAR").

All references in this Agreement to financial statements and schedules and other information which is "contained," "included" or "stated" in the Registration Statement, any preliminary prospectus or the Prospectus (or other references of like import) shall be deemed to mean and include all such financial statements and schedules and other information which are incorporated by reference in the Registration Statement, any preliminary prospectus or the Prospectus, as the case may be.

## SECTION 1.  REPRESENTATIONS AND WARRANTIES.

(a)     Representations and Warranties by the Fund and the Adviser. The Fund and the Adviser represent and warrant to each Underwriter as of the date hereof, as of the Closing Time

2

referred to in Section 2(c) hereof, and as of each Date of Delivery (if any) referred to in Section 2(b) hereof, and agree with each Underwriter, as follows:

(i)    Compliance with Registration Requirements. Each of the Registration Statement and any Rule 462(b) Registration Statement has become effective under the 1933 Act and no stop order suspending the effectiveness of the Registration Statement or any Rule 462(b) Registration Statement has been issued under the 1933 Act, or order of suspension or revocation of registration pursuant to Section 8(e) of the 1940 Act, and no proceedings for any such purpose, have been instituted or are pending or, to the knowledge of the Fund or the Adviser, are contemplated by the Commission, and any request on the part of the Commission for additional information has been complied with.

At the respective times the Registration Statement, any Rule 462(b) Registration Statement and any post-effective amendment thereto (filed before the Closing Time) became effective and at the Closing Time, as hereinafter defined (and, if any Option Shares are purchased, at the Date of Delivery), the Registration Statement, the Rule 462(b) Registration Statement, the notification of Form N-8A and all amendments and supplements thereto complied and will comply in all material respects with the requirements of the 1933 Act, the 1940 Act and the Rules and Regulations and did not and will not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading. Neither the Prospectus nor any amendment or supplement thereto, at the time the Prospectus or any such amendment or supplement was issued and at the Closing Time (and, if any Option Shares are purchased, at the Date of Delivery), included or will include an untrue statement of a material fact or omitted or will omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading. If Rule 434 is used, the Fund will comply with the requirements of Rule 434 and the Prospectus shall not be "materially different," as such term is used in Rule 434, from the prospectus included in the Registration Statement at the time it became effective. The representations and warranties in this subsection shall not apply to statements in or omissions from the Registration Statement or Prospectus made in reliance upon and in conformity with information furnished to the Fund by or on behalf of any Underwriter for use in the Registration Statement or Prospectus.

Each preliminary prospectus and the prospectus filed as part of the Registration Statement as originally filed or as part of any amendment thereto, or filed pursuant to Rule 497 under the 1933 Act, complied when so filed in all material respects with the Rules and Regulations and each preliminary prospectus and the Prospectus delivered to the Underwriters for use in connection with this offering was identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

If a Rule 462(b) Registration Statement is required in connection with the offering and sale of the Shares, the Fund has complied or will comply with the requirements of Rule 111 under the 1933 Act and the rules and regulations relating to the payment of filing fees thereof.

3

(ii)     Independent Accountants. The accountants who certified the statement of assets and liabilities included in the Registration Statement have confirmed to the Fund their status as independent public accountants as required by the 1933 Act and the Rules and Regulations and the Fund and the Adviser have no reason to believe that they are not independent public accountants.

(iii)     Financial Statements. The statement of assets and liabilities included in the Registration Statement and the Prospectus, together with the related notes, presents fairly in accordance with generally accepted accounting principals ("GAAP") in all material respects the financial position of the Fund at the date indicated and has been prepared in conformity in all material respects with GAAP.

(iv)     No Material Adverse Change. Since the respective dates as of which information is given in the Registration Statement and the Prospectus, except as otherwise stated therein, (A) there has been no material adverse change in the condition, financial or otherwise, or in the earnings, business affairs or business prospects of the Fund, whether or not arising in the ordinary course of business (other than as a result of changes in market conditions generally) (a "Material Adverse Effect"), (B) there have been no transactions entered into by the Fund, other than those in the ordinary course of business, which are material with respect to the Fund, and (C) there has been no dividend or distribution of any kind declared, paid or made by the Fund on any class of its capital stock.

(v)     Good Standing of the Fund. The Fund has been duly organized and is validly existing as a corporation in good standing under the laws of the State of Maryland and has the corporate power and authority to own, lease and operate its properties and to conduct its business as described in the Prospectus and to enter into and perform its obligations under this Agreement; and the Fund is duly qualified as a foreign corporation to transact business and is in good standing in each other jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except where the failure so to qualify or to be in good standing would not result in a Material Adverse Effect.

(vi)     No Subsidiaries. The Fund has no subsidiaries.

(vii)     Investment Company Status. The Fund is duly registered with the Commission under the 1940 Act as a diversified, closed-end management investment company, and no order of suspension or revocation of such registration has been issued or proceedings therefor initiated or, to the Fund's knowledge, threatened by the Commission.

(viii)     Officers and Directors. No person is serving or acting as an officer, director or investment adviser of the Fund except in accordance with the provisions of the 1940 Act and the Rules and Regulations and the Investment Advisers Act of 1940, as amended (the "Advisers Act"), and the rules and regulations of the Commission promulgated under the Advisers Act (the "Advisers Act Rules and Regulations"). Except as disclosed in the Registration Statement or Prospectus, to the Fund's knowledge after

4

(including exhibits filed therewith or incorporated by reference therein) and signed copies of all consents and certificates of experts, and will also deliver to the Representatives, without charge, a conformed copy of the Registration Statement as originally filed and of each amendment (except any post-effective amendment required by Rule 8b-16 of the 1940 Act which is filed with the Commission after the later of (x) one year from the date of this Agreement or (y) the date on which the distribution of the Shares is completed) thereto (without exhibits) for each of the Underwriters. The copies of the Registration Statement and each amendment thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(iv)  Delivery of Prospectuses.  The Fund has delivered to each Underwriter, without charge, as many copies of each preliminary prospectus as such Underwriter reasonably requested, and the Fund hereby consents to the use of such copies for purposes permitted by the 1933 Act.  The Fund will furnish to each Underwriter, without charge, during the period when the Prospectus is required to be delivered under the 1933 Act or the 1934 Act, such number of copies of the Prospectus (as amended or supplemented) as such Underwriter may reasonably request.  The Prospectus and any amendments or supplements thereto furnished to the Underwriters will be identical to the electronically transmitted copies thereof filed with the Commission pursuant to EDGAR, except to the extent permitted by Regulation S-T.

(v)  Continued Compliance with Securities Laws.  If at any time when a prospectus is required by the 1933 Act to be delivered in connection with sales of the Shares, any event shall occur or condition shall exist as a result of which it is necessary, in the reasonable opinion of counsel for the Underwriters or for the Fund, to amend the Registration Statement or amend or supplement the Prospectus in order that the Prospectus will not include any untrue statements of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in the light of the circumstances existing at the time it is delivered to a purchaser, or if it shall be necessary, in the opinion of such counsel, at any such time to amend the Registration Statement or amend or supplement the Prospectus in order to comply with the requirements of the 1933 Act or the Rules and Regulations, the Fund will promptly prepare and file with the Commission, subject to Section 3(a)(ii), such amendment or supplement as may be necessary to correct such statement or omission or to make the Registration Statement or the Prospectus comply with such requirements, and the Fund will furnish to the Underwriters such number of copies of such amendment or supplement as the Underwriters may reasonably request.

(vi)  Blue Sky Qualifications.  The Fund will use its best efforts, in cooperation with the Underwriters, to qualify the Shares for offering and sale under the applicable securities laws of such states and other jurisdictions of the United States as the Representatives may designate and to maintain such qualifications in effect so long as required for the distribution of the Shares; provided, however, that the foregoing shall not apply to the extent that the Shares are "covered securities" that are exempt from state regulation of securities offerings pursuant to Section 18 of the 1933 Act; and provided, further, that the Fund shall not be obligated to file any general consent to service of process or to qualify as a foreign corporation or as a dealer in securities in any

13

CONFIDENTIAL

Very truly yours,

**RMK ADVANTAGE INCOME FUND, INC.**

By: _Charles D. Maxwell_

Name: Charles D. Maxwell
Title: Secretary and Assistant Treasurer

**MORGAN ASSET MANAGEMENT, INC.**

By: _Charles D. Maxwell_

Name: Charles D. Maxwell
Title: Secretary and Treasurer

**CONFIRMED AND ACCEPTED,**
   as of the date first above written:

Morgan Keegan & Company, Inc.
Legg Mason Wood Walker, Incorporated
Oppenheimer & Co. Inc.
RBC Capital Markets Corporation
Stifel, Nicolaus & Company, Incorporated
SunTrust Capital Markets, Inc.
Advest, Inc.
BB&T Capital Markets, a division of Scott & Stringfellow, Inc.
Stephens Inc.
Wedbush Morgan Securities Inc.

By: **MORGAN KEEGAN & COMPANY, INC.**

By: _Bradley W. Barber_

Authorized Signatory

For itself and as Representatives of the other
   Underwriters named in Schedule A hereto.

26

# TAB 11

ADDITIONAL COMPENSATION AGREEMENT (the "Agreement"), dated as of November 12, 2004, between Morgan Asset Management, Inc. (the "Investment Advisor") and Morgan Keegan & Company, Inc. ("Morgan Keegan").

WHEREAS, RMK Advantage Income Fund, Inc. (the "Fund") is a newly organized, diversified, closed-end management investment company registered under the Investment Company Act of 1940, as amended, and its shares of common stock (the "Common Shares") are registered under the Securities Act of 1933, as amended;

WHEREAS, Morgan Keegan is acting as lead underwriter in an offering (the "Offering") of the Fund's Common Shares;

WHEREAS, the Investment Advisor desires to provide additional compensation to Morgan Keegan for acting as lead underwriter in the Offering; and

WHEREAS, the Investment Advisor desires to retain Morgan Keegan to provide after-market support services designed to maintain the visibility of the Fund on an ongoing basis, and Morgan Keegan is willing to render such services.

NOW, THEREFORE, in consideration of the mutual terms and conditions set forth below, the parties hereto agree as follows:

SECTION 1.

(a)     The Investment Advisor hereby employs Morgan Keegan, for the period and on the terms and conditions set forth herein, to provide the following services at the reasonable request of the Investment Advisor: (i) to provide after-market support services designed to maintain the visibility of the Fund on an ongoing basis; (ii) to provide relevant information, studies or reports regarding general trends in the closed-end investment company and asset management industries, if reasonably obtainable, and consult with representatives of the Investment Advisor in connection therewith; (iii) to provide information to and consult with the Investment Advisor with respect to applicable strategies designed to address market value discounts, if any; and (iv) to provide assistance with answering questions from broker-dealers and investors concerning the Fund.

(b)     At the request of the Investment Advisor, Morgan Keegan shall limit or cease any action or service provided hereunder to the extent and for the time period requested by the Investment Advisor; provided, however, that pending termination of this Agreement as provided for in Section 5 hereof, any such limitation or cessation shall not relieve the Investment Advisor of its payment obligations pursuant to Section 2 hereof.

(c)     Morgan Keegan will promptly notify the Investment Advisor if it learns of any material inaccuracy or misstatement in, or material omission from, any written information, as of

1

CONFIDENTIAL

IN WITNESS WHEREOF, the parties hereto have duly executed this Additional Compensation Agreement as of the date first above written.

MORGAN KEEGAN & COMPANY, INC.

By: _Bradley W. Barber_
Name: Bradley W. Barber
Title: Senior Vice President

MORGAN ASSET MANAGEMENT, INC.

By: _Charles D. Maxwell_
Name: Charles D. Maxwell
Title: Secretary and Treasurer

5

5066154.1

# TAB 12

ADMINISTRATION AGREEMENT

THIS ADMINISTRATION AGREEMENT ("Agreement") is made this 18th day of November 2004 by and between RMK ADVANTAGE INCOME FUND, INC. (the "Fund"), a Maryland corporation, having its principal place of business at Fifty North Front Street, Memphis, Tennessee 38103, and MORGAN KEEGAN & COMPANY, INC. (the "Administrator"), a Tennessee corporation, having its principal place of business at Fifty North Front Street, Memphis, Tennessee 38103.

WHEREAS, the Fund, a closed-end, diversified management investment company registered under the Investment Company Act of 1940, as amended (the "1940 Act"), wishes to retain the Administrator to provide administrative services to the Fund; and

WHEREAS, the Administrator is willing to furnish such services on the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the promises and mutual covenants herein contained, it is agreed as follows:

1.      Appointment of the Administrator. The Fund hereby appoints the Administrator to act as the administrator for the Fund for the period, in the manner, and on the terms set forth in this Agreement. The Administrator hereby accepts such appointment and agrees during such period to render the services and to assume the obligations herein set forth. The Administrator shall for all purposes herein be deemed to be an independent contractor and shall, except as expressly provided or authorized (whether herein or otherwise), have no authority to act for or represent the Fund in any way or otherwise be deemed an agent of the Fund

2.      Administrative Services. As administrator, and subject to the supervision and control of the Board of Directors of the Fund, the Administrator shall perform (or supervise the performance by others) and will provide facilities, equipment and personnel to carry out the following administrative services for operation of the business and affairs of the Fund:

(i)     furnish without cost to the Fund, or pay the cost of, such office space, office equipment and office facilities as are adequate for the needs of the Fund;

(ii)    provide, without remuneration from or other cost to the Fund, the services of individuals competent to perform all of the executive, administrative and clerical functions of the Fund that are not performed by employees or other agents engaged by the Fund or by the Administrator acting in some other capacity pursuant to a separate agreement or arrangement with the Fund;

(iii)   assist the Fund in selecting and coordinating the activities of the other agents engaged by the Fund, including the Fund's dividend disbursing agent, custodian, independent public accountants and legal counsel;

(iv)    authorize and permit the Administrator's directors, officers or employees who

DC-672759 v2 0307977-0100

CONFIDENTIAL

may be elected or appointed as officers of the Fund or directors of the Fund to serve in such capacities, without remuneration from or other cost to the Fund;

(v) assure that all financial, accounting and other records required to be maintained and preserved by the Fund are maintained and preserved by it or on its behalf in accordance with applicable laws and regulations;

(vi) assist in the preparation of (but not pay for) all periodic reports by the Fund to stockholders of the Fund and all reports and filings required to maintain the registration, qualification and listing on a national securities exchange of the Fund and the shares of the Fund, or to meet other regulatory or tax requirements applicable to the Fund or the shares of the Fund, under federal and state securities and tax laws;

(vii) respond to telephonic and in-person inquiries from existing stockholders or their representatives requesting information regarding matters such as stockholder account or transaction status, net asset value of Fund shares, and Fund performance, Fund services, plans and options, Fund investment policies, Fund portfolio holdings, and Fund distributions and classification thereof for tax purposes;

(viii) handle stockholder complaints and correspondence directed to or brought to the attention of the Administrator; generate or develop and distribute special data, notices, reports, programs and literature required by large stockholders, by stockholders with specialized informational needs, or by stockholders generally in light of developments, such as changes in tax laws; and

(ix) provide such other services required by the Fund as the parties may from time to time agree in writing are appropriate to be provided under this Agreement.

3. Books and Records. The Administrator shall maintain customary records in connection with its duties as specified in this Agreement. Any records required to be maintained and preserved pursuant to Rules 31a-1 and 31a-2 under the 1940 Act which are prepared or maintained by the Administrator on behalf of the Fund shall be the property of the Fund and will be made available or surrendered to the Fund promptly upon request. In the case of any request or demand for the inspection of such records by another party, the Administrator shall notify the Fund and follow the Fund's instructions as to permitting or refusing such inspection.

4. Reports. The Administrator shall furnish to or place at the disposal of the Fund such information, evaluations, analyses and opinions formulated or obtained by the Administrator in the discharge of its duties as the Fund may, from time to time, reasonably request. The Fund shall furnish the Administrator with such documents and information with regard to its affairs as the Administrator may, at any time or from time to time, reasonably request in order to discharge its obligations under this Agreement.

5. Fund Personnel. The Administrator agrees to permit individuals who are

2

Tab 12, p.2 of 4

MK/PURDUE03540

CONFIDENTIAL

directors, officers or employees of the Administrator to serve (if duly appointed or elected) as directors, officers or employees of the Fund, without remuneration from or other cost to the Fund.

6.    Expenses.    The Administrator shall be responsible for expenses incurred in providing office space, equipment and personnel as may be necessary or convenient to provide administrative services to the Fund, including the payment of all fees, expenses and salaries of the directors, officers or employees of the Fund who are directors, officers or employees of the Administrator.    The Fund shall bear the expense of its operation, except those specifically allocated to the Administrator under this Agreement or under any separate agreement between the Fund and the Administrator.    Subject to any separate agreement or arrangement between the Fund and the Administrator, the expenses hereby allocated to the Fund, and not to the Administrator, include, but are not limited to:    (i) organizational expenses; (ii) legal and audit expenses; (iii) borrowing expenses; (iv) interest; (v) taxes; (vi) governmental fees; (vii) fees, voluntary assessments and other expenses incurred in connection with membership in investment company organizations; (viii) the cost (including brokerage commissions or charges, if any) of securities purchased or sold by the Fund and any losses incurred in connection therewith; (ix) fees of custodians, transfer agents, registrars or other agents; (x) expenses of preparing share certificates; (xi) expenses relating to the redemption or repurchase of shares; (xii) expenses of registering and qualifying shares for sale under applicable federal law and maintaining such registrations and qualifications; (xiii) expenses of preparing, setting in print, printing and distributing prospectuses, proxy statements, reports, notices and dividends to stockholders; (xiv) cost of stationery; (xv) costs of stockholders and other meetings of the Fund; (xvi) compensation and expenses of the independent directors of the Fund; (xvii) the Fund's portion of premiums of any fidelity bond and other insurance covering the Fund and its officers and directors; and (xviii) the fees and other expenses of listing and maintaining the Fund's shares on the New York Stock Exchange or any other national stock exchange.

7.    Compensation.    As compensation for the services performed hereunder, the Administrator shall receive from the Fund an administration fee at the annual rate of 0.15% of the Fund's average daily total assets minus liabilities (other than the aggregate indebtedness entered into for purposes of leverage) ("Managed Assets").    This administration fee shall be payable monthly as soon as practicable after the last day of each month based on the average of the daily values placed on the Managed Assets of the Fund as determined at the close of business on each day throughout the month.    The Managed Assets of the Fund will be valued as of the close of regular trading on the New York Stock Exchange (currently 4:00 p.m., Eastern time) on each business day throughout the month or, if the Fund lawfully determines the value of its Managed Assets as of some other time on each business day, as of such time.    The first payment of such fee shall be made as promptly as possible at the end of the month next succeeding the effective date of this Agreement.    In the event that the Administrator's right to such fee commences on a date other than the first day of the month, the fee for such month shall be based on the average daily Managed Assets of the Fund in that period from the date of commencement to the last day of the month.    If the Fund determines the value of its Managed Assets more than once on any business day, the last such determination on that day shall be deemed to be the sole determination on that day. The value of the Managed Assets shall be determined pursuant to the applicable provisions of the Fund's Articles of Incorporation, its By-Laws and the 1940 Act. If,

3

IN WITNESS WHEREOF the parties have caused this instrument to be signed on their behalf by their respective officers thereunto duly authorized all as of the date first written above.

RMK ADVANTAGE INCOME FUND, INC.

By: _Charles D. Maxwell_

Name: Charles D. Maxwell

Title: Secretary and Assistant Treasurer

MORGAN ASSET MANAGEMENT, INC.

By: _Charles D. Maxwell_

Name: Charles D. Maxwell

Title: Assistant Treasurer and Assistant Secretary

7

# TAB 13



# Regions Morgan Keegan:
## The Abuse of Structured Finance
### Craig McCann, PhD, CFA[1]

Innovations in financial engineering have allowed investment banks to create securities backed by other securities rather than by bricks and mortar and business plans. These innovations have increased funding available to homeowners and businesses and provided investors with more varied opportunities. As these structured securities become more complex and opaque though, they allow advisors and managers including mutual funds to take on significant, undisclosed risks.

Investors in six Regions Morgan Keegan ("RMK") bond funds lost $2 billion in 2007. This paper explains how the funds were able to generate higher returns than their competitors but ultimately collapsed in 2007.[2]



The RMK funds suffered massive losses because they held concentrated holdings of low-priority tranches in structured finance deals backed by risky assets. RMK did not disclose the risks it was taking until *after* the losses had occurred. In fact, it misrepresented hundreds of millions of dollars of leveraged asset-backed securities as corporate bonds and preferred stocks thereby making the funds seem more diversified and less risky than they were. It appears that RMK was smoothing the returns of its mutual funds by smoothing the valuation of its portfolio holdings. We illustrate our findings for the six funds by detailing our findings for the Multi-Sector High Income fund (RHY).

## I. Introduction

Six RMK bond funds – four closed-end funds (RMH, RHY, RMA and RSF) and two open-end funds (MKHIX and MKIBX) - collapsed spectacularly in 2007. The six funds had higher returns and yields than their peers in years prior to 2007, but lost 62% on average in 2007 while their peers had positive returns or only modest losses. [3]

---

[1] © 2008 Securities Litigation and Consulting Group, Inc., 3998 Fair Ridge Drive, Suite 250, Fairfax, VA 22033. www.slcg.com.

Dr. McCann is the primary author of this report but the research was conducted by a team of professionals at SLCG including Dr. Hongwei Wang, Dr. Sherry Liu, Dr. Geng Deng, Dana Lin and Sandy Eng. Dr. Edward O'Neal, Paul Meyer and Lily Chu provided helpful comments and suggestions. Copy editing provided by Kristian@yourbriefeditor.com. Dr. McCann can be reached at 703-246-9381 or craigmccann@slcg.com.

[2] This paper focuses on Regions Morgan Keegan bond funds. Companion working papers analyze similar portfolio holdings and losses in First Trust Portfolios' bond funds and Charles Schwab's YieldPlus fund.

[3] These losses in the RMK funds relative to their peers in the mutual fund and closed end fund universe are explored in more detail in "The Implosion of High Yield Funds 2007 – 2008" by Edward O'Neal, available at www.slcg.com.

The apparent superior performance of these funds in earlier years and the spectacular losses in 2007 resulted from the funds' holdings of hundreds of low-priority *tranches* of structured finance deals. These low-priority tranches significantly leveraged up investors' exposure to credit risk. The structured finance deals held by the Regions Morgan Keegan funds included *collateralized debt obligations* (CDOs), *collateralized mortgage obligations* (CMOs), and *asset-backed securities* (ABS). The funds' prospectuses did not disclose the extraordinary amount of credit risk to which fund shareholders were exposed as a result of the low-priority tranches the funds' portfolio manager was purchasing.

Section II describes the six funds and illustrates their reported returns. Section III explains why the structured finance securities purchased by the Regions Morgan Keegan bond funds were dramatically more risky than investors were led to believe from the disclosures in the funds' filings with the Securities and Exchange Commission. Section IV provides a few examples of the securities held in the Multi-Sector High Income (RHY) fund. Section V highlights some of the deficiencies in RHY's public filings.

## II. Regions Morgan Keegan Bond Funds

### A. Returns

The six Regions Morgan Keegan bond funds that collapsed in 2007 are listed in Table 1. The four closed-end funds were initially offered between June 24, 2003 and January 19, 2006 and had net assets of $1.6 billion as of December 31, 2006. The two open-end funds were issued on March 22, 1999 and had net assets of $2.2 billion as of December 31, 2006. The closed-end funds lost $1 billion in market value in 2007. The open-end funds net assets declined even more although some of the decline was due to investors redeeming their shares.

Table 1
Regions Morgan Keegan Bond Funds

| Fund Name | Ticker | Inception | Net Assets 12/31/2006 | 12/31/2007 | 2007 Returns Capital Appreciation | Total Return |
|---|---|---|---|---|---|---|
| Closed-end Funds | | | | | | |
| High Income | RMH | 6/24/2003 | $311.6 m | $115.5 m | -70.7% | -65.5% |
| Strategic Income | RSF | 3/18/2004 | $366.0 m | $134.2 m | -72.1% | -67.2% |
| Advantage Income | RMA | 11/8/2004 | $423.8 m | $161.9 m | -71.6% | -66.8% |
| M-S High Income | RHY | 1/19/2006 | $478.8 m | $159.5 m | -72.2% | -65.4% |
| | | | $1,580.2 m | $571.1 m | | |
| Open-end Funds | | | | | | |
| Select High Income | MKHIX | 3/22/1999 | $1,251.6 m | $156.7 m | | -58.4% |
| Select Intermediate | MKIBX | 3/22/1999 | $913.8 m | $168.7 m | | -49.6% |
| | | | $2,165.4 m | $325.4 m | | |
| | | | $3,745.6 m | $896.5 m | | |

The M tranche in our illustration had 10 to 15 times as much credit risk as the underlying bonds. Even the B tranche in our illustration had 6 times as much credit risk as the underlying bond portfolio. As we will see next, virtually all of the RMK holdings had as much leveraged credit risk as the B and M tranches - and some of RMK holdings had as much credit risk as in the Equity tranche - in our example

## IV. Multi-Sector High Income Fund's Portfolio Holdings

### A. Introduction

We have analyzed the portfolio holdings for the six Regions Morgan Keegan bond funds and determined that they all held high concentrations of heavily leveraged, low-quality debt. RMK purchased low-priority tranches in asset and mortgage-backed securities deals. These tranches are virtually always the smallest slices in a deal because they issuer is trying to create larger slices of the more marketable senior slices. RMK frequently purchased all or almost all these relatively small, unique tranches. As a result of the mutual funds' portfolio manager's investment decisions, the funds' holdings were illiquid and could not be valued by reference to market prices of substantially similar assets. We also found that Regions Morgan Keegan misrepresented the true nature of a significant portion of their portfolios' assets.

We illustrate our findings with the Multi-Sector High Income (RHY) fund's reported holdings as of March 31, 2007. Regions Morgan Keegan reported RHY's portfolio holdings on March 31, 2007 as summarized in Table 4. RHY's net assets could be, and were, leveraged 33%. Thus, investors in RHY were exposed to leveraged credit risk implicit in the portfolio's asset-backed securities holdings, further leveraged by the explicit borrowings.

Table 4
RHY Holdings as of March 31, 2007

|  | As Reported by RMK | | Corrected | |
|---|---|---|---|---|
| Asset-backed Securities | $364,472,540 | 77.7% | $431,970,558 | 92.1% |
| Corporate Bonds | $174,108,322 | 37.1% | $129,527,163 | 27.6% |
| Common Stocks | $54,977,849 | 11.7% | $54,977,849 | 11.7% |
| Preferred Stocks | $25,436,859 | 5.4% | $2,520,000 | 0.5% |
| Cash | $2,202,458 | 0.5% | $2,202,458 | 0.5% |
| Gross Assets | $621,198,028 | 132.5% | $621,198,028 | 132.5% |
| Margin Debt | $(152,319,346) | -32.5% | $(152,319,346) | -32.5% |
| Net Assets | $468,878,682 | 100.0% | $468,878,682 | 100.0% |

(1) RMK significantly understated the extent of RHY's holdings of asset-backed and mortgage-backed securities. $67 million of the $200 million RMK classified as corporate bonds or preferred stocks on March 31, 2007 were actually asset-backed or mortgage-backed securities. Virtually all of the securities RMK classified as "Corporate Bonds –

==Neither reference to tranching in the SAI tells investors that RHY will be concentrated in the lowest priority, highly-leveraged tranches in deals backed by assets with significant credit risk and that as a result investors will be exposed to extraordinary credit risk.==

### C. Semi-Annual Reports

RMK filed a semi-annual report for RHY as of September 30, 2006 wherein it describes the fund's risks as follows.[22]

INVESTMENT RISKS: Bond funds tend to experience smaller fluctuations in value than stock funds. However, investors in any bond fund should anticipate fluctuations in price. Bond prices and the value of bond funds decline as interest rates rise. Longer-term funds generally are more vulnerable to interest rate risk than shorter-term funds. Below investment grade bonds involve greater credit risk, which is the risk that the issuer will not make interest or principal payments when due. An economic downturn or period of rising interest rates could adversely affect the ability of issuers, especially issuers of below investment grade debt, to service primary obligations and an unanticipated default could cause the Fund to experience a reduction in value of its shares. The value of U.S. and foreign equity securities in which the Fund invests will change based on changes in a company's financial condition and in overall market and economic conditions. Leverage creates an opportunity for an increased return to common stockholders, but unless the income and capital appreciation, if any, on securities acquired with leverage proceeds exceed the costs of the leverage, the use of leverage will diminish the investment performance of the Fund's shares. Use of leverage may also increase the likelihood that the net asset value of the Fund and market value of its common shares will be more volatile, and the yield and total return to common stockholders will tend to fluctuate more in response to changes in interest rates and creditworthiness.

This description of investment risks is typical of each of the other RMK funds. ==Nowhere in this description is there any mention of the leveraged credit risk investors were exposed to as a result of the fund's concentration in low-priority tranches in structured securities.== In the same semi-annual report as September 30, 2006, RMK described the fund's recent returns as follows.

During the first half of RMK Multi-Sector High Income Fund, Inc.'s fiscal year 2007, which ended September 30, 2006, the Fund had a total return of 15.39%, based on market price and reinvested dividends. For the six months ended September 30, 2006, the Fund had a total return of 6.16%, based on net asset value and reinvested dividends. For the six months ended September 30, 2006, the Lehman Brothers Ba U.S. High Yield Index 1 had a total return of 4.12%. The

---

[22] RHY's self-descriptions for the periods ending September 30, 2006, March 31, 2007 and September 30, 2007 are excerpted in Appendix 1.

Even these belated disclosures do not accurately reflect what happened to investors in RHY and the other RMK funds. RMK invested a substantial majority of the portfolios in low-priority tranches. It is not that these securities *may* increase credit risk, these securities dramatically do increase credit risk. Also, as RMK acknowledges that the 2007 losses were suffered because of the subordinated structured securities it held, it says for the first time that its prior returns were due to investments in the same risky structured securities. This leveraged credit risk was not previously disclosed to investors but would be well known to the portfolio managers who ran the funds.

Finally RMK gets closer to full disclosure a few months later when it filed the December 31, 2007 semi-annual report for its Select High Income fund.

> … The structured finance category has taken the hardest hit so far due to the implicit (i.e., built into the structures) and explicit (i.e., financed, or bought on margin) leverage employed for this asset category. …

This appears to be the first disclosure by RMK that it was investing in securities that had the effect of leveraging up the credit risk investors in its funds faced.

## VI. Conclusion

Investors in Regions Morgan Keegan's six bond funds lost two billion dollars in 2007 because of losses on poor-quality debt, leveraged up many times over by complex asset-backed structures. A rudimentary analysis of the type Regions Morgan Keegan claimed to perform on its holdings would have determined that it was exposing investors to as much as 10 times the credit risk of the underlying, already risky, debt in exchange for 1% or 2% higher returns than a diversified, transparent high-yield bond portfolio would have earned.

Regions Morgan Keegan did not fully or accurately inform investors in its bond funds of the risks of the subordinated tranches the funds held until well after the losses had occurred. Moreover, prior to March 31, 2008 Regions Morgan Keegan affirmatively misrepresented hundreds of millions of dollars of risky securities it held in these portfolios as corporate bonds and preferred stocks.

# TAB 14

```
<DOCUMENT>
<TYPE>424B5
<SEQUENCE>1
<FILENAME>c34179_424b5.txt
<TEXT>
```

<div align="right">
Filed Pursuant to Rule 424(b)(5)

File Number: 333-110039
</div>

Prospectus  Supplement  dated October 28, 2004 (to Prospectus  dated November 5, 2003)

$1,090,119,000 (APPROXIMATE)

ACE SECURITIES CORP. HOME EQUITY LOAN TRUST, SERIES 2004-HE3

ASSET BACKED PASS-THROUGH CERTIFICATES

ACE SECURITIES CORP.
Depositor

WELLS FARGO BANK, NATIONAL ASSOCIATION
Servicer

WELLS FARGO BANK, NATIONAL ASSOCIATION
Master Servicer

--------------------------------------------------------------------------------
   YOU SHOULD CONSIDER CAREFULLY THE RISK FACTORS BEGINNING ON PAGE S-9 IN THIS
   PROSPECTUS SUPPLEMENT.

   This prospectus supplement  may  be  used  to  offer  and  sell  the Offered
   Certificates only if accompanied by the prospectus.
--------------------------------------------------------------------------------

OFFERED CERTIFICATES        The trust created for the Series  2004-HE3  certificates
                            will hold a pool of first and second lien fixed-rate and
                            adjustable-rate,  one- to  four-family,  residential
                            mortgage loans.  The trust will issue seventeen  classes
                            of  Offered  Certificates.  You can find a list of these
                            classes,  together  with  their  initial  certificate
                            principal balances and pass-through  rates, in the table
                            below.  Credit  enhancement  for  all  of  the  Offered
                            Certificates  will be  provided  in the  form of  excess
                            interest,  overcollateralization  and subordination.  In
                            addition,  the Offered  Certificates  may benefit from a
                            series of  interest  rate cap  payments  pursuant to two
                            separate cap agreements which are intended  partially to
                            mitigate interest rate risk.
```
<TABLE>
<CAPTION>
```

| CLASS | INITIAL CERTIFICATE PRINCIPAL BALANCE(1) | PASS-THROUGH RATE |
|---|---|---|

Page 391 of 1693

Page 83 of 181

Tab 14, p. 1 of 34

EXHIBIT 39, page 1

https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt

1/390

Jt.45-Page 1

RISK FACTORS

THE FOLLOWING INFORMATION, WHICH YOU SHOULD CONSIDER CAREFULLY, IDENTIFIES SIGNIFICANT RISKS ASSOCIATED WITH AN INVESTMENT IN THE CERTIFICATES.

THE MORTGAGE LOANS WERE UNDERWRITTEN TO STANDARDS WHICH DO NOT CONFORM TO THE STANDARDS OF FANNIE MAE OR FREDDIE MAC.

The underwriting standards of the originators are intended to assess the ability and willingness of the mortgagor to repay the debt and to evaluate the adequacy of the property as collateral for the mortgage loan. The originators consider, among other things, a mortgagor's credit history, repayment ability and debt service-to-income ratio, as well as the value, type and use of the mortgaged property. As further described in this prospectus supplement, the underwriting standards of the originators do not conform to Fannie Mae and Freddie Mac guidelines.

In addition, mortgage loans originated by the originators generally bear higher rates of interest than mortgage loans originated in accordance with Fannie Mae and Freddie Mac guidelines and may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with Fannie Mae and Freddie Mac guidelines.

Furthermore, changes in the values of mortgaged properties may have a greater effect on the delinquency, foreclosure, bankruptcy and loss experience of the Mortgage Loans than on mortgage loans originated in accordance with Fannie Mae and Freddie Mac guidelines. No assurance can be given that the values of the related mortgaged properties have remained or will remain at the levels in effect on the dates of origination of the related Mortgage Loans. SEE "THE MORTGAGE POOL--UNDERWRITING STANDARDS" IN THIS PROSPECTUS SUPPLEMENT.

MORTGAGE LOANS WITH HIGH COMBINED LOAN-TO-VALUE RATIOS LEAVE THE RELATED MORTGAGOR WITH LITTLE OR NO EQUITY IN THE RELATED MORTGAGED PROPERTY.

Approximately 39.15% of the Group I Mortgage Loans and approximately 42.68% of the Group II Mortgage Loans, in each case, by the related aggregate principal balance as of the Cut-off Date, had a combined loan-to-value ratio at origination in excess of 80%. No Mortgage Loan had a combined loan-to-value ratio at origination in excess of 100%.

An overall decline in the residential real estate market, a rise in interest rates over a period of time and the condition of a mortgaged property, as well as other factors, may have the effect of reducing the value of the mortgaged property from the appraised value at the time the Mortgage Loan was originated. If there is a reduction in the value of the mortgaged property, the combined loan-to-value ratio may increase over what it was at the time the Mortgage Loan was originated. Such an increase may reduce the likelihood of liquidation or other proceeds being sufficient to satisfy the Mortgage Loan, and any losses to the extent not covered by the credit enhancement may affect the yield to maturity of your certificates. There can be no assurance that the value of a mortgaged property estimated in any appraisal or review is equal to the actual value of that mortgaged property at the time of that appraisal or review. Investors should note that the values of the mortgaged properties may be insufficient to cover the outstanding principal balance of the Mortgage Loans. There can be no assurance that the combined loan-to-value ratio of any Mortgage Loan determined at any time after origination will be less than or equal to its

combined loan-to-value ratio at origination.

<div align="center">S-9</div>

<PAGE>


DEVELOPMENTS IN SPECIFIED STATES COULD HAVE A DISPROPORTIONATE EFFECT ON THE
MORTGAGE LOANS DUE TO THE GEOGRAPHIC CONCENTRATION OF THE MORTGAGED PROPERTIES.

     Approximately 45.55% of the Group I Mortgage Loans and approximately
71.63% of the Group II Mortgage Loans, in each case, by the related aggregate
principal balance as of the Cut-off Date, are secured by mortgaged properties
located in the State of California. Approximately 0.59% of the aggregate
principal balance of the Mortgage Loans as of the Cut-off Date, are located in a
single California zip code, which is the largest concentration of Mortgage Loans
in a single zip code. If the California residential real estate market should
experience an overall decline in property values after the dates of origination
of the Mortgage Loans, the rates of delinquencies, foreclosures, bankruptcies
and losses on the Mortgage Loans may increase over historical levels of
comparable type loans, and may increase substantially. In addition, properties
located in California may be more susceptible than homes located in other parts
of the country to certain types of uninsured hazards, such as earthquakes,
hurricanes, as well as floods, mudslides and other natural disasters.

     Various hurricanes during the 2004 hurricane season may have adversely
affected any mortgaged properties located in the southeast portion of the United
States. The Mortgage Loan Seller will make a representation and warranty that
each mortgaged property is free of material damage and in good repair as of the
closing date. In the event that a mortgaged property is materially damaged as of
the closing date due to hurricanes occurring during the 2004 hurricane season
and such damage materially and adversely affects the value or the interests of
the certificateholders in such Mortgage Loan, the Mortgage Loan Seller will be
required to repurchase the related Mortgage Loan from the trust. Damage to
mortgaged properties as a result of the hurricanes occurring during the 2004
season may or may not be covered by the related hazard insurance policies.
Approximately 3.65% of the Group I Mortgage Loans and approximately 2.11% of the
Group II Mortgage Loans, in each case, by the related aggregate principal
balance as of the Cut-off Date, are located in areas which may have been
affected by hurricanes occurring during the 2004 hurricane season. In addition,
no assurance can be given as to the effect of these events on the rate of
delinquencies and losses on the Mortgage Loans secured by mortgaged properties
that may have been affected by hurricanes during the 2004 hurricane season. Any
adverse impact as a result of this event may be borne by the holders of the
offered certificates, particularly if the Mortgage Loan Seller fails to
repurchase any Mortgage Loan that breaches this representation and warranty.

SECOND LIEN MORTGAGE LOANS RISK.

     Approximately 7.04% of the Group I Mortgage Loans and approximately 9.82%
of the Group II Mortgage Loans, in each case, by the related aggregate principal
balance as of the Cut-off Date, are secured by second liens on the related
mortgaged properties. The proceeds from any liquidation, insurance or
condemnation proceedings will be available to satisfy the outstanding balance of
such Mortgage Loans only to the extent that the claims of the related senior
mortgages have been satisfied in full, including any related foreclosure costs.
In circumstances when it has been determined to be uneconomical to foreclose on
the mortgaged property, the servicer may write off the entire balance of such

Page 406 of 1693

Mortgage Loan as a bad debt. The foregoing considerations will be particularly applicable to Mortgage Loans secured by second liens that have high combined loan-to-value ratios because it is comparatively more likely that the servicer would determine foreclosure to be uneconomical in the case of such Mortgage Loans. The rate of default of second lien Mortgage Loans may be greater than that of Mortgage Loans secured by first liens on comparable properties.

BALLOON MORTGAGE LOAN RISK.

Mortgage Loans that are balloon loans pose a risk because a borrower must make a large lump sum payment of principal at the end of the loan term. If the borrower is unable to pay the lump sum or refinance such amount, the servicer will not be obligated to advance the principal portion of

S-10

<PAGE>

that lump sum payment, you may suffer a loss. Approximately 4.99% of the Group I Mortgage Loans and approximately 9.36% of the Group II Mortgage Loans, in each case, by related aggregate principal balance as of the Cut-off Date, are balloon loans.

INTEREST ONLY MORTGAGE LOAN RISK.

Approximately 8.42% the Group I Mortgage Loans and approximately 27.30% of the Group II Mortgage Loans, in each case, by related aggregate principal balance as of the Cut-off Date, require the borrowers to make monthly payments only of accrued interest for the first two, three or five years following origination. After such interest-only period, the borrower's monthly payment will be recalculated to cover both interest and principal so that the Mortgage Loan will amortize fully prior to its final payment date. If the monthly payment increases, the related borrower may not be able to pay the increased amount and may default or may refinance the related Mortgage Loan to avoid the higher payment. Because no principal payments may be made or advanced on such Mortgage Loans for two, three or five years following origination, the certificateholders will receive smaller principal distributions during such period than they would have received if the related borrowers were required to make monthly payments of interest and principal for the entire lives of such Mortgage Loans. This slower rate of principal distributions may reduce the return on an investment in the Offered Certificates that are purchased at a discount.

THE MEZZANINE CERTIFICATES WILL BE MORE SENSITIVE TO LOSSES ON THE MORTGAGE LOANS THAN THE CLASS A CERTIFICATES BECAUSE THEY ARE SUBORDINATE TO THE CLASS A CERTIFICATES.

The weighted average lives of, and the yields to maturity on, the Class M-1, Class M-2, Class M-3, Class M-4, Class M-5, Class M-6, Class M-7, Class M-8, Class M-9, Class M-10 and Class M-11 Certificates will be progressively more sensitive, in that order, to the rate and timing of mortgagor defaults and the severity of ensuing losses on the Mortgage Loans. If the actual rate and severity of losses on the Mortgage Loans is higher than those assumed by an investor in these certificates, the actual yield to maturity of these certificates may be lower than the yield anticipated by the investor based on such assumption. The timing of losses on the Mortgage Loans will also affect an investor's actual yield to maturity, even if the rate of defaults and severity of losses over the life of the mortgage pool are consistent with an investor's

expectations. In general, the earlier a loss occurs, the greater the effect on an investor's yield to maturity. Realized losses on the Mortgage Loans, to the extent they exceed the amount of excess interest, overcollateralization and the aggregate certificate principal balance of the Class B Certificates, following distributions of principal on the related Distribution Date, will reduce the certificate principal balances of the Mezzanine Certificates beginning with the class of Mezzanine Certificates then outstanding with the lowest payment priority. As a result of such reductions, less interest will accrue on each such class of Mezzanine Certificates than would otherwise be the case. However, the amount of any realized losses allocated to the Mezzanine Certificates may be distributed to the holders of those certificates according to the priorities set forth under "Description of the Certificates--Overcollateralization Provisions" in this prospectus supplement.

THE MEZZANINE CERTIFICATES GENERALLY WILL NOT BE ENTITLED TO RECEIVE PRINCIPAL PAYMENTS UNTIL NOVEMBER 2007 WHICH MAY RESULT IN A GREATER RISK OF LOSS RELATING TO THESE CERTIFICATES.

Unless the aggregate certificate principal balance of the Class A Certificates has been reduced to zero, the Mezzanine Certificates will not be entitled to any principal distributions until at least November 2007 or a later date as provided in this prospectus supplement or during any period in which delinquencies on the Mortgage Loans exceed the levels set forth under "Description of the Certificates--Principal Distributions on the Offered Certificates and the Class B Certificates" in this prospectus supplement. As a result, the weighted average lives of the Mezzanine Certificates will be longer than would be the case if distributions of principal were allocated among all of the certificates at the same time. As a result of the longer weighted average lives of the Mezzanine Certificates, the

<div align="center">S-11</div>

<PAGE>

holders of these certificates have a greater risk of suffering a loss on their investments. Further, because such certificates might not receive any principal if the delinquency levels set forth under "Description of the Certificates--Principal Distributions on the Offered Certificates and the Class B Certificates" in this prospectus supplement are exceeded, it is possible for such certificates to receive no principal distributions on a particular Distribution Date even if no losses have occurred on the mortgage pool.

THE OFFERED CERTIFICATES WILL BE LIMITED OBLIGATIONS SOLELY OF THE TRUST FUND AND NOT OF ANY OTHER PARTY.

The Offered Certificates will not represent an interest in or obligation of the depositor, the servicer, the master servicer, the securities administrator, the originators, the trustee or any of their respective affiliates. Neither the Offered Certificates nor the underlying Mortgage Loans will be guaranteed or insured by any governmental agency or instrumentality, or by the depositor, the servicer, the master servicer, the securities administrator, the originators, the trustee or any of their respective affiliates. Proceeds of the assets included in the trust will be the sole source of payments on the Offered Certificates, and there will be no recourse to the depositor, the servicer, the originators, the master servicer, the securities administrator, the trustee or any other entity in the event that these proceeds are insufficient or otherwise unavailable to make all payments provided for under

Page 408 of 1693
Page 87 of 181
Tab 14, page 54
EXHIBIT 39, page 18
https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt 18/390
Jt.45-Page 18

under the Offered Certificates.

THE DIFFERENCE BETWEEN THE PASS-THROUGH RATES ON THE CLASS A CERTIFICATES AND MEZZANINE CERTIFICATES AND THE MORTGAGE RATES ON THE MORTGAGE LOANS MAY RESULT IN INTEREST SHORTFALLS ON SUCH CERTIFICATES.

The yield to maturity on the Class A Certificates and the Mezzanine Certificates may be affected by the resetting of the mortgage rates on the adjustable-rate Mortgage Loans included in the mortgage pool on their related adjustment dates. In addition, because the mortgage rate for approximately 77.26% of the Mortgage Loans, by aggregate principal balance as of the Cut-off Date, adjusts based on Six-Month LIBOR plus a fixed percentage amount, such rate could be higher than prevailing market interest rates, and this may result in an increase in the rate of prepayments on such Mortgage Loans after their adjustments. Finally, the mortgage rates on such adjustable-rate Mortgage Loans are based on Six-Month LIBOR while the pass-through rates on the Class A Certificates and the Mezzanine Certificates are based on one-month LIBOR. Consequently, the application to such certificates of the rate cap, which is generally equal to the weighted average coupon on the Mortgage Loans, net of certain fees of the trust, could adversely affect the yield to maturity on such certificates. In addition, the rate cap will decrease if Mortgage Loans with relatively high mortgage rates prepay at a faster rate than Mortgage Loans with relatively low mortgage rates.

If the pass-through rates on the Class A Certificates or the Mezzanine Certificates are limited for any Distribution Date, the resulting interest shortfalls may be recovered by the holders of these certificates on the same Distribution Date or on future Distribution Dates on a subordinated basis to the extent that on such Distribution Date or future Distribution Dates there are available funds remaining after certain other distributions on the Offered Certificates, the Class B Certificates and the payment of certain fees and expenses of the trust. SEE "YIELD ON THE CERTIFICATES--SPECIAL YIELD CONSIDERATIONS" IN THIS PROSPECTUS SUPPLEMENT.

THE RATE AND TIMING OF PRINCIPAL DISTRIBUTIONS ON THE CLASS A CERTIFICATES AND THE MEZZANINE CERTIFICATES WILL BE AFFECTED BY PREPAYMENT SPEEDS AND BY THE PRIORITY OF PAYMENT ON SUCH CERTIFICATES.

The rate and timing of distributions allocable to principal on the Class A Certificates and the Mezzanine Certificates will depend, in general, on the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) on the Mortgage Loans and the allocation thereof to pay principal on such certificates as described in "Description of the Certificates--Principal Distributions on the Offered Certificates and the Class B Certificates" in this

<div align="center">S-12</div>

<PAGE>

prospectus supplement. As is the case with mortgage backed pass-through certificates generally, the Offered Certificates are subject to substantial inherent cash-flow uncertainties because the Mortgage Loans may be prepaid at any time. However, with respect to approximately 78.76% of the Mortgage Loans, by aggregate principal balance of the Mortgage Loans as of the Cut-off Date, a prepayment may subject the related mortgagor to a prepayment charge. A prepayment charge may or may not act as a deterrent to prepayment of the related

Page 409 of 1693

Page 88 of 181

EXHIBIT 39, page 19

Table 6 of 34

https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt 19/390

Jt.45-Page 19

Mortgage Loan. SEE "THE MORTGAGE POOL" IN THIS PROSPECTUS SUPPLEMENT.

        Generally, when prevailing interest rates are increasing, prepayment rates on mortgage loans tend to decrease; a decrease in the prepayment rates on the Mortgage Loans will result in a reduced rate of return of principal to investors in the Class A Certificates and the Mezzanine Certificates at a time when reinvestment at such higher prevailing rates would be desirable. Conversely, when prevailing interest rates are declining, prepayment rates on mortgage loans tend to increase; an increase in the prepayment rates on the Mortgage Loans will result in a greater rate of return of principal to investors in the Class A Certificates and Mezzanine Certificates at a time when reinvestment at comparable yields may not be possible.

        Distributions of principal will be made to the holders of the Mezzanine Certificates according to the priorities described in this prospectus supplement. The timing of commencement of principal distributions and the weighted average life of each such class of certificates will be affected by the rates of prepayment on the Mortgage Loans experienced both before and after the commencement of principal distributions on such classes. For further information regarding the effect of principal prepayments on the weighted average lives of the Offered Certificates, SEE "YIELD ON THE CERTIFICATES" IN THIS PROSPECTUS SUPPLEMENT, INCLUDING THE TABLE ENTITLED "PERCENT OF INITIAL CERTIFICATE PRINCIPAL BALANCE OUTSTANDING AT THE SPECIFIED PERCENTAGES OF THE PREPAYMENT ASSUMPTION."

THE YIELD TO MATURITY ON THE OFFERED CERTIFICATES WILL DEPEND ON A VARIETY OF FACTORS.

        The yield to maturity on the Offered Certificates will depend on:

        o  the applicable pass-through rate thereon;

        o  the applicable purchase price;

        o  the rate and timing of principal payments (including prepayments and collections upon defaults, liquidations and repurchases) and the allocation thereof to reduce the certificate principal balance of the Offered Certificates; and

        o  the rate, timing and severity of realized losses on the Mortgage Loans, adjustments to the mortgage rates on the adjustable-rate Mortgage Loans included in the mortgage pool, the amount of excess interest generated by the Mortgage Loans and the allocation to the Offered Certificates of certain interest shortfalls.

        In general, if the Offered Certificates are purchased at a premium and principal distributions thereon occur at a rate faster than anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that assumed at the time of purchase. Conversely, if the Offered Certificates are purchased at a discount and principal distributions thereon occur at a rate slower than that anticipated at the time of purchase, the investor's actual yield to maturity will be lower than that originally assumed.

        The proceeds to the Depositor from the sale of the Offered Certificates were determined based on a number of assumptions, including a prepayment assumption of 28% CPR with respect to the

Page 410 of 1693

Page 89 of 181

Tab 14, p. 7 of 34
EXHIBIT 39, page 20

https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt

20/390

Jt.45-Page 20

<PAGE>

adjustable- rate Mortgage Loans and 100% PPC with respect to the fixed-rate Mortgage Loans as described in this prospectus supplement under "Yield on the Certificates" and weighted average lives corresponding thereto. No representation is made that the Mortgage Loans will prepay at such rate or at any other rate. The yield assumptions for the Offered Certificates will vary as determined at the time of sale.

THE YIELD TO MATURITY ON THE MEZZANINE CERTIFICATES WILL BE PARTICULARLY SENSITIVE TO THE RATE OF PREPAYMENTS ON THE MORTGAGE LOANS.

        The multiple class structure of the Mezzanine Certificates causes the yield of these classes to be particularly sensitive to changes in the rates of prepayment of the Mortgage Loans. Because distributions of principal will be made to the holders of such certificates according to the priorities described in this prospectus supplement, the yield to maturity on such classes of certificates will be sensitive to the rates of prepayment on the Mortgage Loans experienced both before and after the commencement of principal distributions on such classes. The yield to maturity on such classes of certificates will also be extremely sensitive to losses due to defaults on the Mortgage Loans (and the timing thereof), to the extent these losses are not covered by excess cashflow otherwise payable to the Class CE Certificates, to the Class B Certificates or to a class of Mezzanine Certificates with a lower payment priority. Furthermore, as described in this prospectus supplement, the timing of receipt of principal and interest by the Mezzanine Certificates may be adversely affected by losses even if these classes of certificates do not ultimately bear such loss.

VIOLATION OF CONSUMER PROTECTION LAWS MAY RESULT IN LOSSES ON THE MORTGAGE LOANS AND YOUR CERTIFICATES.

        Applicable state laws generally regulate interest rates and other charges, require certain disclosure, and require licensing of the originators. In addition, other state laws, public policy and general principles of equity relating to the protection of consumers, unfair and deceptive practices and debt collection practices may apply to the origination, servicing and collection of the Mortgage Loans.

        The Mortgage Loans are also subject to federal laws, including:

    o   the Federal Truth-in-Lending Act and Regulation Z promulgated thereunder, which require certain disclosures to the mortgagors regarding the terms of the Mortgage Loans;

    o   the Equal Credit Opportunity Act and Regulation B promulgated thereunder, which prohibit discrimination on the basis of age, race, color, sex, religion, marital status, national origin, receipt of public assistance or the exercise of any right under the Consumer Credit Protection Act, in the extension of credit;

    o   the Fair Credit Reporting Act, which regulates the use and reporting of information related to the mortgagor's credit experience; and

    o   the Depository Institutions Deregulation and Monetary Control Act of 1980, which preempts certain state usury laws.

Page 411 of 1693

Violations of certain provisions of these federal and state laws may limit the ability of the servicer to collect all or part of the principal of or interest on the Mortgage Loans and in addition could subject the trust to damages and administrative enforcement. In particular, the failure of the originators to comply with certain requirements of the Federal Truth-in-Lending Act, as implemented by Regulation Z, could subject the trust to monetary penalties, and result in the mortgagors'

<div align="center">S-14</div>

<PAGE>

rescinding the Mortgage Loans against the trust. In addition to federal law, some states have enacted, or may enact, laws or regulations that prohibit inclusion of some provisions in Mortgage Loans that have interest rates or origination costs in excess of prescribed levels, and require that mortgagors be given certain disclosures prior to the consummation of the Mortgage Loans and restrict the servicer's ability to foreclose in response to mortgagor defaults. The failure of the originators to comply with these laws could subject the trust to significant monetary penalties, could result in the mortgagors rescinding the Mortgage Loans against the trust and/or limit the servicer's ability to foreclose upon the related mortgaged properties in the event of mortgagor defaults.

The mortgage loan seller will represent that, as of the Closing Date, each Mortgage Loan is in compliance with applicable federal and state laws and regulations. In the event of a breach of such representation, the mortgage loan seller will be obligated to cure such breach or repurchase or replace the affected Mortgage Loan in the manner described in the prospectus. If the mortgage loan seller is unable or otherwise fails to satisfy such obligations, the yield on the Offered Certificates may be materially and adversely affected.

THE TRANSFER OF SERVICING MAY RESULT IN HIGHER DELINQUENCIES AND DEFAULTS WHICH MAY ADVERSELY AFFECT THE YIELD ON YOUR CERTIFICATES.

Although the servicer has agreed to act as primary servicer pursuant to the terms and provisions of the Pooling and Servicing Agreement, the transfer of the primary servicing obligations with respect to all of the Mortgage Loans was not completed as of the cut-off date. The primary servicing obligations are expected to transfer from the originators (or other parties that are currently servicing a portion of the Mortgage Loans) to the servicer no later than December 1, 2004. All transfers of servicing involve the risk of disruption in collections due to data input errors, misapplied or misdirected payments, system incompatibilities and other reasons. As a result, the rate of delinquencies and defaults is likely to increase at least for a period of time. There can be no assurance as to the extent or duration of any disruptions associated with the transfer of servicing or as to the resulting effects on the yield on your certificates.

INTEREST GENERATED BY THE MORTGAGE LOANS MAY BE INSUFFICIENT TO MAINTAIN OR RESTORE OVERCOLLATERALIZATION.

The Mortgage Loans are expected to generate more interest than is needed to pay interest owed on the Offered Certificates and the Class B Certificates and to pay certain fees and expenses of the trust. Any remaining interest generated by the Mortgage Loans will then be used to absorb losses that occur on the Mortgage Loans. After these financial obligations of the trust are covered,

available excess interest generated by the Mortgage Loans will be used to maintain or restore the overcollateralization. We cannot assure you, however, that enough excess interest will be generated to maintain or restore the required level of overcollateralization. The factors described below will affect the amount of excess interest that the Mortgage Loans will generate:

- o Every time a Mortgage Loan is prepaid in full, excess interest may be reduced because such Mortgage Loan will no longer be outstanding and generating interest or, in the case of a partial prepayment, will be generating less interest.

- o Every time a Mortgage Loan is liquidated or written off, excess interest may be reduced because such Mortgage Loan will no longer be outstanding and generating interest.

- o If the rates of delinquencies, defaults or losses on the Mortgage Loans are higher than expected, excess interest will be reduced by the amount necessary to compensate for

S-15

<PAGE>

any shortfalls in cash available to make required distributions on the Offered Certificates and the Class B Certificates.

- o The adjustable-rate Mortgage Loans have mortgage rates that adjust less frequently than, and on the basis of an index that is different from the index used to determine, the pass-through rates on the Offered Certificates and the Class B Certificates, and the fixed-rate Mortgage Loans have mortgage rates that do not adjust. As a result, the pass-through rates on the Offered Certificates and the Class B Certificates may increase relative to mortgage rates on the Mortgage Loans, requiring that a greater portion of the interest generated by the Mortgage Loans be applied to cover interest on such certificates.

INTEREST PAYMENTS ON THE MORTGAGE LOANS MAY BE INSUFFICIENT TO PAY INTEREST ON YOUR CERTIFICATES.

When a Mortgage Loan is prepaid in full, the mortgagor is charged interest only up to the date on which payment is made, rather than for an entire month. This may result in a shortfall in interest collections available for payment on the next Distribution Date. The servicer is required to cover a portion of the shortfall in interest collections that are attributable to prepayments in full on the Mortgage Loans, but only up to the servicing fee payable to the servicer for the related interest accrual period. If the credit enhancement is insufficient to cover this shortfall in excess of the amount the servicer covers, you may incur a loss. In addition, the servicer will not cover shortfalls in interest collections due to bankruptcy proceedings or the application of the Servicemembers Civil Relief Act (the "Relief Act") or similar state or local laws.

On any Distribution Date, any shortfalls resulting from the application of the Relief Act or similar state or local laws and any prepayment interest shortfalls to the extent not covered by compensating interest paid by the servicer will be allocated, first, to the Class CE-1 Certificates, second, to the Class B Certificates, third, to the Class M-11 Certificates, fourth, to the

Class M-10 Certificates, fifth, to the Class M-9 Certificates, sixth, to the Class M-8 Certificates, seventh, to the Class M-7 Certificates, eighth, to the Class M-6 Certificates, ninth, to the Class M-5 Certificates, tenth, to the Class M-4 Certificates, eleventh, to the Class M-3 Certificates, twelfth, to the Class M-2 Certificates, thirteenth, to the Class M-1 Certificates and fourteenth, to the Class A Certificates, on a PRO RATA basis, based on their respective senior interest distribution amounts for such Distribution Date before such reduction. The holders of the Offered Certificates and the Class B Certificates will be entitled to reimbursement for any such interest shortfalls but only to the extent of available funds and in the order of priority set forth under "Description of the Certificates--Overcollateralization Provisions." If these shortfalls are allocated to the Offered Certificates and the Class B Certificates the amount of interest paid to those certificates will be reduced, adversely affecting the yield on your investment.

THE LIQUIDITY OF YOUR CERTIFICATES MAY BE LIMITED.

        The Underwriter has no obligation to make a secondary market in the classes of Offered Certificates. There is therefore no assurance that a secondary market will develop or, if it develops, that it will continue. Consequently, you may not be able to sell your certificates readily or at prices that will enable you to realize your desired yield. The market values of the certificates are likely to fluctuate; these fluctuations may be significant and could result in significant losses to you.

        The secondary markets for asset-backed securities have experienced periods of illiquidity and can be expected to do so in the future. Illiquidity can have a severely adverse effect on the prices of securities that are especially sensitive to prepayment, credit or interest rate risk, or that have been structured to meet the investment requirements of limited categories of investors.

                                    S-16
<PAGE>


THE CAP AGREEMENTS ARE SUBJECT TO COUNTERPARTY RISK

        The assets of the trust include the Cap Agreements which will require the counterparty thereunder to make certain payments for the benefit of the holders of the Offered Certificates and the Class B Certificates. To the extent that distributions on the Offered Certificates and the Class B Certificates depend in part on payments to be received by the trustee under the Cap Agreements, the ability of the trustee to make such distributions on the Offered Certificates and the Class B Certificates will be subject to the credit risk of the counterparty to the Cap Agreements. Although there is a mechanism in place to facilitate replacement of the Cap Agreements upon the default or credit impairment of the counterparty, there can be no assurance that any such mechanism will result in the ability of the trustee to obtain suitable replacement Cap Agreements.

THE RETURN ON YOUR CERTIFICATES COULD BE REDUCED BY SHORTFALLS DUE TO THE APPLICATION OF THE RELIEF ACT.

        The Relief Act and similar state or local laws provide relief to mortgagors who enter active military service and to mortgagors in reserve status who are called to active military service after the origination of their

mortgage loans. The ongoing military operations of the United States in Iraq and Afghanistan have caused an increase in the number of citizens in active military duty, including those citizens previously in reserve status. Under the Relief Act the interest rate applicable to a mortgage loan for which the related mortgagor is called to active military service will be reduced from the percentage stated in the related mortgage note to 6.00%. This interest rate reduction and any reduction provided under similar state or local laws could result in an interest shortfall because neither the master servicer nor the servicer will be able to collect the amount of interest which otherwise would be payable with respect to such Mortgage Loan if the Relief Act or similar state or local law was not applicable thereto. This shortfall will not be paid by the mortgagor on future due dates or advanced by the master servicer or the servicer and, therefore, will reduce the amount available to pay interest to the certificateholders on subsequent Distribution Dates. We do not know how many Mortgage Loans in the mortgage pool have been or may be affected by the application of the Relief Act or similar state or local law.

POSSIBLE REDUCTION OR WITHDRAWAL OF RATINGS ON THE OFFERED CERTIFICATES.

        Each rating agency rating the Offered Certificates may change or withdraw its initial ratings at any time in the future if, in its judgment, circumstances warrant a change. No person is obligated to maintain the ratings at their initial levels. If a rating agency reduces or withdraws its rating on one or more classes of the Offered Certificates, the liquidity and market value of the affected certificates is likely to be reduced.

SUITABILITY OF THE OFFERED CERTIFICATES AS INVESTMENTS.

        The Offered Certificates are not suitable investments for any investor that requires a regular or predictable schedule of monthly payments or payment on any specific date. The Offered Certificates are complex investments that should be considered only by investors who, either alone or with their financial, tax and legal advisors, have the expertise to analyze the prepayment, reinvestment, default and market risk, the tax consequences of an investment and the interaction of these factors.

        ALL CAPITALIZED TERMS USED IN THIS PROSPECTUS SUPPLEMENT WILL HAVE THE MEANINGS ASSIGNED TO THEM UNDER "DESCRIPTION OF THE CERTIFICATES--GLOSSARY" OR IN THE PROSPECTUS UNDER "INDEX OF DEFINED TERMS."

                                    S-17

<PAGE>

                               USE OF PROCEEDS

        DB Structured Products, Inc. (the "Mortgage Loan Seller"), will sell the Mortgage Loans to Ace Securities Corp. (the "Depositor") and the Depositor will convey the Mortgage Loans to the trust fund in exchange for and concurrently with the delivery of the certificates. Net proceeds from the sale of the Offered Certificates will be applied by the Depositor to the purchase of the Mortgage Loans from the Mortgage Loan Seller. Such net proceeds together with certain classes of certificates not offered by this prospectus supplement will represent the purchase price to be paid by the Depositor to the Mortgage Loan Seller for the Mortgage Loans. The Mortgage Loans were previously purchased by the Mortgage Loan Seller directly from the originates.

THE MORTGAGE POOL

GENERAL

        The pool of mortgage loans (the "Mortgage Pool") will consist of
approximately 5,906 conventional, one- to four-family, first and second lien,
fixed-rate and adjustable-rate mortgage loans (the "Mortgage Loans") on
residential real properties (the "Mortgaged Properties") and having an aggregate
principal balance as of the Cut-off Date of approximately $1,105,596,756, after
application of scheduled payments due on or before the Cut-off Date whether or
not received, and subject to a permitted variance of plus or minus 5%. The
Mortgage Loans have original terms to maturity of not greater than approximately
30 years. For purposes of calculating interest and principal distributions on
the Class A Certificates, the Mortgage Loans have been divided into two loan
groups, designated as the "Group I Mortgage Loans" and the "Group II Mortgage
Loans." The Group I Mortgage Loans consist of 4,325 fixed-rate and
adjustable-rate mortgage loans having an aggregate principal balance as of the
Cut-off Date of approximately $638,781,694, after application of scheduled
payments due on or before the Cut-off Date whether or not received, and subject
to a permitted variance of plus or minus 5%. The principal balances of the Group
I Mortgage Loans at origination conformed to Fannie Mae loan limits. The Group
II Mortgage Loans consist of 1,581 fixed-rate and adjustable-rate mortgage loans
having an aggregate principal balance as of the Cut-off Date of approximately
$466,815,062, after application of scheduled payments due on or before the
Cut-off Date whether or not received, and subject to a permitted variance of
plus or minus 5%. The principal balances of the Group II Mortgage Loans at
origination may or may not have conformed to Fannie Mae loan limits.

        Approximately 76.77% of the Mortgage Loans, by aggregate principal balance
as of the Cut-off Date, provide for level monthly payments in an amount
sufficient fully to amortize the Mortgage Loans over their terms or, in the case
of adjustable rate Mortgage Loans, monthly payments that will be adjusted to an
amount that will amortize such Mortgage Loans fully over their terms.
Approximately 6.83% of the Mortgage Loans, by aggregate principal balance as of
the Cut-off Date, are balloon loans (the "Balloon Loans"), which require the
related mortgagors to make balloon payments on the maturity date of such Balloon
Loans that are larger than the monthly payments made by such mortgagors on prior
due dates in order to amortize such Balloon Loans fully over their terms.
Approximately 16.39% of the Mortgage Loans, by aggregate principal balance as of
the Cut-off Date, are interest only loans (the "Interest Only Loans") which
require the related mortgagors to make monthly payments of only accrued interest
for the first two, three or five years following origination. After such
interest-only period, the mortgagor's monthly payment will be recalculated to
cover both interest and principal so that such Mortgage Loan will amortize fully
on or prior to its final payment date.

        Approximately 91.79% of the Mortgage Loans, by aggregate principal balance
as of the Cut-off Date, are secured by first mortgages or deeds of trust or
other similar security instruments creating first liens on residential
properties ("First Lien Mortgage Loans"). Approximately 8.21% of the Mortgage
Loans, by aggregate principal balance as of the Cut-off Date, are secured by
second

                                    S-18

<PAGE>

mortgages or deeds of trust or other similar security instruments creating second liens on residential properties ("Second Lien Mortgage Loans"). The Mortgaged Properties consist of attached, detached or semi-detached, one to four-family dwelling units, individual condominium units and individual units in planned unit developments.

References to percentages of the Mortgage Loans, unless otherwise noted, are calculated based on the aggregate principal balance of the Mortgage Loans as of the Cut-off Date.

The mortgage rate (the "Mortgage Rate") on each Mortgage Loan is the per annum rate of interest specified in the related mortgage note as reduced by application of the Relief Act or similar state or local laws and bankruptcy adjustments. Approximately 22.74% of the Mortgage Loans are fixed-rate mortgage loans and approximately 77.26% of the Mortgage Loans are adjustable-rate mortgage loans. The adjustable-rate mortgage loans are referred to herein as "ARM Loans". All of the ARM Loans provide for semi-annual adjustment to the Mortgage Rates applicable thereto based on Six-Month LIBOR (as described below). The first adjustment with respect to each ARM Loan will not occur until after an initial period of six months or two, three or five years from the date of origination thereof (each, a "Delayed First Adjustment Mortgage Loan"). In connection with each Mortgage Rate adjustment, the ARM Loans have corresponding adjustments to their monthly payment amount, in each case on each applicable adjustment date (each such date, an "Adjustment Date"). On each Adjustment Date, the Mortgage Rate on each ARM Loan will be adjusted generally to equal the sum of Six-Month LIBOR and a fixed percentage amount (the "Gross Margin") for that ARM Loan specified in the related mortgage note. The Mortgage Rate on each ARM Loan, however, including each Delayed First Adjustment Mortgage Loan, will not increase or decrease by more than the initial periodic rate cap (the "Periodic Rate Cap") specified in the related mortgage note on the initial Adjustment Date or increase or decrease by more than the subsequent periodic rate cap (the "Subsequent Periodic Rate Cap") specified in the related mortgage note on any subsequent Adjustment Date and will not exceed a specified maximum mortgage rate (the "Maximum Mortgage Rate") over the life of the ARM Loan or be less than a specified minimum mortgage rate (the "Minimum Mortgage Rate") over the life of the ARM Loan. The weighted average initial Periodic Rate Cap and Subsequent Periodic Rate Cap for the ARM Loans is approximately 2.170% per annum and 1.002% per annum, respectively. Effective with the first monthly payment due on each ARM Loan after each related Adjustment Date, the monthly payment amount will be adjusted to an amount that will fully amortize the outstanding principal balance of the related ARM Loan over its remaining term and pay interest at the Mortgage Rate as so adjusted. Due to the application of the Periodic Rate Caps and the Maximum Mortgage Rates, the Mortgage Rate on each ARM Loan, as adjusted on any related Adjustment Date, may be less than the sum of the Index, calculated as described in this prospectus supplement, and the related Gross Margin. See "--The Index" in this prospectus supplement. None of the ARM Loans permit the related mortgagor to convert the adjustable Mortgage Rate thereon to a fixed Mortgage Rate.

Substantially all of the Mortgage Loans have scheduled monthly payments due on the first day of the month (with respect to each Mortgage Loan, the "Due Date"). Each Mortgage Loan will contain a customary "due-on-sale" clause which provides that the Mortgage Loan must be repaid at the time of a sale of the related Mortgaged Property or assumed by a creditworthy purchaser of the related Mortgaged Property.

Page 417 of 1693

Approximately 78.76% of the Mortgage Loans provide for payment at the

mortgagor of a prepayment charge (a "Prepayment Charge") in limited circumstances on certain prepayments as provided in the related mortgage note. Each such Mortgage Loan provides for payment of a Prepayment Charge on certain partial prepayments and all prepayments in full made up to five years from the date of origination of the Mortgage Loan, as provided in the related mortgage note. The amount of the Prepayment Charge is as provided in the related mortgage note, but, in most cases, is equal to six months' interest on any amounts prepaid in excess of 20% of the original principal balance of the related Mortgage Loan in any 12 month period, as permitted by law. The holders of the

<center>S-19</center>

<PAGE>

Class P Certificates will be entitled to all Prepayment Charges received on the Mortgage Loans, and these amounts will not be available for distribution on the other classes of certificates. Under the limited instances described under the terms of the pooling and servicing agreement, the servicer may waive the payment of any otherwise applicable Prepayment Charge with respect to the Mortgage Loans. As of July 1, 2003, the Alternative Mortgage Parity Act of 1982 (the "Parity Act"), which regulates the ability of originators to impose prepayment charges, was amended, and as a result, the originators will be required to comply with state and local laws in originating mortgage loans with prepayment charge provisions with respect to loans originated on or after July 1, 2003. The Depositor makes no representations as to the effect that the prepayment charges and the recent amendment of the Parity Act may have on the prepayment performance of the Mortgage Loans. However, the recent amendment of the Parity Act does not retroactively affect loans originated before July 1, 2003. Investors should conduct their own analysis of the effect, if any, that the Prepayment Charges, decisions by the servicer with respect to the waiver of the Prepayment Charges and the recent amendment to the Parity Act, may have on the prepayment performance of the Mortgage Loans. The Depositor makes no representation as to the effect that the Prepayment Charges, decisions by the servicer with respect to the waiver of the Prepayment Charges and the recent amendment to the Parity Act, may have on the prepayment performance of the Mortgage Loans. See "Certain Legal Aspects of the Loans-Enforceability of Prepayment and Late Payment Fees" in the prospectus.

MORTGAGE LOAN CHARACTERISTICS

        The average principal balance of the Mortgage Loans at origination was approximately $187,372. No Mortgage Loan had a principal balance at origination greater than approximately $850,000 or less than approximately $4,500. The average principal balance of the Mortgage Loans as of the Cut-off Date was approximately $187,199. No Mortgage Loan had a principal balance as of the Cut-off Date greater than approximately $849,286 or less than approximately $3,440.

        The Mortgage Loans had Mortgage Rates as of the Cut-off Date ranging from approximately 4.625% per annum to approximately 13.125% per annum, and the weighted average Mortgage Rate was approximately 7.190% per annum. As of the Cut-off Date, the ARM Loans had Gross Margins ranging from approximately 1.000% per annum to approximately 9.750% per annum, Minimum Mortgage Rates ranging from approximately 3.250% per annum to approximately 12.000% per annum and Maximum Mortgage Rates ranging from approximately 8.375% per annum to approximately 18.625% per annum. As of the Cut-off Date, the weighted average Gross Margin was approximately 5.874%, the weighted average Minimum Mortgage Rate was

approximately 6.874% per annum and the weighted average Maximum Mortgage Rate was approximately 13.313% per annum. The latest first Adjustment Date following the Cut-off Date on any ARM Loan occurs on October 1, 2009 and the weighted average next Adjustment Date for all of the ARM Loans following the Cut-off Date is November 2, 2006.

The weighted average combined loan-to-value ratio of the Mortgage Loans at origination was approximately 82.37%. At origination, no Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00% or less than approximately 17.24%.

The weighted average remaining term to stated maturity of the Mortgage Loans was approximately 344 months as of the Cut-off Date. None of the Mortgage Loans will have a first due date prior to January 1, 2000 or after November 1, 2004 or will have a remaining term to stated maturity of less than 42 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any Mortgage Loan is October 1, 2034.

As of the Cut-off Date, the weighted average FICO Score for the Mortgage Loans that were scored is approximately 640. No Mortgage Loan which was scored had a FICO Score as of the Cut-off Date greater than 900 or less than 500.

<div align="center">S-20</div>

<PAGE>

The Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding):

<div align="center">S-21</div>

<PAGE>

<div align="center">COLLATERAL TYPE OF THE MORTGAGE LOANS</div>

| COLLATERAL TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Fixed - 5 Year ............... | 1 | $ 3,440 | 0.00% |
| Fixed - 15 Year .............. | 100 | 10,501,546 | 0.95 |
| Fixed - 20 Year .............. | 21 | 2,221,645 | 0.20 |
| Fixed - 30 Year .............. | 995 | 163,114,904 | 14.75 |
| Balloon - 20/30 .............. | 7 | 271,977 | 0.02 |
| Balloon - 15/30 .............. | 1,210 | 75,278,126 | 6.81 |
| ARM - 6 Month ................ | 11 | 2,644,884 | 0.24 |
| ARM - 2 Year/6 Month ......... | 2,729 | 608,106,352 | 55.00 |
| ARM - 2 Year/6 Month - IO .... | 506 | 163,444,909 | 14.78 |
| ARM - 3 Year/6 Month ......... | 156 | 34,059,374 | 3.08 |
| ARM - 3 Year/6 Month - IO .... | 6 | 1,445,352 | 0.13 |
| ARM - 5 Year/6 Month ......... | 115 | 28,163,925 | 2.55 |
| ARM - 5 Year/6 Month - IO .... | 49 | 16,340,322 | 1.48 |
| | ----- | -------------- | ------ |
| Total ................... | 5,906 | $1,105,596,756 | 100.00% |
| | ===== | ============== | ====== |

Page 419 of 1693

LIEN PRIORITY OF THE MORTGAGE LOANS

| LIEN PRIORITY | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| First Lien ................... | 4,410 | $ 1,014,783,288 | 91.79% |
| Second Lien ................. | 1,496 | 90,813,468 | 8.21 |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |

S-22

<PAGE>

PRINCIPAL BALANCES OF THE MORTGAGE LOANS AT ORIGINATION

| PRINCIPAL BALANCE AT ORIGINATION ($) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AT ORIGINATION | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AT ORIGINATION |
|---|---|---|---|
| 0.01 - 50,000.00 ...... | 754 | $ 26,162,322 | 2.36% |
| 50,000.01 - 100,000.00 ...... | 1,297 | 95,612,325 | 8.64 |
| 100,000.01 - 150,000.00 ...... | 945 | 118,138,388 | 10.68 |
| 150,000.01 - 200,000.00 ...... | 732 | 127,997,121 | 11.57 |
| 200,000.01 - 250,000.00 ...... | 604 | 135,837,674 | 12.28 |
| 250,000.01 - 300,000.00 ...... | 433 | 119,080,795 | 10.76 |
| 300,000.01 - 350,000.00 ...... | 349 | 113,575,423 | 10.26 |
| 350,000.01 - 400,000.00 ...... | 260 | 97,352,659 | 8.80 |
| 400,000.01 - 450,000.00 ...... | 170 | 72,595,521 | 6.56 |
| 450,000.01 - 500,000.00 ...... | 137 | 65,553,066 | 5.92 |
| 500,000.01 - 550,000.00 ...... | 79 | 41,561,160 | 3.76 |
| 550,000.01 - 600,000.00 ...... | 64 | 36,936,487 | 3.34 |
| 600,000.01 - 650,000.00 ...... | 34 | 21,328,808 | 1.93 |
| 650,000.01 - 700,000.00 ...... | 20 | 13,464,860 | 1.22 |
| 700,000.01 - 750,000.00 ...... | 16 | 11,782,011 | 1.06 |
| 750,000.01 - 800,000.00 ...... | 7 | 5,462,400 | 0.49 |
| 800,000.01 - 850,000.00 ...... | 5 | 4,178,500 | 0.38 |
| Total ................... | 5,906 | $ 1,106,619,520 | 100.00% |

S-23

<PAGE>

PRINCIPAL BALANCES OF THE MORTGAGE LOANS
AS OF THE CUT-OFF DATE

| PRINCIPAL BALANCE | NUMBER OF MORTGAGE | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF |
|---|---|---|---|

```
  AS OF THE CUT-OFF DATE ($)      LOANS      THE CUT-OFF DATE      THE CUT-OFF DATE
---------------------------------------------------------------------------------
       0.01 -   50,000.00 ......     754    $      26,111,070           2.36%
  50,000.01 -  100,000.00 ......   1,300          95,829,396           8.67
 100,000.01 -  150,000.00 ......     944         118,023,947          10.68
 150,000.01 -  200,000.00 ......     732         127,970,161          11.57
 200,000.01 -  250,000.00 ......     602         135,301,588          12.24
 250,000.01 -  300,000.00 ......     433         118,972,182          10.76
 300,000.01 -  350,000.00 ......     349         113,485,108          10.26
 350,000.01 -  400,000.00 ......     261          97,676,826           8.83
 400,000.01 -  450,000.00 ......     171          73,035,599           6.61
 450,000.01 -  500,000.00 ......     135          64,601,724           5.84
 500,000.01 -  550,000.00 ......      79          41,522,387           3.76
 550,000.01 -  600,000.00 ......      64          36,898,771           3.34
 600,000.01 -  650,000.00 ......      34          21,307,368           1.93
 650,000.01 -  700,000.00 ......      20          13,455,314           1.22
 700,000.01 -  750,000.00 ......      16          11,773,906           1.06
 750,000.01 -  800,000.00 ......       7           5,456,420           0.49
 800,000.01 -  850,000.00 ......       5           4,174,990           0.38
                                   -----    ----------------        ------
      Total ..................    5,906    $ 1,105,596,756          100.00%
                                   =====    ================        ======
```

S-24

<PAGE>

GEOGRAPHIC DISTRIBUTION OF THE MORTGAGED PROPERTIES OF THE MORTGAGE LOANS

| LOCATION | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| California ................... | 2,627 | $    625,353,356 | 56.56% |
| Florida ..................... | 420 | 57,345,975 | 5.19 |
| New York .................... | 184 | 45,473,605 | 4.11 |
| Illinois .................... | 254 | 37,675,624 | 3.41 |
| Maryland .................... | 199 | 34,772,113 | 3.15 |
| Texas ....................... | 297 | 31,102,351 | 2.81 |
| Nevada ...................... | 174 | 30,147,238 | 2.73 |
| Virginia .................... | 180 | 28,221,217 | 2.55 |
| Arizona ..................... | 182 | 23,810,076 | 2.15 |
| New Jersey .................. | 107 | 22,956,145 | 2.08 |
| Washington .................. | 97 | 15,234,943 | 1.38 |
| Connecticut ................. | 68 | 14,115,162 | 1.28 |
| Massachusetts ............... | 65 | 13,598,951 | 1.23 |
| Colorado .................... | 82 | 12,062,185 | 1.09 |
| Pennsylvania ................ | 96 | 11,701,230 | 1.06 |
| Georgia ..................... | 88 | 11,588,406 | 1.05 |
| Ohio ........................ | 91 | 9,127,536 | 0.83 |
| Hawaii ...................... | 35 | 8,942,572 | 0.81 |
| Michigan .................... | 79 | 7,850,428 | 0.71 |
| Louisiana ................... | 90 | 6,833,801 | 0.62 |
| Oregon ...................... | 40 | 6,164,187 | 0.56 |
| Rhode Island ................ | 27 | 5,096,637 | 0.46 |
| North Carolina .............. | 46 | 4,888,846 | |

Page 421 of 1693

```
Tennessee ...................    42        4,290,919        0.39
District of Columbia .........  21        4,214,708        0.38
Indiana .....................   49        4,084,614        0.37
Montana .....................   27        3,947,997        0.36
Missouri ....................   38        3,298,246        0.30
Utah ........................   31        3,246,162        0.29
Minnesota ...................   19        2,650,186        0.24
New Mexico ..................   15        1,996,927        0.18
South Carolina ..............   16        1,691,238        0.15
New Hampshire ...............   12        1,641,325        0.15
Delaware ....................    9        1,443,224        0.13
Oklahoma ....................   15        1,323,790        0.12
Mississippi .................   14        1,276,034        0.12
Idaho .......................   17        1,187,780        0.11
Kentucky ....................   13        1,185,111        0.11
Wisconsin ...................   12        1,087,738        0.10
Arkansas ....................    9          657,138        0.06
Maine .......................    3          594,933        0.05
Kansas ......................    5          554,373        0.05
Iowa ........................    4          313,667        0.03
West Virginia ...............    3          276,305        0.02
Alaska ......................    1          224,841        0.02
Wyoming .....................    1          214,291        0.02
Alabama .....................    1           75,887        0.01
Nebraska ....................    1           56,737        0.01
                               -----    --------------    ------
   Total ...................  5,906    $ 1,105,596,756    100.00%
                               =====    ==============    ======
```

                                  S-25

<PAGE>


            MORTGAGE RATES OF THE MORTGAGE LOANS AS OF THE CUT-OFF DATE

| MORTGAGE RATE (%) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 4.500 - 4.999 .............. | 14 | $ 5,214,393 | 0.47% |
| 5.000 - 5.499 .............. | 73 | 21,422,971 | 1.94 |
| 5.500 - 5.999 .............. | 487 | 139,767,048 | 12.64 |
| 6.000 - 6.499 .............. | 572 | 151,462,195 | 13.70 |
| 6.500 - 6.999 .............. | 1,209 | 310,448,348 | 28.08 |
| 7.000 - 7.499 .............. | 584 | 129,286,907 | 11.69 |
| 7.500 - 7.999 .............. | 781 | 157,104,705 | 14.21 |
| 8.000 - 8.499 .............. | 281 | 47,420,132 | 4.29 |
| 8.500 - 8.999 .............. | 423 | 47,949,972 | 4.34 |
| 9.000 - 9.499 .............. | 122 | 12,249,129 | 1.11 |
| 9.500 - 9.999 .............. | 456 | 30,831,367 | 2.79 |
| 10.000 - 10.499 .............. | 124 | 7,882,956 | 0.71 |
| 10.500 - 10.999 .............. | 484 | 30,855,322 | 2.79 |
| 11.000 - 11.499 .............. | 77 | 3,875,132 | 0.35 |
| 11.500 - 11.999 .............. | 98 | 4,723,338 | 0.43 |
| 12.000 - 12.499 .............. | 32 | 1,565,015 | 0.14 |
| 12.500 - 12.999 .............. | 88 | 3,488,449 | |

Page 422 of 1693

```
13.000 - 13.499 ...............       1              49,378          0.00
                                  -----     ---------------         ------
     Total ..................    5,906     $ 1,105,596,756         100.00%
                                  =====     ===============         ======
```

ORIGINAL TERM OF THE MORTGAGE LOANS

| ORIGINAL TERM | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 60 months ................... | 1 | $ 3,440 | 0.00% |
| 180 months ................... | 1,310 | 85,779,672 | 7.76 |
| 240 months ................... | 28 | 2,493,622 | 0.23 |
| 360 months ................... | 4,567 | 1,017,320,022 | 92.02 |
| Total .................. | 5,906 | $ 1,105,596,756 | 100.00% |

S-26

<PAGE>

REMAINING TERM TO STATED MATURITY OF
THE MORTGAGE LOANS AS OF THE CUT-OFF DATE

| REMAINING TERM TO STATED MATURITY | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 1 - 60 months .............. | 1 | $ 3,440 | 0.00% |
| 121 - 180 months ............. | 1,310 | 85,779,672 | 7.76 |
| 181 - 240 months ............. | 28 | 2,493,622 | 0.23 |
| 301 - 360 months ............. | 4,567 | 1,017,320,022 | 92.02 |
| Total .................. | 5,906 | $ 1,105,596,756 | 100.00% |

PROPERTY TYPES OF THE MORTGAGE LOANS

| PROPERTY TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Single Family Residence ...... | 4,224 | $ 783,458,393 | 70.86% |
| PUD .......................... | 798 | 146,272,345 | 13.23 |
| Condominium .................. | 548 | 97,323,992 | 8.80 |
| 2-4 Family ................... | 336 | 78,542,025 | 7.10 |
| Total .................. | 5,906 | $ 1,105,596,756 | 100.00% |

### ORIGINAL COMBINED LOAN-TO-VALUE RATIOS OF THE MORTGAGE LOANS

| ORIGINAL COMBINED LOAN-TO-VALUE RATIO (%) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Less than or equal to 50.00 .. | 96 | $ 12,348,361 | 1.12% |
| 50.01 - 55.00 ............... | 54 | 10,362,259 | 0.94 |
| 55.01 - 60.00 ............... | 83 | 15,467,875 | 1.40 |
| 60.01 - 65.00 ............... | 123 | 24,547,367 | 2.22 |
| 65.01 - 70.00 ............... | 207 | 42,745,622 | 3.87 |
| 70.01 - 75.00 ............... | 274 | 66,587,869 | 6.02 |
| 75.01 - 80.00 ............... | 2,020 | 484,226,587 | 43.80 |
| 80.01 - 85.00 ............... | 456 | 104,596,389 | 9.46 |
| 85.01 - 90.00 ............... | 735 | 165,964,792 | 15.01 |
| 90.01 - 95.00 ............... | 446 | 86,566,138 | 7.83 |
| 95.01 - 100.00 ............... | 1,412 | 92,183,495 | 8.34 |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |

S-27

<PAGE>

### DOCUMENTATION TYPE OF THE MORTGAGE LOANS

| DOCUMENTATION TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Full/Alternative Documentation .............. | 3,383 | $ 605,387,443 | 54.76% |
| Stated Income Documentation .. | 2,045 | 391,638,651 | 35.42 |
| Limited/Lite Documentation ... | 473 | 107,731,672 | 9.74 |
| No Income Documentation ...... | 5 | 838,990 | 0.08 |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |

### FICO SCORE FOR THE MORTGAGE LOANS

| FICO SCORE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 500 - 524 .................... | 99 | $ 16,447,273 | 1.49% |
| 525 - 549 .................... | 244 | 44,043,211 | 3.98 |
| 550 - 574 .................... | 396 | 83,118,445 | 7.52 |
| 575 - 599 .................... | 584 | 111,608,079 | 10.09 |
| 600 - 624 .................... | 1,021 | 193,617,600 | 17.51 |
| 625 - 649 .................... | 1,179 | 210,604,439 | |

Tab. 145 p. 21 of 34

EXHIBIT 39, page 34

Jt.45-Page 34

| | | | |
|---|---|---|---|
| 650 - 674 ........................ | 920 | 166,032,839 | 15.02 |
| 675 - 699 ....................... | 614 | 116,883,843 | 10.57 |
| 700 - 724 ...................... | 352 | 66,808,648 | 6.04 |
| 725 - 749 .................... | 256 | 47,263,950 | 4.27 |
| 750 - 774 .................... | 172 | 35,686,535 | 3.23 |
| 775 - 799 ................... | 62 | 11,908,892 | 1.08 |
| 800 - 824 ................... | 6 | 1,485,687 | 0.13 |
| Greater than or equal to 900 . | 1 | 87,314 | 0.01 |
| | ----- | -------------- | ------ |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |
| | ===== | ============== | ====== |

### LOAN PURPOSE OF THE MORTGAGE LOANS

| LOAN PURPOSE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Purchase ..................... | 3,292 | $ 553,143,875 | 50.03% |
| Refinance - Cashout ......... | 1,994 | 428,296,723 | 38.74 |
| Refinance - Rate Term ........ | 620 | 124,156,158 | 11.23 |
| | ----- | -------------- | ------ |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |
| | ===== | ============== | ====== |

S-28

<PAGE>

### OCCUPANCY STATUS OF THE MORTGAGE LOANS

| OCCUPANCY STATUS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Primary ..................... | 5,452 | $ 1,031,590,011 | 93.31% |
| Investment ................... | 358 | 57,190,969 | 5.17 |
| Second Home ................ | 96 | 16,815,776 | 1.52 |
| | ----- | -------------- | ------ |
| Total ................... | 5,906 | $ 1,105,596,756 | 100.00% |
| | ===== | ============== | ====== |

The occupancy status of a Mortgaged  Property is as represented by the mortgagor
in its loan application.

### NEXT ADJUSTMENT DATES FOR THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

| NEXT ADJUSTMENT DATE | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| December 2004 ................ | 1 | $ 31,222 | 0.00 |

```
January 2005 ..................        1          114,203        0.01
February 2005 .................        3          564,869        0.07
March 2005 ....................        8        2,151,276        0.25
August 2005 ...................        2          239,951        0.03
September 2005 ................        1           47,064        0.01
December 2005 .................        1           85,051        0.01
January 2006 ..................        1           80,260        0.01
February 2006 .................        4          539,436        0.06
April 2006 ....................        3          838,349        0.10
May 2006 ......................        3          418,221        0.05
June 2006 .....................       15        3,517,834        0.41
July 2006 .....................       67       17,896,974        2.10
August 2006 ...................      633      161,983,508       18.96
September 2006 ................    2,474      579,752,085       67.87
October 2006 ..................       29        5,935,841        0.69
May 2007 ......................        1          187,239        0.02
June 2007 .....................        1          186,951        0.02
July 2007 .....................        5        1,196,222        0.14
August 2007 ...................       34        7,732,516        0.91
September 2007 ................      120       26,037,798        3.05
October 2007 ..................        1          164,000        0.02
July 2009 .....................        5        2,225,202        0.26
August 2009 ...................       34        8,943,709        1.05
September 2009 ................      124       32,921,336        3.85
October 2009 ..................        1          414,000        0.05
                                   -----      ------------      ------
   Total ....................     3,572    $ 854,205,118      100.00%
                                   =====      ============      ======
```

                                       S-29

<PAGE>


              GROSS MARGINS OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL


|  |  | AGGREGATE | % OF AGGREGATE |
|  | NUMBER OF | PRINCIPAL BALANCE OUTSTANDING AS OF | PRINCIPAL BALANCE OUTSTANDING AS OF |
| GROSS MARGIN (%) | ARM LOANS | THE CUT-OFF DATE | THE CUT-OFF DATE |
|---|---|---|---|
| 1.000 - 1.499 ................. | 2 | $ 178,798 | 0.02% |
| 3.000 - 3.499 ................. | 2 | 554,350 | 0.06 |
| 3.500 - 3.999 ................. | 115 | 34,196,896 | 4.00 |
| 4.000 - 4.499 ................. | 24 | 5,914,136 | 0.69 |
| 4.500 - 4.999 ................. | 218 | 57,587,742 | 6.74 |
| 5.000 - 5.499 ................. | 911 | 208,743,099 | 24.44 |
| 5.500 - 5.999 ................. | 624 | 166,978,527 | 19.55 |
| 6.000 - 6.499 ................. | 682 | 171,782,150 | 20.11 |
| 6.500 - 6.999 ................. | 470 | 106,027,738 | 12.41 |
| 7.000 - 7.499 ................. | 247 | 53,189,353 | 6.23 |
| 7.500 - 7.999 ................. | 163 | 31,664,014 | 3.71 |
| 8.000 - 8.499 ................. | 100 | 15,842,050 | 1.85 |
| 8.500 - 8.999 ................. | 12 | 1,277,920 | 0.15 |
| 9.000 - 9.499 ................. | 1 | 83,268 | 0.01 |
| 9.500 - 9.999 ................. | 1 | 185,077 | 0.02 |
| Total ................... | 3,572 | $ 854,205,118 | 100.00% |

```
=====        ================        ======
```

### MAXIMUM MORTGAGE RATES OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

| MAXIMUM MORTGAGE RATE (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 8.000 - 8.499 ............... | 1 | $ 215,000 | 0.03% |
| 10.000 - 10.499 ............... | 1 | 175,359 | 0.02 |
| 10.500 - 10.999 ............... | 1 | 129,911 | 0.02 |
| 11.000 - 11.499 ............... | 22 | 7,069,395 | 0.83 |
| 11.500 - 11.999 ............... | 109 | 29,114,588 | 3.41 |
| 12.000 - 12.499 ............... | 478 | 137,256,368 | 16.07 |
| 12.500 - 12.999 ............... | 527 | 141,264,995 | 16.54 |
| 13.000 - 13.499 ............... | 872 | 228,239,859 | 26.72 |
| 13.500 - 13.999 ............... | 548 | 124,525,400 | 14.58 |
| 14.000 - 14.499 ............... | 508 | 107,560,035 | 12.59 |
| 14.500 - 14.999 ............... | 236 | 42,339,534 | 4.96 |
| 15.000 - 15.499 ............... | 164 | 25,137,054 | 2.94 |
| 15.500 - 15.999 ............... | 62 | 7,507,007 | 0.88 |
| 16.000 - 16.499 ............... | 26 | 2,650,517 | 0.31 |
| 16.500 - 16.999 ............... | 9 | 586,191 | 0.07 |
| 17.000 - 17.499 ............... | 3 | 193,029 | 0.02 |
| 17.500 - 17.999 ............... | 4 | 209,655 | 0.02 |
| 18.500 - 18.999 ............... | 1 | 31,222 | 0.00 |
| Total ................... | 3,572 | $ 854,205,118 | 100.00% |

S-30

<PAGE>

### MINIMUM MORTGAGE RATES OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

| MINIMUM MORTGAGE RATE (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 3.000 - 3.499 ............... | 1 | $ 309,550 | 0.04% |
| 4.000 - 4.499 ............... | 3 | 587,036 | 0.07 |
| 4.500 - 4.999 ............... | 23 | 7,297,664 | 0.85 |
| 5.000 - 5.499 ............... | 75 | 21,544,015 | 2.52 |
| 5.500 - 5.999 ............... | 460 | 132,363,092 | 15.50 |
| 6.000 - 6.499 ............... | 447 | 120,187,493 | 14.07 |
| 6.500 - 6.999 ............... | 962 | 256,187,071 | 29.99 |
| 7.000 - 7.499 ............... | 446 | 103,384,793 | 12.10 |
| 7.500 - 7.999 ............... | 598 | 128,099,177 | 15.00 |
| 8.000 - 8.499 ............... | 211 | 38,643,672 | 4.52 |
| 8.500 - 8.999 ............... | 206 | 31,218,783 | 3.65 |
| 9.000 - 9.499 ............... | 68 | 7,882,703 | 0.92 |
| 9.500 - 9.999 ............... | 43 | 4,694,692 | 0.55 |
| 10.000 - 10.499 ............... | 15 | 1,121,084 | 0.13 |

Page 427 of 1693

Page 106 of 181
Tab. 143, p. 24 of 34
EXHIBIT 39, page 37
37/390
https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt
Jt.45-Page 37

```
10.500 - 10.999 ..............         9            492,623         0.06
11.000 - 11.499 ..............         1             44,184         0.01
11.500 - 11.999 ..............         3            116,264         0.01
12.000 - 12.499 ..............         1             31,222         0.00
                                   -----      ---------------       ------
     Total ..................     3,572    $    854,205,118         100.00%
                                   =====      ===============       ======
```

INITIAL PERIODIC RATE CAPS OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

|  | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
| INITIAL PERIODIC RATE CAP (%) | | | |
|---|---|---|---|
| 1.000 ........................ | 48 | $ 8,614,710 | 1.01% |
| 1.125 ........................ | 1 | 123,154 | 0.01 |
| 1.160 ........................ | 2 | 193,117 | 0.02 |
| 1.497 ........................ | 1 | 539,547 | 0.06 |
| 1.500 ........................ | 1,958 | 460,745,066 | 53.94 |
| 1.987 ........................ | 1 | 157,170 | 0.02 |
| 2.000 ........................ | 96 | 30,919,146 | 3.62 |
| 2.115 ........................ | 1 | 155,612 | 0.02 |
| 3.000 ........................ | 1,417 | 336,869,701 | 39.44 |
| 5.000 ........................ | 47 | 15,887,895 | 1.86 |
| Total .................. | 3,572 | $ 854,205,118 | 100.00% |

S-31

<PAGE>

SUBSEQUENT PERIODIC RATE CAPS OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

| SUBSEQUENT PERIODIC RATE CAP (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 0.750 ........................ | 1 | $ 301,880 | 0.04% |
| 1.000 ........................ | 3,548 | 850,688,122 | 99.59 |
| 1.500 ........................ | 19 | 2,560,108 | 0.30 |
| 2.000 ........................ | 4 | 655,007 | 0.08 |
| Total .................. | 3,572 | $ 854,205,118 | 100.00% |

LIFETIME RATE CAPS OF THE ARM LOANS INCLUDED IN THE MORTGAGE POOL

| LIFETIME RATE CAP (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|

```
5.000 - 5.499 ................       1     $          175,359        0.02%
6.000 - 6.499 ................     800            155,217,331       18.17
6.500 - 6.999 ................   2,668            666,295,461       78.00
7.000 - 7.499 ................     103             32,516,967        3.81
                                -----            ------------       ------
        Total ................   3,572     $     854,205,118      100.00%
                                =====            ============       ======
```

PREPAYMENT PENALTY MONTHS OF THE MORTGAGE LOANS AT ORIGINATION

| PREPAYMENT PENALTY MONTHS AT ORIGINATION | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 0 ........................... | 1,448 | $   234,877,550 | 21.24% |
| 6 ........................... | 1 | 103,930 | 0.01 |
| 12 .......................... | 206 | 50,504,229 | 4.57 |
| 24 .......................... | 3,129 | 642,046,852 | 58.07 |
| 36 .......................... | 1,121 | 177,756,920 | 16.08 |
| 60 .......................... | 1 | 307,275 | 0.03 |
| Total ................. | 5,906 | $ 1,105,596,756 | 100.00% |

S-32

<PAGE>

ORIGINATORS OF THE MORTGAGE LOANS

| ORIGINATORS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| WMC ......................... | 4,483 | $   866,889,947 | 78.41% |
| People's Choice .............. | 1,145 | 199,782,410 | 18.07 |
| Other ....................... | 278 | 38,924,399 | 3.52 |
| Total ................. | 5,906 | $ 1,105,596,756 | 100.00% |

S-33

<PAGE>

GROUP I MORTGAGE LOAN CHARACTERISTICS

     Approximately 25.77% of the Group I Mortgage Loans are fixed-rate mortgage
loans and approximately  74.23% of the Group I Mortgage Loans are ARM Loans (the
"Group I ARM Loans"),  in each case, by aggregate principal balance of the Group
I Mortgage Loans as of the Cut-off Date.

     Approximately 92.96% of the Group I Mortgage Loans are First Lien Mortgage
Loans and  approximately  7.04% of the Group I Mortgage  Loans are  Second Lien

Mortgage Loans, in each case, by aggregate principal balance of the Group I Mortgage Loans as of the Cut-off Date.

Approximately 4.99% of the Group I Mortgage Loans are Balloon Loans and approximately 8.42% of the Group I Mortgage Loans are Interest Only Loans, in each case, by aggregate principal balance of the Group I Mortgage Loans as of the Cut-off Date.

The average principal balance of the Group I Mortgage Loans at origination was approximately $147,843. No Group I Mortgage Loan had a principal balance at origination greater than approximately $590,750 or less than approximately $13,200. The average principal balance of the Group I Mortgage Loans as of the Cut-off Date was approximately $147,695. No Group I Mortgage Loan had a principal balance as of the Cut-off Date greater than approximately $589,826 or less than approximately $13,197.

The Group I Mortgage Loans had Mortgage Rates as of the Cut-off Date ranging from approximately 4.925% per annum to approximately 12.990% per annum, and the weighted average Mortgage Rate was approximately 7.277% per annum. As of the Cut-off Date, the Group I ARM Loans had Gross Margins ranging from approximately 1.000% per annum to approximately 8.000% per annum, Minimum Mortgage Rates ranging from approximately 4.925% per annum to approximately 11.990% per annum and Maximum Mortgage Rates ranging from approximately 11.125% per annum to approximately 17.990% per annum. As of the Cut-off Date, the weighted average Gross Margin was approximately 5.966%, the weighted average Minimum Mortgage Rate was approximately 7.012% per annum and the weighted average Maximum Mortgage Rate was approximately 13.431% per annum. The latest first Adjustment Date following the Cut-off Date on any Group I ARM Loan occurs on September 1, 2009 and the weighted average next Adjustment Date for all of the Group I ARM Loans following the Cut-off Date is October 29, 2006.

The weighted average combined loan-to-value ratio of the Group I Mortgage Loans at origination was approximately 81.48%. At origination, no Group I Mortgage Loan had a combined loan-to-value ratio greater than approximately 100.00% or less than approximately 17.24%.

The weighted average remaining term to stated maturity of the Group I Mortgage Loans was approximately 347 months as of the Cut-off Date. None of the Group I Mortgage Loans will have a first due date prior to November 1, 2003 or after November 1, 2004, or will have a remaining term to stated maturity of less than 168 months or greater than 360 months as of the Cut-off Date. The latest maturity date of any Group I Mortgage Loan is October 1, 2034.

As of the Cut-off Date, the weighted average FICO Score for the Group I Mortgage Loans that were scored is approximately 634. No Group I Mortgage Loan which was scored had a FICO Score as of the Cut-off Date greater than 814 or less than 500.

The Group I Mortgage Loans are expected to have the following additional characteristics as of the Cut-off Date (the sum in any column may not equal the total indicated due to rounding):

S-34

<PAGE>

COLLATERAL TYPE OF THE GROUP I MORTGAGE LOANS

| COLLATERAL TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Fixed-15 Year ................ | 93 | $ 9,414,646 | 1.47% |
| Fixed-20 Year ................ | 11 | 1,390,006 | 0.22 |
| Fixed-30 Year ................ | 876 | 121,930,643 | 19.09 |
| Balloon-15/30 ................ | 740 | 31,860,784 | 4.99 |
| ARM - 6 Month ................ | 8 | 1,494,592 | 0.23 |
| ARM - 2 Year/6 Month ........ | 2,139 | 379,790,970 | 59.46 |
| ARM - 2 Year/6 Month-IO ...... | 222 | 48,581,100 | 7.61 |
| ARM - 3 Year/6 Month ........ | 127 | 22,457,956 | 3.52 |
| ARM - 5 Year/6 Month ........ | 87 | 16,672,185 | 2.61 |
| ARM - 5 Year/6 Month-IO ...... | 22 | 5,188,812 | 0.81 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

## LIEN PRIORITY OF THE GROUP I MORTGAGE LOANS

| LIEN PRIORITY | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| First Lien ................... | 3,335 | $ 593,806,980 | 92.96% |
| Second Lien ................. | 990 | 44,974,714 | 7.04 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

## PRINCIPAL BALANCES OF THE GROUP I MORTGAGE LOANS AT ORIGINATION

| PRINCIPAL BALANCE AT ORIGINATION ($) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AT ORIGINATION | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AT ORIGINATION |
|---|---|---|---|
| 0.01 - 50,000.00 ...... | 688 | $ 23,909,186 | 3.74% |
| 50,000.01 - 100,000.00 ...... | 955 | 68,245,729 | 10.67 |
| 100,000.01 - 150,000.00 ...... | 761 | 95,204,957 | 14.89 |
| 150,000.01 - 200,000.00 ...... | 658 | 115,220,946 | 18.02 |
| 200,000.01 - 250,000.00 ...... | 574 | 129,124,110 | 20.19 |
| 250,000.01 - 300,000.00 ...... | 412 | 113,412,808 | 17.74 |
| 300,000.01 - 350,000.00 ...... | 218 | 69,282,874 | 10.84 |
| 350,000.01 - 400,000.00 ...... | 24 | 8,992,835 | 1.41 |
| 400,000.01 - 450,000.00 ...... | 19 | 8,053,400 | 1.26 |
| 450,000.01 - 500,000.00 ...... | 11 | 5,220,375 | 0.82 |
| 500,000.01 - 550,000.00 ...... | 2 | 1,032,000 | 0.16 |
| 550,000.01 - 600,000.00 ...... | 3 | 1,722,357 | 0.27 |
| Total ................... | 4,325 | $ 639,421,577 | 100.00% |

Page 431 of 1693

S-35

<PAGE>

PRINCIPAL BALANCES OF THE GROUP I MORTGAGE LOANS
AS OF THE CUT-OFF DATE

| PRINCIPAL BALANCE AS OF THE CUT-OFF DATE ($) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 0.01 - 50,000.00 ...... | 688 | $ 23,864,153 | 3.74% |
| 50,000.01 - 100,000.00 ...... | 957 | 68,384,179 | 10.71 |
| 100,000.01 - 150,000.00 ...... | 760 | 95,061,510 | 14.88 |
| 150,000.01 - 200,000.00 ...... | 659 | 115,357,221 | 18.06 |
| 200,000.01 - 250,000.00 ...... | 572 | 128,591,123 | 20.13 |
| 250,000.01 - 300,000.00 ...... | 412 | 113,309,171 | 17.74 |
| 300,000.01 - 350,000.00 ...... | 218 | 69,224,744 | 10.84 |
| 350,000.01 - 400,000.00 ...... | 25 | 9,383,054 | 1.47 |
| 400,000.01 - 450,000.00 ...... | 18 | 7,643,290 | 1.20 |
| 450,000.01 - 500,000.00 ...... | 11 | 5,213,288 | 0.82 |
| 500,000.01 - 550,000.00 ...... | 2 | 1,029,309 | 0.16 |
| 550,000.01 - 600,000.00 ...... | 3 | 1,720,652 | 0.27 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

S-36

<PAGE>

GEOGRAPHIC DISTRIBUTION OF THE MORTGAGED PROPERTIES OF THE
GROUP I MORTGAGE LOANS

| LOCATION | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| California ................... | 1,603 | $ 290,973,161 | 45.55% |
| Florida ...................... | 369 | 43,748,611 | 6.85 |
| Illinois ..................... | 230 | 31,600,188 | 4.95 |
| New York ..................... | 128 | 29,183,696 | 4.57 |
| Texas ........................ | 243 | 23,062,251 | 3.61 |
| Maryland ..................... | 148 | 21,720,293 | 3.40 |
| Virginia ..................... | 142 | 19,456,244 | 3.05 |
| Nevada ....................... | 142 | 18,884,458 | 2.96 |
| Arizona ...................... | 125 | 13,839,221 | 2.17 |
| New Jersey ................... | 78 | 13,048,728 | 2.04 |
| Pennsylvania ................. | 91 | 10,457,924 | 1.64 |
| Washington ................... | 76 | 10,358,273 | 1.62 |
| Massachusetts ................ | 54 | 10,245,868 | 1.60 |
| Georgia ...................... | 81 | 9,661,760 | 1.51 |
| Colorado ..................... | 7 | 8,761,936 | 1.37 |
| Connecticut ................. | 50 | 8,628,604 | |

Page 432 of 1693

```
Hawaii .......................        32         7,855,791           1.23
Ohio .........................        86         7,601,553           1.19
Michigan .....................        74         7,122,175           1.11
Louisiana ....................        84         6,273,604           0.98
Rhode Island .................        27         5,096,637           0.80
Tennessee ....................        38         3,972,507           0.62
North Carolina ...............        39         3,520,063           0.55
Oregon .......................        30         3,510,282           0.55
District of Columbia .........        18         3,169,522           0.50
Montana ......................        24         2,985,352           0.47
Indiana ......................        35         2,941,329           0.46
Missouri .....................        32         2,646,008           0.41
Utah .........................        29         2,447,804           0.38
Minnesota ....................        14         2,212,588           0.35
New Hampshire ................        12         1,641,325           0.26
New Mexico ...................        11         1,600,866           0.25
Delaware .....................         9         1,443,224           0.23
Oklahoma .....................        15         1,323,790           0.21
Mississippi ..................        13         1,192,766           0.19
Idaho ........................        17         1,187,780           0.19
Wisconsin ....................        12         1,087,738           0.17
South Carolina ...............        11           920,692           0.14
Arkansas .....................         9           657,138           0.10
Kentucky .....................         6           636,158           0.10
Maine ........................         3           594,933           0.09
Kansas .......................         5           554,373           0.09
Iowa .........................         4           313,667           0.05
Alaska .......................         1           224,841           0.04
Wyoming ......................         1           214,291           0.03
West Virginia ................         2           144,944           0.02
Nebraska .....................         1            56,737           0.01
                                   -----     -------------          ------
     Total ...................     4,325     $ 638,781,694          100.00%
                                   =====     =============          ======
```

                                  S-37

<PAGE>


        MORTGAGE RATES OF THE GROUP I MORTGAGE LOANS AS OF THE CUT-OFF DATE

```
                                          AGGREGATE        % OF AGGREGATE
                           NUMBER OF   PRINCIPAL BALANCE  PRINCIPAL BALANCE
                           MORTGAGE    OUTSTANDING AS OF  OUTSTANDING AS OF
       MORTGAGE RATE (%)    LOANS      THE CUT-OFF DATE   THE CUT-OFF DATE
      ------------------------------------------------------------------------
    4.500 -  4.999 .............     6     $   1,437,096        0.22%
    5.000 -  5.499 .............    42         9,130,557        1.43
    5.500 -  5.999 .............   303        64,521,185       10.10
    6.000 -  6.499 .............   411        84,565,910       13.24
    6.500 -  6.999 .............   885       173,964,719       27.23
    7.000 -  7.499 .............   473        84,977,188       13.30
    7.500 -  7.999 .............   637       104,054,254       16.29
    8.000 -  8.499 .............   217        29,446,668        4.61
    8.500 -  8.999 .............   300        31,170,768        4.88
    9.000 -  9.499 .............    94         8,810,606        1.38
    9.500 -  9.999 .............   304        17,104,722
```

```
10.000 - 10.499 ..............     106        6,129,496         0.96
10.500 - 10.999 ..............     321       15,422,278         2.41
11.000 - 11.499 ..............      50        2,022,789         0.32
11.500 - 11.999 ..............      76        2,723,011         0.43
12.000 - 12.499 ..............      24          816,746         0.13
12.500 - 12.999 ..............      76        2,483,702         0.39
                                  -----     -------------       ------
        Total ..................  4,325   $ 638,781,694       100.00%
                                  =====     =============       ======
```

### ORIGINAL TERM OF THE GROUP I MORTGAGE LOANS

| ORIGINAL TERM | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 180 months .................. | 833 | $ 41,275,430 | 6.46% |
| 240 months .................. | 11 | 1,390,006 | 0.22 |
| 360 months .................. | 3,481 | 596,116,258 | 93.32 |
| Total .................. | 4,325 | $ 638,781,694 | 100.00% |

<center>S-38</center>

&lt;PAGE&gt;

### REMAINING TERM TO STATED MATURITY OF
### THE GROUP I MORTGAGE LOANS AS OF THE CUT-OFF DATE

| REMAINING TERM TO STATED MATURITY | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 121 - 180 months ............. | 833 | $ 41,275,430 | 6.46% |
| 181 - 240 months ............. | 11 | 1,390,006 | 0.22 |
| 301 - 360 months ............. | 3,481 | 596,116,258 | 93.32 |
| Total .................. | 4,325 | $ 638,781,694 | 100.00% |

### PROPERTY TYPES OF THE GROUP I MORTGAGE LOANS

| PROPERTY TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Single Family Residence ...... | 3,120 | $ 451,169,016 | 70.63% |
| PUD .......................... | 523 | 71,466,064 | 11.19 |
| 2-4 Family ................... | 282 | 59,463,250 | 9.31 |
| Condominium .................. | 400 | 56,683,364 | 8.87 |

Page 434 of 1693

Tab 14, p. 31 of 34

```
Total ...................  4,325    $ 638,781,694     100.00%
                           =====    =============     ======
```

### ORIGINAL COMBINED LOAN-TO-VALUE RATIOS OF THE GROUP I MORTGAGE LOANS

| ORIGINAL COMBINED LOAN-TO-VALUE RATIO (%) | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Less than or equal to 50.00 .. | 90 | $ 11,215,903 | 1.76% |
| 50.01 - 55.00 .............. | 44 | 6,726,269 | 1.05 |
| 55.01 - 60.00 .............. | 75 | 12,209,731 | 1.91 |
| 60.01 - 65.00 .............. | 108 | 19,002,656 | 2.97 |
| 65.01 - 70.00 .............. | 173 | 30,035,926 | 4.70 |
| 70.01 - 75.00 .............. | 214 | 38,221,054 | 5.98 |
| 75.01 - 80.00 .............. | 1,476 | 271,317,936 | 42.47 |
| 80.01 - 85.00 .............. | 360 | 65,559,252 | 10.26 |
| 85.01 - 90.00 .............. | 538 | 90,025,198 | 14.09 |
| 90.01 - 95.00 .............. | 315 | 47,995,606 | 7.51 |
| 95.01 - 100.00 .............. | 932 | 46,472,164 | 7.28 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

S-39

<PAGE>

### DOCUMENTATION TYPE OF THE GROUP I MORTGAGE LOANS

| DOCUMENTATION TYPE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Full/Alternative Documentation | 2,526 | $ 365,007,772 | 57.14% |
| Stated Income Documentation .. | 1,510 | 228,630,447 | 35.79 |
| Limited/Lite Documentation ... | 289 | 45,143,476 | 7.07 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

### FICO SCORE FOR THE GROUP I MORTGAGE LOANS

| FICO SCORE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 500 - 524 ................... | 88 | $ 12,245,883 | 1.92% |
| 525 - 549 ................... | 207 | 31,318,734 | 4.90 |
| 550 - 574 ................... | 325 | 57,052,011 | 8.93 |
| 575 - 599 ................... | 476 | 72,793,462 | 11.40 |
| 600 - 624 ................... | 759 | 114,831,003 | 17.98 |

```
625 - 649 ........................    824       115,022,234         18.01
650 - 674 ......................      652        91,112,625         14.26
675 - 699 ......................      429        61,910,096          9.69
700 - 724 ......................      238        35,114,962          5.50
725 - 749 ......................      179        25,219,708          3.95
750 - 774 ......................      102        14,798,822          2.32
775 - 799 ......................       43         6,566,108          1.03
800 - 824 ......................        3           796,047          0.12
                                    -----     -------------        ------
       Total ...................    4,325   $ 638,781,694         100.00%
                                    =====     =============        ======
```

### LOAN PURPOSE OF THE GROUP I MORTGAGE LOANS

| LOAN PURPOSE | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Purchase ..................... | 2,264 | $ 291,249,329 | 45.59% |
| Refinance - Cashout ......... | 1,558 | 266,823,635 | 41.77 |
| Refinance - Rate Term ........ | 503 | 80,708,730 | 12.63 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

S-40

<PAGE>

### OCCUPANCY STATUS OF THE GROUP I MORTGAGE LOANS

| OCCUPANCY STATUS | NUMBER OF MORTGAGE LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| Primary ..................... | 3,936 | $ 586,641,697 | 91.84% |
| Investment .................. | 318 | 42,744,677 | 6.69 |
| Second Home ................. | 71 | 9,395,320 | 1.47 |
| Total ................... | 4,325 | $ 638,781,694 | 100.00% |

The occupancy status of a Mortgaged Property is as represented by the mortgagor in its loan application.

### NEXT ADJUSTMENT DATES FOR THE GROUP I ARM LOANS

| NEXT ADJUSTMENT DATE | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| January 2005 ................. | 1 | $ 114,203 | 0.04 |

Page 436 of 1693

Page 115 of 181

EXHIBIT 39, page 46

Tab. 42, 33 of 34

https://www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt 46/390

Jt.45-Page 46

```
February 2005 ................    3          564,869         0.12
March 2005 ...................    4          815,520         0.17
December 2005 ................    1           85,051         0.02
April 2006 ...................    2          428,849         0.09
May 2006 .....................    3          418,221         0.09
June 2006 ....................   11        1,999,532         0.42
July 2006 ....................   39        7,001,187         1.48
August 2006 .................   423       80,753,903        17.03
September 2006 ...............  1,865     334,914,573        70.63
October 2006 .................   17        2,770,753         0.58
May 2007 .....................    1          187,239         0.04
June 2007 ....................    1          186,951         0.04
July 2007 ....................    4          651,196         0.14
August 2007 .................    29        5,667,710         1.20
September 2007 ...............   92       15,764,860         3.32
July 2009 ....................    2          366,073         0.08
August 2009 .................    21        3,782,097         0.80
September 2009 ...............   86       17,712,827         3.74
                                -----     ------------       ------
     Total ..................  2,605    $ 474,185,615       100.00%
                                =====     ============       ======
```

S-41

<PAGE>

GROSS MARGINS OF THE GROUP I ARM LOANS

| GROSS MARGIN (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 1.000 - 1.499 ................. | 2 | $ 178,798 | 0.04% |
| 3.500 - 3.999 ................. | 58 | 11,824,303 | 2.49 |
| 4.000 - 4.499 ................. | 2 | 321,164 | 0.07 |
| 4.500 - 4.999 ................. | 133 | 26,506,990 | 5.59 |
| 5.000 - 5.499 ................. | 705 | 123,604,314 | 26.07 |
| 5.500 - 5.999 ................. | 433 | 86,780,361 | 18.30 |
| 6.000 - 6.499 ................. | 495 | 93,818,733 | 19.79 |
| 6.500 - 6.999 ................. | 371 | 65,733,243 | 13.86 |
| 7.000 - 7.499 ................. | 198 | 34,253,890 | 7.22 |
| 7.500 - 7.999 ................. | 135 | 21,355,743 | 4.50 |
| 8.000 - 8.499 ................. | 73 | 9,808,075 | 2.07 |
| Total ................... | 2,605 | $ 474,185,615 | 100.00% |

MAXIMUM MORTGAGE RATES OF THE GROUP I ARM LOANS

| MAXIMUM MORTGAGE RATE (%) | NUMBER OF ARM LOANS | AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE | % OF AGGREGATE PRINCIPAL BALANCE OUTSTANDING AS OF THE CUT-OFF DATE |
|---|---|---|---|
| 11.000 - 11.499 .............. | 7 | $ 1,555,533 | 0.33 |

# TAB 15

# UNITED STATES OF AMERICA
## Before the
## SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 64720 / June 22, 2011**

**INVESTMENT ADVISERS ACT OF 1940**
**Release No. 3218 / June 22, 2011**

**INVESTMENT COMPANY ACT OF 1940**
**Release No. 29704 / June 22, 2011**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 3296 / June 22, 2011**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-13847**

| | |
|---|---|
| **In the Matter of**<br><br>**MORGAN ASSET MANAGEMENT, INC.; MORGAN KEEGAN & COMPANY, INC.; JAMES C. KELSOE, JR.; and JOSEPH THOMPSON WELLER, CPA,**<br><br>**Respondents.** | CORRECTED ORDER MAKING FINDINGS AND IMPOSING REMEDIAL SANCTIONS AND A CEASE-AND-DESIST ORDER PURSUANT TO SECTION 15(b) OF THE SECURITIES EXCHANGE ACT OF 1934, SECTIONS 203(e), 203(f) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, AND IMPOSING SUSPENSION PURSUANT TO SECTION 4C OF THE SECURITIES EXCHANGE ACT OF 1934 AND RULE 102(e)(1)(iii) OF THE COMMISSION'S RULES OF PRACTICE |

## I.

On April 7, 2010, the Commission instituted public administrative and cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 ("Securities Act"), Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), and Sections 9(b) and 9(f) of the Investment Company Act of 1940 ("Investment Company Act") against Morgan Asset Management, Inc. ("Morgan Asset"); Morgan Keegan & Company, Inc. ("Morgan Keegan");

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 7 of 26

James C. Kelsoe, Jr. ("Kelsoe"); and Joseph Thompson Weller, CPA ("Weller"); pursuant to Section 15(b)(4) of the Exchange Act against Morgan Keegan; pursuant to Section 15(b)(6) of the Exchange Act against Morgan Asset, Kelsoe and Weller; pursuant to Sections 203(e) and 203(k) of the Investment Advisers Act of 1940 ("Advisers Act") against Morgan Asset and Morgan Keegan; pursuant to Sections 203(f) and 203(k) of the Advisers Act against Kelsoe and Weller; and pursuant to Section 4C of the Exchange Act and Rule 102(e)(1)(iii) of the Commission's Rules of Practice against Weller. Respondents Morgan Asset, Morgan Keegan, Kelsoe and Weller (collectively "Respondents") have submitted an Offer of Settlement which the Commission has determined to accept.

**II.**

Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over them and the subject matter of these proceedings, which are admitted, Respondents consent to the entry of this Order Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order Pursuant to Sections 4C and 15(b) of the Securities Exchange Act of 1934, Sections 203(e), 203(f) and 203(k) of the Investment Advisers Act of 1940, and Sections 9(b) and 9(f) of the Investment Company Act of 1940, and Imposing Suspension Pursuant to Section 4C of the Securities Exchange Act of 1934 and Rule 102(e)(1)(iii) of the Commission's Rules of Practice ("Order"), as set forth below.

**III.**

On the basis of this Order and Respondent's Offer, the Commission finds[1] that,

**A. RESPONDENTS**

1.    <u>Morgan Asset</u>, incorporated in Tennessee on April 10, 1986, has been an investment adviser registered with the Commission at all relevant times. Morgan Asset's principal place of business is in Birmingham, Alabama. Morgan Asset is a wholly-owned subsidiary of MK Holding, Inc., which in turn is a wholly-owned subsidiary of Regions Financial Corporation.

2.    <u>Morgan Keegan</u>, incorporated in Tennessee on June 27, 1969, has been registered with the Commission as a broker-dealer at all relevant times and as an investment adviser since July 27, 1992. During the relevant time period, Morgan Keegan served as the principal

---

[1]    The findings herein are made pursuant to Respondents' Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 8 of 26

## C.    FACTS

### Overview

10.    Morgan Asset, through Kelsoe, as Portfolio Manager, managed the Helios Select Fund, Inc., the Helios High Income Fund, Inc., the Helios Multi-Sector High Income Fund, Inc., the Helios Strategic Income Fund, Inc., and the Helios Advantage Income Fund, Inc. (collectively, the "Funds") from at least November 2004 through July 29, 2008.

11.    Respondent Morgan Keegan, a registered broker-dealer and registered investment adviser, was the principal underwriter and distributor of shares of the open-ended Funds. Each of the Funds' Boards of Directors was responsible for pricing the Funds' securities in accordance with the Funds' valuation policies and procedures ("valuation procedures"). Although the Funds' prospectuses stated that Morgan Asset would price the securities, each Fund's Board of Directors delegated the pricing responsibility to Morgan Keegan. Morgan Keegan priced each Fund's securities and calculated the Fund's daily net asset value[2] ("NAV") through its Fund Accounting Department ("Fund Accounting"). Weller was an officer and treasurer of the Funds. Weller, Morgan Keegan's Controller, along with other Morgan Keegan personnel, staffed a "Valuation Committee" that oversaw Fund Accounting's processes and evaluated the prices assigned to securities. Morgan Keegan and Weller failed to adequately fulfill Morgan Keegan's responsibilities, as delegated to it by the Funds' Boards of Directors, to price the Funds' securities in accordance with their valuation policies and procedures regarding valuation. For example, at various times from January 2007 through July 2007, Fund Accounting accepted unsubstantiated "price adjustments," submitted by Kelsoe, that inaccurately inflated the prices of certain securities, contrary to the Funds' valuation procedures. Fund Accounting failed to document justifications for such pricing adjustments.

12.    The Funds' valuation policies and procedures required the comparison of fair values to prices provided by other sources. Pursuant to that requirement, Fund Accounting periodically obtained broker-dealer price confirmations for certain fair valued securities. Unbeknownst to Fund Accounting and the Funds' independent auditor ("Independent Auditor"), the Portfolio Manager, Kelsoe, actively screened and influenced a broker-dealer to change the price confirmations that Fund Accounting and the Independent Auditor obtained from the broker-dealer. Kelsoe also failed to advise Fund Accounting or the Funds' Boards of Directors when he received information indicating that the Funds' prices for certain securities should be reduced.

---

[2]    The "net asset value" or "NAV" of an investment company is the company's total assets minus its total liabilities. An investment company calculates the NAV of a single share (or the "per share NAV") by dividing its NAV by the number of shares that are outstanding.

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 10 of 26

13.     Each of the Funds held, in varying amounts, securities backed by subprime mortgages, and the market for such securities deteriorated in the first half of 2007. Morgan Keegan utilized practices which were not reasonably designed to determine that the Funds' NAVs were accurate. Morgan Asset, through Kelsoe, engaged in actions that forestalled declines in the NAVs of the Funds that would have occurred as a result of the deteriorating market, absent his intervention.

14.     Many of the securities that were held by the Funds and backed by subprime mortgages lacked readily available market quotations and, as a result, were required by the Investment Company Act to be priced by the Funds' Boards of Directors, using "fair value" methods. Under Section 2(a)(41)(B) of the Investment Company Act, the Funds were required to use market values for portfolio securities with readily available market quotations and use fair value for all other portfolio assets, as determined in good faith by the board of directors. The fair value of securities for which market quotations are not readily available is the price the Funds would reasonably expect to receive on a current sale of the securities.[3]

15.     The Funds adopted valuation procedures for pricing the Funds' portfolio securities and assigned the task of following those procedures to Morgan Keegan. The Funds' valuation procedures for fair-valued securities mandated that such securities should be valued in "good faith" by the Valuation Committee, considering a series of general and specific factors including, among others, "fundamental analytical data relating to the investment," "an evaluation of the forces which influence the market in which the securities are purchased or sold" and "events affecting the security." The procedures required the Valuation Committee to maintain a written report "documenting the manner in which the fair value of a security was determined and the accuracy of the valuation made based on the next reliable public price quotation for that security." The procedures also required that values assigned to securities be periodically validated through, among other means, broker-dealer price confirmations. Fund Accounting also used broker-dealer price confirmations to set current values. The procedures specified that prices obtained from a broker-dealer could only be overridden when there was "a reasonable basis to believe that the price provided [did] not accurately reflect the fair value of the portfolio security." Whenever a price was overridden, the procedures mandated the basis for overriding the price to be "documented and provided to the Valuation Committee for its review."

16.     In filings with the Commission, the Funds stated that the fair value of securities would be determined by Morgan Asset's Valuation Committee using procedures adopted by the Funds' board of directors. In fact, the responsibility was delegated to Morgan Keegan, which primarily staffed the Valuation Committee. Morgan Keegan and the Valuation Committee did not

---

[3]     See AICPA Audit and Accounting Guide - Investment Companies (Sect. 2.35-2.39), which incorporates Accounting Series Release No. 118 ("ASR 118"). The Commission has provided interpretive guidance related to financial reporting in the Accounting Series Releases, which is included in the Codification of Financial Reporting Policies. Thus, conformity with the ASR 118 is required by Commission rules and complies with Generally Accepted Accounting Principles ("GAAP"). See also Articles 1-01(a) and 6.03 of Regulation S-X.

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 11 of 26

reasonably satisfy their responsibilities under the Funds' procedures in several ways. Among other things: (i) the Valuation Committee left pricing decisions to lower level employees in Fund Accounting who did not have the training or qualifications to make fair value pricing determinations; (ii) Fund Accounting personnel relied on Kelsoe's "price adjustments" to determine the prices assigned to portfolio assets, without obtaining a reasonable basis for or documentation supporting the price adjustments or applying the factors set forth in the procedures; (iii) Fund Accounting personnel gave Kelsoe discretion beyond the parameters of the valuation procedures in validating the prices of portfolio securities by allowing him to determine which dealer price confirmations to use and which to ignore, without obtaining documentation to support his adjustments; and (iv) the Valuation Committee and Fund Accounting did not ensure that the fair value prices assigned to many of the portfolio securities were periodically re-evaluated, allowing them to be carried at stale values for months at a time.

17.     Morgan Asset adopted its own procedures to determine the actual fair value to assign to portfolio securities and to "validate" those values "periodically." Among other things, those procedures provided that "[q]uarterly reports listing all securities held by the Funds that were fair valued during the quarter under review, along with explanatory notes for the fair values assigned to the securities, shall be presented to the Board for its review." Morgan Asset failed to fully implement this provision of its pricing policy.

18.     At various times between January 2007 and July 2007, Kelsoe had his assistant send "price adjustments" to Fund Accounting. The adjustments were communications by Kelsoe to Fund Accounting concerning the values of specific portfolio securities. In many instances, these adjustments were arbitrary and did not reflect fair value. The price adjustments were routinely entered upon receipt by the staff accountant into a spreadsheet used to calculate the NAVs of the Funds.

19.     Fund Accounting did not generally request, and Kelsoe did not generally supply, supporting documentation for his price adjustments. Fund Accounting and the Funds did not record which securities had been assigned values by Kelsoe.

20.     As part of the Funds' valuation procedures, Fund Accounting sometimes requested third party broker-dealer price confirmations as a means to validate the values it had assigned to the Funds' fair valued securities. The Funds' Independent Auditor used similar requests for third party broker-dealer price confirmations as part of its annual year-end audits of the Funds. Fund Accounting or the Independent Auditor would periodically send such requests to broker-dealers asking them to provide price confirmations for various portfolio securities.

21.     During the period from January through July 2007, when month-end dealer price confirmations were received by Fund Accounting, an employee of Fund Accounting performed a review to estimate whether they contained any securities prices that varied from current portfolio values by more than five percent. If so, then Kelsoe determined whether the current values should be maintained or a new value—which may or may not have been the price given by the broker-dealer—should be assigned to the security. Thus, Fund Accounting generally allowed Kelsoe to

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 12 of 26

determine whether broker-dealer price confirmations were used or ignored.  In some instances, when price confirmations were received that were substantially lower than current portfolio values, Fund Accounting personnel, acting at the direction of Kelsoe, lowered values of bonds over a period of days, in a series of pre-planned reductions to values at or closer to, but still above, the price confirmations.  As a result, during the interim days, Fund Accounting did not price those bonds at their current fair value.

22.     During the period from January through July 2007, Fund Accounting failed to record which bond values were not adjusted in response to dealer price confirmations at Kelsoe's direction.

23.     The head of Fund Accounting reported to Weller, and Weller was a member of the Valuation Committee. He knew, or was reckless in not knowing, of the deficiencies in the implementation of the valuation procedures set forth above, and failed to remedy them or otherwise make sure fair-valued securities were accurately priced and the Funds' NAVs were accurately calculated. During the period from January through July 2007, Weller was aware that: (i) the Valuation Committee did not adequately supervise Fund Accounting's application of the valuation factors;  (ii) Kelsoe was supplying fair value price adjustments for specific securities to Fund Accounting but the members of the Valuation Committee did not generally know which securities Kelsoe supplied fair values for or what those fair values were, and did not generally receive supporting documentation for those values; and (iii) the only other pricing test regularly applied by the Valuation Committee  was a "look back" test, which compared the sales price of any security sold by a Fund to the valuation of that security used in the NAV calculation for the five business days preceding the sale.  The test only covered securities after they were sold; thus, at any given time, the Valuation Committee never knew how many securities' prices could ultimately be validated by it.  Weller nevertheless signed the Funds' annual and semi-annual financial reports on Forms N-CSR, filed with the Commission, including certifications pursuant to Sections 302 and 906 of the Sarbanes-Oxley Act of 2002.

24.     During the period from January 2007 through July 2007, Morgan Keegan, acting through Weller and Fund Accounting, failed to employ reasonable procedures to price the Funds' portfolio securities and, as a result of that failure, did not calculate current NAVs for the Funds. Despite these failures, Morgan Keegan published daily NAVs of the Funds which it could not know were accurate and, as distributor of the open-end portfolios, sold and redeemed shares to investors based on those NAVs.

25.     On various dates from January 2007 through July 2007, Morgan Asset, through Kelsoe, screened and influenced the price confirmations obtained from at least one broker-dealer ("the Submitting Firm").  Among other things, the Submitting Firm was induced to provide interim price confirmations that were lower than the values at which the Funds were valuing certain bonds, but higher than the initial confirmations that the Submitting Firm had intended to provide.  The interim price confirmations enabled the Funds to avoid marking down the value of securities to reflect current fair value.  Kelsoe was aware that use of the interim price confirmations was inconsistent with the valuation procedures and did not reflect fair value, that the Submitting Firm

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 13 of 26

Tab 15, p. 6 of 11

would be providing lower price confirmations in response to future pricing validation requests, and that the Funds would be required to further mark down the value of the securities to reflect their already diminished value, but that information was not disclosed to Fund Accounting, the Funds' Boards of Directors or the Independent Auditor. In some instances, even after causing the Submitting Firm to increase its price confirmations, Kelsoe subsequently provided price adjustments to Fund Accounting that were higher than even the Submitting Firm's increased price confirmations. These adjustments were not consistent with the Funds' procedures. In other instances, the Submitting Firm was induced to not provide price confirmations to Fund Accounting (or, depending on the period, to the Independent Auditor), where those price confirmations would have been significantly lower than the Funds' current valuations of the relevant bonds. Fund Accounting and the Funds' Boards were not advised that the Submitting Firm had proposed price confirmations which were lower than the current valuations recorded by the Funds, and that the Submitting Firm had refrained from submitting price confirmations to Fund Accounting or had submitted price confirmations at higher prices than it had originally planned.

26. In each of the Funds' annual and semi-annual reports filed with the Commission on Forms N-CSR during the relevant period (including, among others, the Annual Report for the Morgan Keegan Select Fund, Inc. for the year-ended June 30, 2007 filed with the Commission on October 4, 2007), Kelsoe included a signed letter to investors reporting on the Funds' performance "based on net asset value." In fact, the performance reported was materially misstated. Untrue statements of material fact concerning the Funds' performance were made in the Funds' annual and semi-annual reports filed with the Commission on Forms N-CSR. Morgan Asset, through Kelsoe, also provided a quarterly valuation packet reflecting inflated prices for certain securities to the Funds' Boards, failed to disclose to the Funds' Boards information indicating that the Funds' NAVs were inflated and that broker-dealer price confirmations were being screened and caused to be altered, and provided Fund Accounting with unsubstantiated price adjustments. In addition, the prospectuses incorrectly described Morgan Asset as responsible for fair valuation of the Funds' portfolios.

## D. VIOLATIONS

27. Investment advisers owe their clients, including investment company clients, a fiduciary duty. *Transamerica Mortgage Advisers, Inc. v. Lewis*, 444 U.S.11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.* 375 U.S. 180, 195-97 (1963). Misstatements or omissions of fact by an investment adviser, such as those made to the Funds' boards, violate an adviser's fiduciary duty and constitute fraud when they are material. Similarly, the failure to disclose to the Funds' boards that Morgan Asset and Morgan Keegan were not complying with stated valuation procedures constitutes fraud. In addition, the knowing or reckless failure to value securities, for which market quotations are not readily available, consistent with fair value requirements under the Investment Company Act and that materially affects a fund's NAV constitutes fraud. *See, In re Piper Capital Management, Inc.,* Exch. Act. Rel.48409 (August 26, 2003). Section 206(1) of the Advisers Act makes it unlawful for an investment adviser to employ any device, scheme or artifice to defraud any client or prospective client. Section 206(2) makes it unlawful for an investment adviser to engage in any transaction, practice or course of business that operates as a fraud or deceit upon any client or prospective client. As a result of the conduct described above,

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 14 of 26

Page 124 of 181          Tab 15, p. 7 of 11

Respondent Morgan Asset willfully violated, and Kelsoe willfully aided and abetted and caused violations of, Sections 206(1) and 206(2) of the Advisers Act.

28.    Section 206(4) of the Advisers Act prohibits fraudulent, deceptive or manipulative practices or courses of business by an investment adviser. Rule 206(4)-7 requires investment advisers to "[a]dopt and implement written policies and procedures reasonably designed to prevent violation" of the Advisers Act and the rules thereunder by their supervised persons. An adviser's failure "to have adequate compliance policies and procedures in place will constitute a violation of our rules independent of any other securities law violation." *Compliance Programs of Investment Companies and Investment Advisers*, Advisers Act Release No. 2204, 68 F.R. 74714, 74715 (Dec. 24, 2003) ("Compliance Programs Release"). As a result of the conduct described above, Respondent Morgan Asset willfully violated, and Respondent Kelsoe willfully aided and abetted and caused violations of, Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder.

29.    Section 34(b) of the Investment Company Act prohibits untrue statements of material fact or omissions to state facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, in any registration statement, report or other document filed pursuant to the Investment Company Act or the keeping of which is required pursuant to Section 31(a) of the Investment Company Act. Any person who makes a material misrepresentation concerning a Fund's performance in the Fund's annual and semi-annual reports filed with the Commission, or in the records required to be maintained by the Fund, or submits inflated prices to be included in the Fund's NAV calculations and the records forming the basis for the Fund's financial statements, violates Section 34(b). As a result of the conduct described above, Respondents Morgan Asset and Kelsoe willfully violated, and Respondent Morgan Keegan willfully aided, abetted, and caused violations of, Section 34(b) of the Investment Company Act.

30.    Rule 22c-1 under the Investment Company Act prohibits the sale or redemption of shares in a registered investment company "except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security." For an NAV to be deemed current, Section 2(a)(41) of the Investment Company Act and Rule 2a-4 thereunder require portfolio securities for which market quotations are not readily available to be valued at fair value. As a result of the conduct described above, Respondent Morgan Keegan willfully violated,[4] and Respondents Morgan Asset, Kelsoe and Weller willfully aided and abetted and caused violations of, Rule 22c-1 promulgated under the Investment Company Act.

31.    Rule 38a-1 under the Investment Company Act requires that a registered investment company adopt and implement written policies and procedures reasonably designed to prevent violation of the federal securities laws by the fund and to provide for oversight of compliance by the fund's investment adviser. Failure of a fund to have adequate compliance

---

[4] A willful violation of the securities laws means merely "'that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)).

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 15 of 26

Page 125 of 181                      Tab 15, p. 8 of 11

policies and procedures in place and/or to implement them will constitute a violation of Rule 38a-1 independent of any other securities law violations. *Compliance Programs Release*. Morgan Keegan and Morgan Asset knowingly and substantially assisted the Funds' failure to implement fair valuation procedures, which resulted in prices that did not reflect current NAVs. Morgan Keegan, Morgan Asset, Kelsoe and Weller thereby willfully aided and abetted and caused the Funds' violations of Rule 38a-1.

## UNDERTAKINGS

32. Respondent Morgan Keegan undertakes as follows:

A. Morgan Keegan shall not, for a period of three years from the date of the Order, be involved in, or responsible for, recommending to, or determining on behalf of, a registered investment company's board of directors or trustees or such company's valuation committee, the value of any portfolio security for which market quotations are not readily available.

B. If, after three years but within six years from the date of the Order, Morgan Keegan becomes involved in, or responsible for, determining or recommending determinations to a registered investment company's board of directors or trustees or valuation committee of the value of any portfolio security for which market quotations are not readily available and which are held by or on behalf of such registered investment company, Morgan Keegan shall promptly notify Commission counsel identified below or his successor and within 30 days of beginning such valuation activity, shall hire, at its expense, an Independent Consultant ("Consultant") not unacceptable to the Commission's staff, to review the valuations provided by Morgan Keegan to any registered investment company for the next two quarters following the beginning of such valuation activity, and make an Initial Report with recommendations thereafter on Morgan Keegan's policies, procedures and practices with regard to such valuations. The Initial Report shall describe the review performed and the conclusions reached, and will include any recommendations deemed necessary to make the policies, procedures, and practices adequate and consistent with GAAP and the Investment Company Act. Morgan Keegan shall cooperate fully with the Consultant and shall provide the Consultant with access to its files, books, records, and personnel as reasonably requested for the review. Morgan Keegan shall cause the review to begin no later than 60 days after beginning such valuation activity.

C. At the end of that review, and in no event more than 200 days from after beginning such valuation activity, to require the Consultant to submit the report and recommendations to Morgan Keegan and to William P. Hicks of the Commission's Atlanta Regional Office or his successor.

D. Within 30 days of receipt of the Initial Report, Morgan Keegan shall in writing respond to the Initial Report. In such response, Morgan Keegan shall advise the Consultant and the Commission's staff of the recommendations from the Initial Report that it has determined to accept and the recommendations that it considers to be unduly burdensome. With respect to any

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 16 of 26

Tab 15, p. 9 of 11

1.      a preparer or reviewer, or a person responsible for the preparation or review, of any public company's financial statements that are filed with the Commission.  Such an application must satisfy the Commission that Respondent Weller's work in his practice before the Commission will be reviewed either by the independent audit committee of the public company for which he works or in some other acceptable manner, as long as he practices before the Commission in this capacity; and/or

2.      an independent accountant.  Such an application must satisfy the Commission that:

(a)      Respondent Weller, or the public accounting firm with which he is associated, is registered with the Public Company Accounting Oversight Board ("Board") in accordance with the Sarbanes-Oxley Act of 2002, and such registration continues to be effective;

(b)      Respondent Weller, or the registered public accounting firm with which he is associated, has been inspected by the Board and that inspection did not identify any criticisms of or potential defects in the Respondent's or the firm's quality control system that would indicate that the Respondent will not receive appropriate supervision;

(c)      Respondent Weller has resolved all disciplinary issues with the Board, and has complied with all terms and conditions of any sanctions imposed by the Board (other than reinstatement by the Commission); and

(d)      Respondent Weller acknowledges his responsibility, as long as Respondent appears or practices before the Commission as an independent accountant, to comply with all requirements of the Commission and the Board, including, but not limited to, all requirements relating to registration, inspections, concurring partner reviews and quality control standards.

The Commission will consider an application by Respondent Weller to resume appearing or practicing before the Commission provided that his state CPA license is current and he has resolved all other disciplinary issues with the applicable state boards of accountancy.  However, if state licensure is dependent on reinstatement by the Commission, the Commission will consider an application on its other merits.  The Commission's review may include consideration of, in addition to the matters referenced above, any other matters relating to Respondent's character, integrity, professional conduct, or qualifications to appear or practice before the Commission.

K.      Respondents Morgan Keegan and Morgan Asset shall jointly and severally pay disgorgement of $20,500,000 and prejudgment interest of $4,500,000 to the Securities and Exchange Commission, and a civil penalty of $75,000,000 to the Securities and Exchange Commission, within ten (10) business days of the entry of this Order.

L.      Respondent Kelsoe shall pay a civil penalty of $250,000 to the Securities and Exchange Commission, within ten (10) days of this Order.

Tab 15, p. 10 of 11

M.     Respondent Weller shall pay a civil penalty of $50,000 to the Securities and Exchange Commission, within ten (10) days of this Order.

N.     All payments pursuant to paragraphs IV. K, L and M, above, shall be made by certified check, bank cashier's check, or United States postal money order payable to the Securities and Exchange Commission. The payment shall be delivered or mailed to the Office of Financial Management, Accounts Receivable, Securities and Exchange Commission, 100 F Street, NE, Stop 6042, Washington DC 20549, and shall be accompanied by a letter identifying Respondent as a respondent in these proceedings; setting forth the file number of these proceedings; and specifying that payment is made pursuant to this Order, a copy of which cover letter and money order or check shall be sent to William P. Hicks, Associate Regional Administrator, Securities and Exchange Commission, 3475 Lenox Rd., N.E., Suite 500, Atlanta, GA 30326-1232. If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717 and/or SEC Rule of Practice 600.

Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, as amended, a Fair Fund is created for the disgorgement, interest, and penalties described in Paragraphs IV. K, L and M and any funds paid in connection with related actions pursuant to Paragraph III. 36, above. Regardless of whether any such distribution is made from such Fair Fund, amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that any Respondent receiving such offset shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the United States Treasury or to a Fair Fund, as the Commission directs. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against any of the Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

O.     The disgorgement, interest, civil penalties, and any other funds which may be paid to the Fair Fund through or as the result of related actions, shall be aggregated in the Fair Fund, which shall be maintained in an interest-bearing account, and shall be distributed pursuant to a distribution plan (the "Plan") to be administered in accordance with the Commission Rules on Fair Fund and Disgorgement Plans. A Fund Administrator (the "Administrator") shall be appointed by the Commission. The Administrator shall identify the investors in the Funds who suffered losses as a result of the violations determined herein, evaluate investor claims and propose and effectuate a plan to distribute the Fair Fund resulting from this order. The Fair Fund shall be used to compensate injured customers for their loss. Under no circumstances shall any part of the Fair Fund be returned to Morgan Keegan, Morgan Asset, Kelsoe or Weller.

Pltf. Trial Exhibit 12
Cause No. 09-14448
Page 25 of 26

Page 128 of 181          Tab 15, p. 11 of 11

# TAB 16

The Alabama Securities Commission
The Kentucky Department of Financial Institutions
The Mississippi Secretary of State's Office
The South Carolina Office of the Attorney General

| | | |
|---|---|---|
| In the matter of | ) | |
| | ) | **Joint Administrative** |
| | ) | **Proceeding** |
| MORGAN ASSET MANAGEMENT, INC., a | ) | **File Nos.** |
| wholly owned subsidiary of MK HOLDING, INC., | ) | **Alabama: SC-2010-0016** |
| a wholly owned subsidiary of REGIONS | ) | **Kentucky: 2010-AH-021** |
| FINANCIAL CORPORATION; MORGAN | ) | **Mississippi: S-08-0050** |
| KEEGAN & COMPANY, Inc., a wholly owned | ) | **South Carolina: 08011** |
| subsidiary of REGIONS FINANCIAL | ) | |
| CORPORATION; JAMES C. KELSOE, JR.; | ) | |
| BRIAN B. SULLIVAN; GARY S. STRINGER; | ) | |
| and MICHELE F. WOOD, | ) | |
| | ) | |
| Respondents | ) | |

## JOINT NOTICE OF INTENT TO REVOKE REGISTRATION
## AND
## IMPOSE ADMINISTRATIVE PENALTY

COME NOW, Joseph P. Borg, Director, Alabama Securities Commission; Charles A. Vice, Commissioner, Kentucky Department of Financial Institutions; Tanya G. Webber., Assistant Secretary of State for the Mississippi Secretary of State Securities and Charities Division; and Tracy A. Meyers, Assistant Attorney General for the State of South Carolina (collectively the "Agencies") and issue this Joint Notice of Intent to Revoke Registration and Impose Administrative Penalty against Morgan Asset Management, Inc. and Morgan Keegan & Company, Inc. for violating provisions of the Alabama Securities Act, the Kentucky Securities Act, the Mississippi Securities Act, and the South Carolina Securities Act.

The Agencies also seek to bar the individual Respondents, James C. Kelsoe, Jr., Brian B. Sullivan, Gary S. Stringer, and Michele F. Wood from further participation in the securities industry for violations of the above listed State Securities Acts.

Pltf. Trial Exhibit 17
Page 130 of 181
Cause no. 09-14448
Page 88 of 1793

Tab 16, p. 1 of 4
Exhibit A

In support thereof the Agencies respectfully submit as follows:

## I. JURISDICTION AND VENUE

1. Each of the Agencies is authorized to administer its Securities Act. Further, each Agency is authorized to participate in and prosecute violations of their Acts jointly with other state securities regulators.

2. Alabama is specifically authorized to administer the Alabama Securities Act pursuant to Code of Alabama 1975, § 8-6-50.

3. Kentucky is specifically authorized to administer the Kentucky Securities Act pursuant to KRS § 292.500(1).

4. Mississippi is specifically authorized to administer the Mississippi Securities Act pursuant to the Mississippi Securities Act § 75-71-107.

5. The Attorney General of South Carolina is specifically authorized to administer the South Carolina Uniform Securities Act of 2005 (the "SC Act") pursuant to S.C. Code Ann. § 35-1-601(a).

6. Venue is appropriate in any state represented by the participating Agencies. Further, Regions Financial Corporation ("RFC") is headquartered in Birmingham, Alabama. All Respondents are wholly owned subsidiaries of RFC or subsidiaries of other companies which are wholly owned by RFC.

7. All Agency Plaintiffs are authorized and empowered on behalf of their respective states and the citizens of their states to regulate the offer and sale of securities in or from their states, including the registration of broker-dealers and their agents and investment advisers and their representatives.

## II. INTRODUCTION

Pltf. Trial Exhibit 17
Page 131 of 181
Cause no. 09-14448
Page 89 of 1793

Tab 16, p. 2 of 4

27. **James C. Kelsoe, Jr.** ("Kelsoe") (CRD No. 2166416) was Senior Portfolio Manager of the Funds and was responsible for selecting and purchasing the holdings for the Funds. Kelsoe was an employee of MAM.

28. **Brian B. Sullivan** ("Sullivan") (CRD No. 2741207) was President and Chief Investment Officer of MAM. Sullivan was responsible for the overall management of MAM including oversight of the Funds.

29. **Gary S. Stringer** ("Stringer") (CRD No. 2917717) was Director of Investments for WMS. Stringer was responsible for overseeing the due diligence performed on products included on MKC's "Select List." The Select List was a list of products, including mutual funds, separate account managers, and alternative investments, which MKC represented as having passed due diligence screening and appropriate for use in client portfolios. The Select List was available to MKC FAs and was found to have been used by MKC FAs when making investment recommendations to their clients. In addition, WMS, under the direction of Stringer, created and maintained mutual fund allocation portfolios to be used in the discretionary and non-discretionary platforms used by the FAs.

30. **Michele F. Wood** ("Wood") (CRD No. 4534832) served as Chief Compliance Officer of the Funds, Chief Compliance Officer of MAM, and Senior Attorney and First Vice President of MKC.

## V. INVESTIGATION

31. Between March 31, 2007 and March 31, 2008, the Funds lost approximately Two Billion Dollars ($2,000,000,000.00). Fund losses are calculated from the Annual and Semi-Annual Shareholder Reports (Forms N-CSR and N-CSRS filed

Pltf. Trial Exhibit 17
Page 132 of 181
Cause no. 09-14448
Page 96 of 1793

Tab 16, p. 3 of 4

with the SEC) and are summarized and attached as Exhibit 9. Based on complaints regarding the losses, thirteen (13) state securities regulators formed a task force to investigate the management, sales practices, and supervisory/compliance procedures related to the Funds.

32. The task force coordinated and conducted investigations into Respondents' management, marketing, sales, and supervision of the Funds. The state regulators conducted nine (9) on-site branch exams in seven (7) states, interviewed approximately eighty (80) present and former sales representatives, managers, and officers, interviewed customers, and reviewed thousands of e-mail communications, reports, and other records provided by Respondents.

## VI. FINDINGS OF FACT

### A. MORGAN ASSET MANAGEMENT

33. MAM, the investment adviser, is a wholly owned subsidiary of MK Holding, Inc., which, in turn, is a wholly owned subsidiary of RFC, which is headquartered in Alabama.

34. Prior to the 2001 acquisition of MKC by RFC, MAM was a wholly owned subsidiary of MKC, the broker-dealer. Subsequent to the acquisition, MAM became a wholly owned subsidiary of MK Holding, Inc., a wholly owned subsidiary of RFC.

35. Pursuant to investment adviser agreements between MAM and Morgan Keegan Select Fund, Inc., MAM was responsible for the overall investment management of the open-end Funds. Pursuant to similar investment adviser agreements with each of the closed-end funds, MAM was also responsible for the overall

Pltf. Trial Exhibit 17
Page 133 of 181
Cause no. 09-14448
Page 97 of 1793

Tab 16, p. 4 of 4

# TAB 17

# MBS LISTED AS ABS - 2005 ANNUAL REPORT FOR RSF

| Name Listed in Annual Report | Description | Cost |
|---|---|---|
| Aames Mortgage Trust 2001-3B, 7.13% 11/25/31 | Home Equity Loans Non-High Loan to Value | $1,229,177.00 |
| Ace Securities 2004-HE1 B, 4.60% 2/25/34 | Home Equity Loans Non-High Loan to Value | $7,590,644.00 |
| Ace Securities 2004-HE2 B1, 5.311% 10/25/34 | Home Equity Loans Non-High Loan to Value | $2,761,803.00 |
| Ace Securities 2004-HS1 M6, 4.59% 2/25/34 | Home Equity Loans Non-High Loan to Value | $1,446,598.00 |
| Ace Securities 2004-OPI B, 4.60% 4/25/34 | Home Equity Loans Non-High Loan to Value | $8,915,409.00 |
| Ace Securities 2004-RM1 B2, 1.436% 7/25/34 (a) | Home Equity Loans Non-High Loan to Value | $3,329,187.00 |
| Ace Securities 2004-RM1 B3, 1.436% 7/25/34 (a) | Home Equity Loans Non-High Loan to Value | $1,545,452.00 |
| ACE Securities Corp. 2004-HE4 M11, 5.694% 12/25/34 | Home Equity Loans Non-High Loan to Value | $1,603,838.00 |
| ACE Securities Corp. 2004-HE4 M11, 8.318% 12/25/34 | Home Equity Loans Non-High Loan to Value | $1,603,838.00 |
| Amresco Residential Securities 1999-1 B, 5.09% 11/25/29 | Home Equity Loans Non-High Loan to Value | $1,950,824.00 |
| BankAmerica Manufactured Housing 1997-1 B1, Zero Coupon Bond 6/10/21 (d) | Manufactured Housing Loans | $632,746.00 |
| Bombardier Capital Mortgage 1999-B M1, 8.12% 12/51/29 | Manufactured Housing Loans | $564,981.00 |
| Conseco Finance 2000-5 M2, 9.03% 2/1/32 | Manufactured Housing Loans | $555,181.00 |
| Conseco Finance 2001-1 M1, 7.75% 6/15/27 | Manufactured Housing Loans | $720,482.00 |
| Crest 2000-1A D, 10.00% 8/31/36 | Collateralized Mortage Obligation | $1,400,295.00 |
| CS First Boston 1998-C2 H, 6.75% 11/11/30 (a) (Commercial Loan) | Commercial Loans | $4,075,779.00 |
| CS First Boston Mortgage 1995-WF1 G, 8.488% 12/21/27 (Commercial Loan) | Commercial Loans | $1,763,536.00 |
| Delta Funding Home Equity 2000-4B, 7.15% 2/15/31 | Home Equity Loans Non-High Loan to Value | $463,339.00 |
| Enterprise Mortgage 1998-1 A2, 6.38% 1/15/25 (a) (commercial loan) | Commercial Loans | $2,462,297.00 |
| Enterprise Mortgage 1998-1 A3, 6.63% 1/15/25 (a) (commercial Loan) | Commercial Loans | $6,952,973.00 |
| Enterprise Mortgage 1999-1 A2, 6.90% 10/15/25 (a) (commercial loan) | Commercial Loans | $3,075,793.00 |
| Enterprise Mortgage 2000-1 A1, 7.575% 1/15/27 (a) (commercial loan) | Commercial Loans | $11,912,253.00 |
| Enterprise Mortgage 2000-1 A2, 7.505% 1/15/27 (a) (Commercial Loan) | Commercial Loans | $9,904,055.00 |
| Equifirst Mortgage 2004-2 B1, 4.74% 7/25/34 (a) | Home Equity Loans Non-High Loan to Value | $1,724,383.00 |
| Equifirst Mortgage 2004-2 B2, 4.74% 7/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,163,288.00 |
| Equifirst Mortgage Loan Trust 2005-1 B3, 6.08% 4/25/35 (a) | Home Equity Loans Non-High Loan to Value | $827,626.00 |
| First Franklin Mortgage 2004-FF2 N3, 8.835% 4/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,700,000.00 |
| First Franklin Mortgage 2004-FF5 B, 4.47% 8/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,212,318.00 |
| First Franklin Mortgage 2004-FFH2 B2, 4.25% 6/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,429,741.00 |
| First Franklin Mortgage 2004-FFH3 B1, 5.10% 10/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,073,450.00 |
| GMAC Commercial Mortgage 1997-C2 F, 6.75% 4/15/29 | Commercial Loans | $2,775,676.00 |
| GMAC Commercial Mortgage 1998-C1 F, 7.096% 5/15/30 | Commercial Loans | $2,949,149.00 |
| GMAC Commercial Mortgage 2000-C1 H, 7.00% 3/15/33 (a) | Commercial Loans | $2,700,483.00 |

Pltf. Trial Exhibit 23
Cause No. 09-14448
Page 1 of 5

# MBS LISTED AS ABS - 2005 ANNUAL REPORT FOR RSF

| | | |
|---|---|---|
| Green Tree Financial 1996-4 M1, 7.75% 6/15/27 | Manufactured Housing Loans | $2,897,139.00 |
| Green Tree Financial 1996-5 B1, 8.10 % 7/15/27 | Manufactured Housing Loans | $355,708.00 |
| Green Tree Financial 1996-9 M1, 7.63% 1/15/28 | Manufactured Housing Loans | $4,403,379.00 |
| Green Tree Financial 1997-8 M1, 7.02% 10/15/27 | Manufactured Housing Loans | $5,389,409.00 |
| Green Tree Financial 1999-4 M1, 7.60% 5/1/31 | Manufactured Housing Loans | $1,927,632.00 |
| Green Tree Financial 1999-5 M1, 8.05% 3/1/30 | Manufactured Housing Loans | $5,137,388.00 |
| Greenpoint Manufactured Housing 1999-5 M2, 9.23% 12/15/29 | Manufactured Housing Loans | $10,590,407.00 |
| Greenpoint Manufactured Housing 2000-1 M2, 8.780% 3/20/30 | Manufactured Housing Loans | $838,157.00 |
| Greenpoint Manufactured Housing 2000-3 IM1, 9.01% 6/20/31 | Manufactured Housing Loans | $4,682,138.00 |
| GS Mortgage 1998-C1 H, 6.00% 10/18/30 (a) | Commercial Loans | $2,892,654.00 |
| Long Beach Mortgage 2001-4 M3, 4.683% 3/25/32 | Home Equity Loans Non-High Loan to Value | $2,178,233.00 |
| Long Beach Mortgage 2004-2 B, 5.50% 6/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,416,943.00 |
| Long Beach Mortgage 2004-4 M10, 4.615% 10/25/34 | Home Equity Loans Non-High Loan to Value | $4,607,452.00 |
| Madison Avenue Manufactured Housing 2002-A B2, 4.34% 3/25/32 | Manufactured Housing Loans | $3,785,222.00 |
| Merit Securities 12-1 1M2, 7.35% 7/28/33 | Manufactiured Housing Loans | $4,040,926.00 |
| Merit Securities 13 M2, 7.88% 12/28/33 | Manufactured Housing Loans | $3,184,837.00 |
| Meritage Mortgage 2004-2 B2, 4.829% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $1,569,483.00 |
| Merril Lynch Mortgage 2005-SL1 B5, 6.27% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $1,784,852.00 |
| Merrill Lynch Mortgage 1998-C1 F, 6.25% 11/15/26 | Commercial Loans | $1,779,887.00 |
| MM Community Funding II, 3.50% 12/15/31 (a) | Certificate Backed Obligations | $938,903.00 |
| MM Community Funding IX, 10.00% 5/1/33(a) | Certificate Backed Obligations | $1,941,063.00 |
| NovaStar Home Equity 2004-3 B4, 5.238% 12/25/34 | Home Equity Loans Non-High Loan to Value | $1,562,857.00 |
| Oakwood Mortgage 2002-A M1, 7.76% 3/15/32 | Manufactured Housing Loans | $511,694.00 |
| Oakwood Mortgage 2002-B M1, 7.62% 6/15/32 | Manufactured Housing Loans | $3,751,543.00 |
| Option One Mortgage 2004-2 M7, 4.65% 5/25/34 | Home Equity Loans Non-High Loan-to Value | $8,910,197.00 |
| Preferred Term Securities IV, 6.98% 6/24/34 (a) | Certificate Backed Obligations | $2,029,762.00 |
| Preferred Term Securities XV, 9/26/34 (a) (f) | Certificate Backed Obligations | $1,000,000.00 |
| Preferred Term Securities XVI, 3/23/35 (a) (f) | Certificate Backed Obligations | $4,000,000.00 |
| Sail Net 2004-5A B, 6.75% 6/27/34 (a) | Home Equity Loans Non-High Loan to Value | $1,383,703.00 |
| Salomon Brothers Mortgage 2000-C2 J, 6.308% 7/18/33 | Commercial Loans | $1,715,984.00 |
| Terwin Mortgage 2004-16SL B3, 6.34% 10/25/34 | Home Equity Loans Non-High Loan to Value | $1,505,447.00 |
| UCFC Manufactured Housing Contract 1997-2 B1, Zero Coupon Bond 2/15/18 | Manufactured Housing Loans | $844,012.00 |
| US Capital Funding II, 6.90% 8/1/34 | Certificate Backed Obligations | $1,000,000.00 |
| US Capital Funding III, 14.00% 12/1/35 | Certificate Backed Obligations | $1,000,000.00 |

Pltf. Trial Exhibit 23
Cause No. 09-14448
Page 2 of 5

# MBS LISTED AS ABS - 2005 ANNUAL REPORT FOR RSF

| | | |
|---|---|---|
| First Franklin 2004-FF5 M9, 4.47% 8/25/34 | Home Equity Loans Non-High Loan to Value | $2,446,713.00 |
| Terwin Mortgage Trust 2005-3SL B6, 11.500% 3/25/35 interest-only strips | Home Equity Loans Non-High Loan to Value | $4,028,611.00 |
| Meritage Mortgage 2004-2 B1, 4.829% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $2,428,120.00 |

Tab 17, p. 3 of 5
Pltf. Trial Exhibit 23
Cause No. 09-14448
Page 3 of 5

# MBS LISTED AS ABS -2005 ANNUAL REPORT FOR RMA

| Name Listed in Annual Report | Description | Cost |
|---|---|---|
| ACE Securities  2004-HE3 B, 5.549% 11/25/34 (a) | Home Equity Loans Non-High Loan to Value | $7,535,031.00 |
| ACE Securities 2004-HE4 B, 5.694% 12/25/34 (a) | Home Equity Loans Non-High Loan to Value | $1,426,391.00 |
| ACE Securities Corp. 2004-HE3 M11, 5.46% 11/25/34 | Home Equity Loans Non-High Loan to Value | $6,240,150.00 |
| ACE Securities Corp. 2005-HE2 B1, 6.06% 4/25/35 (a) | Home Equity Loans Non-High Loan to Value | $3,709,858.00 |
| Bombardier Capital 2000-A A2, 7.575% 6/15/30 | Manufactured Housing Loans | $11,548,921.00 |
| Equifirst Mortgage Loan Trust 2004-3 B1, 5.708% 12/25/34 (a) | Home Equity Loans Non-High Loan to Value | $1,651,725.00 |
| Equifirst Mortgage Loan Trust 2004-3 B2, 5.708% 12/25/34 (a) | Home Equity Loans Non-High Loan to Value | $5,502,491.00 |
| Equifirst Mortgage Loan Trust 2005-1 B4, 6.08% 4/25/35 (a) | Home Equity Loans Non-High Loan to Value | $827,626.00 |
| First Franklin 2004-FF11 B1, 5.431% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $5,500,496.00 |
| First Franklin 2004-FF11 B2, 5.431% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $5,302,262.00 |
| Green Tree Finacial 1998-8 M1, 6.98% 9/1/30 | Manufactured Housing Loans | $5,946,692.00 |
| Green Tree Financial 1996-7 B1, 7.70% 10/15/27 | Manufactured Housing Loans | $963,156.00 |
| Green Tree Financial 1998-3 M1, 6.86% 3/1/30 | Manufactured Housing Loans | $7,464,186.00 |
| GSAMP Trust 2004-AR1 B5, 5.000% 6/25/34 (a) | Home Equity Loans Non-High Loan to Value | $1,552,348.00 |
| Lease Investment Flight Trust 1 A1, 2.49% 7/15/31 | Commercial Loans | $10,356,145.00 |
| Long Beach Mortgage 2001-1 M2, 2.91% 4/21/31 | Home Equity Loans Non-High Loan to Value | $8,132,764.00 |
| Merrill Lynch 2004-WMC1 B4, 5.181% 10/25/34 (a) | Home Equity Loans Non-High Loan to Value | $7,928,270.00 |
| Oakwood Mortgage 2001-C A4, 7.405% 12/15/30 | Manufactured Housing Loans | $2,965,719.00 |
| Preferred Term Securities XVII, 6/23/35 (a) € | Certificate Backed Obligations | $3,000,000.00 |
| Terwin Mortgage Trust 2005-3SL B6, 5.50% 3/25/35 interest-only strips | Home Equity Loans Non-High Loan to Value | $3,021,458.00 |
| Long Beach Mortgage 2001-4 M3, 4.683% 3/25/32 | Home Equity Loans Non-High Loan to Value | $3,658,258.00 |
| Enterprise Mortgage 2000-1 A2, 7.505% 1/15/27 (a) | Commercial Loans | $18,630,691.00 |
| Equifirst Mortgage Loan Trust 2005-1 B3, 6.08% 4/25/35 (a) | Home Equity Loans Non-High Loan to Value | $827,626.00 |
| Equifirst Mortgage Loan Trust 2005-1 B4, 6.08% 4/25/35 (a) | Home Equity Loans Non-High Loan to Value | $1,453,041.00 |
| Green Tree Financial 1996-9 M1, 7.63% 1/15/28 | Manufactured Housing Loans | $4,045,739.00 |
| Green Tree Financial 1999-4 M1, 7.60% 5/1/31 | Manufactured Housing Loans | $1,462,777.00 |
| GS Mortgage 1998-C1 H, 6.00% 10/15/30 (a) (Commercial Loan) | Commercial Loans | $4,821,091.00 |
| Merrill Lynch 2005-SL1 B5, 6.27% 1/25/35 (a) | Home Equity Loans Non-High Loan to Value | $1,784,853.00 |
| US Capital Funding III, 14.00% 12/1/35 (a) | Certificate Backed Obligations | $2,000,000.00 |

Tab 17, p. 4 of 5

Pltf. Trial Exhibit 23

Cause No. 09-14448

Page 4 of 5

## MBS LISTED AS ABS -2005 ANNUAL REPORT FOR RMA

| | | |
|---|---|---|
| ACE Securities Corp. 2004-HE4 M11, 5.694% 12/25/34 | Home Equity Loans Non-High Loan to Value | $2,405,756.00 |
| First Franklin 2004-FF5, 8.594% 8/25/34 (a) | Home Equity Loans Non-High Loan to Value | $2,000,000.00 |
| Terwin Mortgage Trust 2005-3SL B6, 5.50% 3/25/35 interest-only strips | Home Equity Loan Non-High Loan to Value | $7,553,646.00 |

Tab 17, p. 5 of 5

Pltf. Trial Exhibit 23

Cause No. 09-14448

Page 5 of 5

# TAB 18

IN THE DISTRICT COURT
DALLAS COUNTY, TEXAS
101st JUDICIAL DISTRICT

Purdue Avenue Investors LP, Mary Ann Howard, and Dana Howard, as
Trustee of the Molly A. Howard Trust,

v.

Morgan Keegan & CO. Inc., Morgan Asset Management,
Inc., James C. Kelsoe, Jr. and Thomas Orr.

**Expert Report of
Craig J. McCann, Ph.D., CFA
July 15, 2014**

## I.      Qualifications and Remuneration

### A.      Qualifications

1.      I am the President of Securities Litigation and Consulting Group, Inc. ("SLCG"). Prior to founding SLCG, I was a Director at LECG, a business unit of Navigant Consulting, Inc. Prior to joining LECG, I was Managing Director, Securities Litigation at KPMG LLP for two years.

2.      I was a senior financial economist in the Office of Economic Analysis at the Securities and Exchange Commission (SEC) from 1992 to 1993 and from 1994 to 1995. While at the Commission, I worked on several securities fraud investigations including allegations of material omissions and misrepresentations. These projects included analysis of materiality, causation, illegal profits, losses avoided and monetary penalties.

3.      I earned a Ph.D. in Economics from the University of California, at Los Angeles. My dissertation examined the incidence of golden parachutes and their effect on stock prices using an event study. Financial economists use event studies to determine whether information released was material and was

Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 1 of 97

previously non-public. I hold the Chartered Financial Analyst (CFA) designation. Four years of practical investment management experience and the successful completion of a series of three day-long exams are required to receive the CFA designation.

4.      I have taught graduate investment management at Georgetown University and at the University of Maryland, College Park. These courses include extensive discussions of securities valuation, portfolio construction and performance monitoring. I have held Series 7 and Series 63 National Association of Securities Dealers ("NASD") registrations.

5.      My consulting work over the nineteen years since I left the SEC has primarily involved the analysis of investments, including the valuation of securities. I have spoken at length at continuing legal education programs put on by Bar Associations around the country and by the North American Securities Administrators Association, the United States Securities and Exchange Commission, and the Texas Securities Commission. I have been hired as a consultant and expert witness in investigations by many state and federal agencies including the U.S. Securities and Exchange Commission and the Department of Justice.

6.      My research has been published in peer-reviewed journals such as the *Journal of Alternative Investments*, *Journal of Applied Corporate Finance*, *Journal of Asset Management*, *Journal of Business Valuation and Economic Loss Analysis*, *Journal of Derivatives*, *Journal of Derivatives & Hedge Funds*, *Journal of Financial Transformation*, *Harvard Business Review*, *Journal of Index Investing*, *Journal of Investing*, *Journal of Legal Economics*, *Journal of Retirement* and *Journal of Risk*.

7.   My resume, which includes a list of all publications authored by me within the last 10 years and the cases in which I have testified as an expert at trial or by deposition within the last four years, is attached as Exhibit 1.

### B.   Remuneration

8.   SLCG is being compensated for its time and expenses. My hourly rate is $475. Other SLCG personnel working on this matter have billing rates of $100 to $475 per hour.

## II.   Materials Relied Upon

9.   I have relied on the following materials:

a.   Plaintiffs' Original Petition;

b.   Defendant Morgan Asset Management, Inc.'s First Amended Answer to Plaintiffs' Original Petition;

c.   Defendant Morgan Keegan & Company, Inc.'s First Amended Answer to Plaintiffs' Original Petition;

d.   Defendant James C. Kelsoe, Jr.'s Special Appearance and Objection to Personal Jurisdiction;

e.   Public filings with the Securities and Exchange Commission including Prospectuses, Annual Reports, Semi-annual Reports and Quarterly Reports for the RMK Advantage Income Fund, RMK High Income Fund and RMK Strategic Income Fund;

f.   Prospectuses for securities held by the RMK Advantage Income Fund, RMK High Income Fund and RMK Strategic Income Fund;

g.   Deposition transcripts with exhibits;

h.   Other documents produced in discovery;

i.   Bloomberg and publicly available sources as cited below; and

j.   Materials identified in footnotes herein.

10.   Discovery in this action and my work on this matter are ongoing and therefore I reserve the right to present rebuttal and supplemental testimony and/or amend or supplement my report based on issues raised by

Page **3** of **24**

Page 143 of 181

Tab 18, p. 3 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 3 of 97

Defendants or other experts or any other information made available through discovery or otherwise.

### III. Assignment

11.     I have been asked by Counsel for the Plaintiffs to review the Plaintiffs' investments in the RMK Advantage Income Fund, RMK High Income Fund and RMK Strategic Income Fund ("the RMK Funds"). I have been asked to identify any material misrepresentations or omissions in the RMK Funds' SEC filings and to calculate damages suffered by the Plaintiffs as a result of those misrepresentations.

### IV. Summary of Findings

12.     Based on my review of the documents, I have determined the following to a reasonable degree of scientific certainty. The RMK Funds' Prospectuses, Annual Reports, Semi-annual Reports and Quarterly Reports contained many, repeated misrepresentations. Those included:

- After defining what was meant by "mortgage-backed securities" and "asset-backed securities" in the Prospectus for each Fund, the Defendants report many mortgage-backed securities as asset-backed securities in the Funds' SEC filings. The Funds' direct and indirect exposure to commercial and residential mortgages was thus not limited to amounts listed in the Funds' SEC filings.

- The Funds claimed to be diversified across debt sectors. In fact, the Funds were overwhelmingly exposed to commercial and residential mortgages. The Fund's undisclosed concentration in mortgage-backed securities grew over time and ultimately caused the losses suffered by the Plaintiffs.

- The Defendants attributed the stability of the Funds' net asset values relative to the Lehman Brothers Ba Index to diversification across debt sectors when the Defendants, in fact, knew the Funds' relatively stable net asset values were due to the Defendants' undisclosed practice of not updating the market values of many of the Funds' portfolio holdings on a daily basis.

Page **4** of **24**

Page 144 of 181

Tab 18, p. 4 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 4 of 97

- In Annual and Semi-annual Reports filed with the SEC, the Defendants, without qualification or equivocation, told investors that daily net asset values reported were based on daily closing market prices. This assertion, coupled with other language in the Annual and Semi-annual Reports and in the Prospectuses falsely implied that the Funds were holding securities for which daily closing prices were available and that "fair valuing" was done properly.

- Despite the Funds' minimal holdings of corporate bonds and overwhelming exposure to residential and commercial mortgages, the Defendants repeatedly compared the Funds' returns to the Lehman Brothers Ba Index, an index containing only corporate bonds.

- The Plaintiffs suffered out of pocket losses of $1,435,352, capital losses of $2,253,039 and market adjusted losses of $1,851,506 as a result of the Defendants' misrepresentations. See Exhibit 2.

## V. The Defendants Understated the Funds' Holdings of Mortgage-Backed Securities

13. The Funds' Prospectuses define two of the debt sectors the Funds will diversify across: "mortgage-backed securities" and "asset-backed securities". The Prospectus language cited below makes clear the distinction is whether the underlying collateral is mortgages or something else. The funds then have separate mortgage-backed securities and asset-backed securities sections of portfolio holdings with a lot of the asset-backed securities holdings actually backed by mortgages.

14. The following paragraphs from the 2004 Advantage Income Fund Prospectus at p. 14 state the fund will be diversified across types of debt and separately identifies asset-backed securities and mortgage-backed securities.[1]

---

[1] For brevity, here and throughout I will refer to language in the section of the 2005 Annual Report dealing with the RMK Advantage Income Fund. Similar language, evidencing the same misrepresentations identified herein, can be found in the Prospectuses and Annual and Semi-Annual Reports for the RMK High Income Fund and for the RMK Strategic Income Fund.

Page **5** of 24

Page 145 of 181

Tab 18, p. 5 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 5 of 97

In managing the Fund's portfolio, the Adviser will employ an active management approach that will emphasize the flexibility to allocate assets across a wide range of asset classes and thereby provide the advantages of a widely diversified high income portfolio. The Adviser's fixed-income research team will search a broad array of asset categories and sectors to identify the most attractive relative value prospects. **In addition to the traditional below investment grade corporate market, the Adviser will strategically utilize asset-backed securities, mortgage-backed securities and other structured finance vehicles as well as convertible securities, preferred stock and other equity securities.** The Adviser believes that the opportunity to acquire a diverse set of assets will contribute to higher total returns and a more stable net asset value for the Fund than would result from investing in a single sector of the debt market such as below investment grade corporate bonds. The Adviser will sell securities that it believes no longer offer potentially better yield or total return than other available securities. (Emphasis added)

15.    Two pages later in the 2004 Prospectus, these two debt market segments are described as:

MORTGAGE-BACKED SECURITIES. **Mortgage-backed securities represent direct or indirect participations in, or are secured by and payable from, mortgage loans secured by real property and include single- and multi-class pass-through securities and collateralized mortgage obligations.** U.S. government mortgage-backed securities include mortgage-backed securities issued or guaranteed as to the payment of principal and interest (but not as to market value) by Ginnie Mae (also known as the Government National Mortgage Association), Fannie Mae (also known as the Federal National Mortgage Association), Freddie Mac (also known as the Federal Home Loan Mortgage Corporation) or other government-sponsored enterprises. Other mortgage-backed securities are issued by private issuers. Private issuers are generally originators of and investors in mortgage loans, including savings associations, mortgage bankers, commercial banks, investment bankers and special purpose entities. Payments of principal and interest (but not the market

Page **6** of **24**

Page 146 of 181

Tab 18, p. 6 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 6 of 97

value) of such private mortgage-backed securities may be supported by pools of mortgage loans or other mortgage-backed securities that are guaranteed, directly or indirectly, by the U.S. government or one of its agencies or instrumentalities, or they may be issued without any government guarantee of the underlying mortgage assets but with some form of non-government credit enhancement. Non-governmental mortgage-backed securities may offer higher yields than those issued by government entities, but may also be subject to greater price changes than governmental issues.

Some mortgage-backed securities, such as collateralized mortgage obligations, make payments of both principal and interest at a variety of intervals; others make semiannual interest payments at a predetermined rate and repay principal at maturity (like a typical bond). Stripped mortgage-backed securities are created when the interest and principal components of a mortgage-backed security are separated and sold as individual securities. In the case of a stripped mortgage-backed security, the holder of the principal- only, or "PO," security receives the principal payments made by the underlying mortgage, while the holder of the interest-only, or "IO," security receives interest payments from the same underlying mortgage.

**Mortgage-backed securities are based on different types of mortgages including those on commercial real estate or residential properties.** These securities often have stated maturities of up to thirty years when they are issued, depending upon the length of the mortgages underlying the securities.  In practice, however, unscheduled or early payments of principal and interest on the underlying mortgages may make the securities' effective maturity shorter than this, and the prevailing interest rates may be higher or lower than the current yield of the Fund's portfolio at the time the Fund receives the payments for reinvestment.

ASSET-BACKED SECURITIES. **Asset-backed securities represent direct or indirect participations in, or are secured by and payable from, pools of assets such as, among other things, motor vehicle installment sales contracts, installment loan contracts, leases of various types of real and personal property, and receivables from revolving credit (credit card)**

Page **7** of **24**

Page 147 of 181

Tab 18, p. 7 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 7 of 97

**agreements or a combination of the foregoing.** These assets are securitized through the use of trusts and special purpose corporations. Credit enhancements, such as various forms of cash collateral accounts or letters of credit, may support payments of principal and interest on asset-backed securities. Although these securities may be supported by letters of credit or other credit enhancements, payment of interest and principal ultimately depends upon individuals paying the underlying loans or accounts, which payment may be affected adversely by general downturns in the economy. Asset-backed securities are subject to the same risk of prepayment described below with respect to mortgage-backed securities. The risk that recovery on repossessed collateral might be unavailable or inadequate to support payments, however, is greater for asset-backed securities than for mortgage-backed securities. (emphasis added)

16. The Prospectus for each Fund thus defined "mortgage-backed securities" as securities backed by mortgages - whether on commercial or residential properties, whether issued by quasi-governmental agencies or private issuers, whether structured or pass through – and "asset-backed securities" as securities backed by other types of collateral. This distinction is important since real-estate values are a distinct risk - and a risk that dominated the Funds.

17. The Defendants thereafter significantly under-report the amount of mortgage-backed securities in every SEC filing. For example on page 4 of the Funds' March 31, 2005 Annual Report the Defendants provide this distribution for the Advantage Income Fund. See Figure 1.

Page **8** of **24**

Page 148 of 181

Tab 18, p. 8 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 8 of 97

Figure 1: Advantage Income Fund 2005 Annual Report Excerpt

```
ASSET ALLOCATION* AS OF 3/31/05
[Pie Chart Representation]

Certificate-Backed Obligations              2.1%
Mortgage-Backed Securities                  1.8%
Corporate Bonds                            23.5%
Home Equity Loans                          16.9%
Collateralized Equipment Leases            14.2%
Manufactured Housing Loans                  7.2%
Common Stock                                6.8%
Commercial Loans                            6.7%
Franchise Loans                             6.5%
Collateralized Obligations                  6.2%
Cash Equivalents                            5.7%
Other                                       2.4%
```

18.     Given the Prospectuses' definition of mortgage-backed securities and asset backed securities, the table above makes it appear that only 1.8% of the Advantage Income Fund portfolio consisted of mortgage-backed securities as of March 31, 2005.  Later in the Annual Report, the Harborview Mortgage 2004-8 Class X, interest only strip is the only security listed under "Mortgage-backed Securities". In fact, the amount of securities backed by mortgages in the portfolio was much, much higher than the 1.8% the Funds reported.

19.     The 16.9% identified as "Home Equity Loans" must be added to the 1.8% identified as "Mortgage-Backed Securities". The securities the Defendants identify as "Home Equity Loans" are not backed by traditional home equity loans. Instead, they are backed by first lien loans to subprime borrowers. For example, Ace Securities 2004-HE3 M11 and Ace Securities 2004-HE4 M11 – both listed as investment grade asset-backed securities in the 2005 Annual Report – are the bottom offered tranches in deals backed by first lien loans to subprime borrowers.[2] Also, some or all of the 7.2% identified

---

[2] The Prospectus for Ace Securities 2004-HE3 can be found here www.sec.gov/Archives/edgar/data/1063292/000093041304005014/c34179_424b5.txt

And the Prospectus for Ace Securities 2004-HE4 can be found here http://www.sec.gov/Archives/edgar/data/1063292/000093041304005571/c34511_424b5.txt.

Tab 18, p. 9 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 9 of 97

as "Manufactured Housing Loans" should be added to the "Mortgage-Backed Securities" allocation. For example, Green Tree Financial 1996-9 M1 is backed by mortgages on manufactured housing and residential real estate.[3]

20.    Given the Prospectuses definition of mortgage-backed securities, 25.9% should have been listed as mortgage-backed securities, far exceeding the 2005 Annual Report's 1.8% claimed allocation. However, even this 25.9% though would understate the exposure to mortgage-backed securities in the Advantage Income Fund. Other portfolio holdings in addition to those identified as "Home Equity Loans" and "Manufactured Housing Loans" are mortgage-backed securities as defined in the Funds' Prospectuses.

21.    For example, on page 8 of the 2005 Annual Report, there is a section in the Advantage Income Fund holdings table that starts "Asset-Backed Securities – Non-Investment Grades – 55.2% of Net Assets". Within that section is "Commercial Loans" and listed therein is GS Mortgage 1998 C-1 H. See Figure 2.

---

[3] www.sec.gov/Archives/edgar/data/890175/0000950131-96-005294.txt

Page **10** of **24**

Page 150 of 181

Tab 18, p. 10 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 10 of 97

Figure 2: Advantage Income Fund 2005 Annual Report Excerpt

```
ASSET BACKED SECURITIES - NON-INVESTMENT GRADE - 55.2% OF
NET ASSETS

                    CERTIFICATE-BACKED OBLIGATIONS - 2.4%
   5,000,000        NCAPS Funding 2003-2A SIN, 10.00% 1/15/34 (a)        Non-rated        4,851,929         4,850,000
</TABLE>
                                                         8

<PAGE>

<TABLE>
<CAPTION>
 Principal                                                  NRSRO
  Amount/                                                   Rating                                    Market
   Shares       Description                               (Unaudited)     Cost                       Value (b)
<S>             <C>                                        <C>            <C>                          <C>
   3,000,000    Preferred Term Securities XVII, 6/23/35 (a) (e)          Non-rated $    3,000,000   $     3,000,000

   2,000,000    US Capital Funding III, 14.00% 12/1/35 (a)               Non-rated      2,000,000         2,000,000
                                                                                  ------------------ ------------------
                                                                                  $    9,851,929   $     9,850,000
                                                                                  ------------------ ------------------

                COLLATERALIZED DEBT OBLIGATION - 4.6%
   4,000,000    Hewett's Island 2004-1A COM, 12/15/16 (e)               BB             4,000,000         4,000,000
   2,000,000    Hewett's Island II,
                12/15/16 (a) (e)                                       Non-rated      1,980,079         1,980,000
   3,900,000    MKP 4A CS, 2.00% 7/12/40                               Non-rated      3,900,000         3,900,000
   6,000,000    Prestl XVI Combination Notes, 10.00% 3/23/35 (a)       Non-rated      6,000,000         6,119,160
   2,500,000    Stanfield 2A D1, 8.76% 4/15/15 (a)                     CCC-           2,475,007         2,475,000
                                                                                  ------------------ ------------------
                                                                                  $   18,355,086   $    18,474,160
                                                                                  ------------------ ------------------

                COMMERCIAL LOANS - 7.7%
   1,171,422    Banc of America 2000-1 M, 6.00% 11/15/31 (a)           B-               766,216           757,207
  32,805,935    Enterprise Mortgage 2000-1 A2, 7.505% 1/15/27 (a)      B-            18,630,691        18,371,324
  10,000,000    GS Mortgage 1998-C1 H, 6.00% 10/15/30 (a)             CCC             4,821,091         4,742,100
   3,750,000    Lehman Brothers 2002-LLFA L, 3.50% 6/14/17 (a)        BB+            3,713,531         3,712,500
   4,000,000    Merrill Lynch 204-WMC3 B4, 5.00% 1/25/35 (a)          BB+            3,324,641         3,342,760
                                                                                  ------------------ ------------------
                                                                                  $   31,256,170   $    30,925,891
```

22.     The GS Mortgage 1998 C-1 H is clearly a security backed by mortgages not a security backed by commercial loans.[4] The Defendants also list the Merrill Lynch 204(sic)-WMC3 B4[5] mortgage-backed security in the "Asset-Backed Security – Commercial Loan" category. This mortgage-backed security is incorrectly listed in the holdings table as an "Asset-Backed Security – Commercial Loan" and as a "Commercial Loan" in the summary asset allocation table. ==This misclassification understated the concentration in mortgage-backed securities and made the portfolio seem more diversified than it actually was.==

---

[4] The Prospectus for GS Mortgage 1998 C-1 H is available at www.sec.gov/Archives/edgar/data/1004158/0000950136-98-02349.txt.

[5] www.sec.gov/Archives/edgar/data/809940/000095012304006256/y97242e424b5.txt.

Page **11** of **24**

Page 151 of 181

Tab 18, p. 11 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 11 of 97

23. This misrepresentation is important because the funds were much more concentrated in housing and housing finance risk than the Prospectuses and other SEC filings disclosed. The Defendants told investors what "mortgage-backed securities" meant in the Funds' Prospectuses. Therefore, regardless of how some other firm or an issuer, classified these assets, they should not have been classified by the Funds as asset backed securities which the Fund defined to be backed by non-mortgage collateral "such as, among other things, motor vehicle installment sales contracts, installment loan contracts, leases of various types of real and personal property, and receivables from revolving credit (credit card) agreements or a combination of the foregoing."

## VI. The Prospectuses, Annual Reports and Semi-Annual Reports Misrepresented the Liquidity of the Funds' Holdings

24. The Prospectuses state that the Funds will value the portfolios' holdings at market prices and where closing market prices are not available the Funds will value the holdings at fair value in good faith. At the bottom of the NAV table which ends on page 7 of the 2005 Annual Report there is this note:

```
(1) Net asset value is calculated after the close of
the exchanges each day by taking the closing market
value of all securities owned plus all other assets
such as cash, subtracting all liabilities, then
dividing the result (total net assets) by the total
number of shares outstanding. The market price is the
last reported price at which a security was sold on an
exchange.
```

25. This note in the 2005 Annual Report is untrue since most of the Funds' securities did not have a market price. The NAVs reported in the table on page 5 of the 2005 Annual Report were largely determined at the Defendants' discretion.

Page **12** of **24**

Page 152 of 181

Tab 18, p. 12 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 12 of 97

26. Sixty pages later in the notes to the financial statements there is a Note 2 which reads.

NOTE 2: SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES
The following is a summary of significant accounting policies consistently followed by the Funds in the preparation of their financial statements. These policies are in conformity with accounting principles generally accepted in the United States of America. INVESTMENT VALUATIONS--Investments in securities that trade on national securities exchanges are stated at the last reported sales price on the day of valuation. Securities traded in the over-the-counter market and listed securities for which no sale was reported on that date are stated at the last quoted bid price. The Funds normally obtain market values for their securities from an independent pricing service or from the use of an internal matrix system that derives value based on comparable securities. Debt securities with remaining maturities of 60 days or less are valued at amortized cost, or original cost plus accrued interest, both of which approximate market. When a Fund believes that a market quote does not reflect a security's true value, the Fund may substitute for the market value a fair value estimate made according to methods approved by the Board of Directors. The values assigned to fair value investments are based on available information and do not necessarily represent amounts that might ultimately be realized, since such amounts depend on future developments inherent in long-term investments. Further, because of the inherent uncertainty of valuation, such estimated values may differ significantly from the values that would have been used had a ready market for the investments existed, and the differences could be material.

27. Based on the note to the NAV table on page 7 and Note 2 to the financial statements at the end of the 2005 Annual Report investors are led to believe that NAVs reported at least to March 31, 2005 were based on actual market prices. In fact, there were no "closing market values" for most of the holdings and the Funds placed the same value on many of the securities it held

Page **13** of **24**

Page 153 of 181

Tab 18, p. 13 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 13 of 97

every day for months at a time because there were not readily available transaction prices or quotes.

28.     This valuation was inconsistent with the Prospectuses and while it may have not caused the NAV to be systematically too high or too low on any given day it did cause the funds' NAVs to be smoothed. In fact, for large swaths of the portfolios, the Defendants just left the price unchanged for months at a time. This all resulted in the Funds appearing more stable and their holdings more liquid to investors than the reality of the underlying investments, misrepresenting the true risks of the Funds.

## VII.   The Defendants Use of Stale Prices Was Inconsistent With Prospectus Disclosures

29.     The Prospectuses acknowledge that the market price of illiquid securities is more volatile than of liquid securities. At page 20:

```
ILLIQUID AND RESTRICTED SECURITIES. Illiquid
investments are investments that cannot be sold or
disposed of in the ordinary course of business at
approximately the prices at which they are valued.
Investments currently considered by the Adviser to be
illiquid include repurchase agreements not entitling
the holder to repayment of principal and payment of
interest within seven days, non-government stripped
fixed-rate mortgage-backed securities, and over-the-
counter options. In the absence of readily available
market quotations a committee appointed by the Fund's
Board will price illiquid investments at a fair value
as determined in good faith. Valuing illiquid
securities typically requires greater judgment than
valuing securities for which there is an active
trading market. The market price of illiquid
securities generally is more volatile than that of
more liquid securities, which may adversely affect the
price that the Fund pays for or recovers upon the sale
of illiquid securities.

Investment of the Fund's assets in illiquid securities
may restrict the Fund's ability to take advantage of
market opportunities. The risks associated with
```

Page **14** of **24**

Page 154 of 181

Tab 18, p. 14 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 14 of 97

illiquid securities may be particularly acute in situations in which the Fund's operations require cash and could result in the Fund borrowing to meet its short-term needs or incurring losses on the sale of illiquid securities.

30.   At page 36:

NET ASSET VALUE

The Fund calculates net asset value for its common shares every day the NYSE is open when regular trading closes (normally 4:00 p.m. Eastern time).

For purposes of determining the net asset value of a common share, the value of the securities held by the Fund plus any cash or other assets (including interest accrued but not yet received) minus all liabilities (including accrued expenses and indebtedness) is divided by the total number of common shares outstanding at such time. Expenses, including the fees payable to the Adviser, are accrued daily.

The Fund generally will value its portfolio securities using closing market prices or readily available market quotations. The Fund may use a pricing service or a pricing matrix to value some of its assets.

Securities for which the primary market is on an exchange (domestic or foreign) will be valued at the last sale price on such exchange on the day of valuation or, if there was no sale on such day, at the last quoted bid price.

Securities traded primarily in the Nasdaq Stock Market are normally valued by the Fund at the Nasdaq Official Closing Price ("NOCP") provided by Nasdaq each business day. The NOCP is the most recently reported price as of 4:00:02 p.m. Eastern Time, unless that price is outside the range of the "inside" bid and asked price(i.e., the bid and asked prices that dealers quote to each other when trading for their own accounts); in that case, Nasdaq will adjust the price to equal the inside bid or asked price, whichever is closer. Because of delays in reporting trades, the NOCP may not be based on the price of the last trade to occur before the market closes. Securities that are traded in the over-the-counter market will be valued at the last quoted bid price. Debt securities with remaining maturities of 60 days or less will be valued

Page **15** of **24**

Page 155 of 181

Tab 18, p. 15 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 15 of 97

at amortized cost or original cost plus accrued interest, both of which approximate market value. Foreign securities are translated from the local currency into U.S. dollars using current exchange rates. Foreign securities markets may be open on days when the U.S. markets are closed. For this reason, the value of any foreign securities owned by the Fund could change on a day a stockholder cannot buy or sell shares of the Fund. When closing market prices or market quotations are not available or are considered by the Adviser to be unreliable, the Fund may use a security's fair value. Fair value is the valuation of a security determined on the basis of factors other than market value in accordance with procedures approved by the Fund's Board. The use of fair value pricing by the Fund may cause the net asset value of its shares to differ from the net asset value that would be calculated using closing market prices.

31.     The Funds, in fact, placed the same price on many (most) of the securities it held every day for months at a time because there were not readily available transaction prices or quotes. This valuation was inconsistent with the Prospectus and while it may have not caused the NAV to be systematically too high or too low on any given day it did cause the funds' NAVs to be smoothed.

## VIII. The Defendants Use of Stale Prices Misled Third-Party Vendors of Fund Rankings

32.     The Funds provided return information to Morningstar, Lipper and others for purposes of being ranked, rated or compared. The Funds also compared their returns to other funds or to indexes in their filings and marketing materials. Having said the Funds would provide data to Morningstar and others and advertise the rankings thus generated, it was false and misleading to not also tell investors the Funds were going to smooth the NAVs to get higher rankings or "Star" ratings. There is nothing in the prospectus disclosure that warns investors that the Funds would leave

Page **16** of **24**

Page 156 of 181

Tab 18, p. 16 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 16 of 97

unchanged for a year or longer the values the Funds placed on much of their holdings, thus making the low volatility of their NAV completely artificial and the accolades they received from services like Morningstar unearned.

33.    Also, the Funds said they would compare their returns to indexes and that this information should be considered in light of similarities to the index and current market conditions. They then repeatedly compared their returns in the Annual and Semi-annual Reports to the Lehman Ba index which contains none of the securities which dominate the Funds' returns.

34.    At page 53 of the first Statement of Additional Information attached to the prospectus for the Advantage Income Fund:

PERFORMANCE-RELATED, COMPARATIVE AND OTHER INFORMATION

The Fund may quote certain performance-related information and may compare certain aspects of its portfolio and structure to other similar funds as categorized by Lipper, Inc., Morningstar Inc. or other independent services.

Comparison of the Fund to an alternative investment should be made with consideration of differences in features and expected performance. The Fund may obtain and report data from sources or reporting services, such as Bloomberg Financial and Lipper, Inc. that the Fund believes to be generally accurate.

From time to time, the Fund and/or the Adviser may report to Stockholders or to the public in advertisements concerning the Adviser's performance as an adviser to Regions Morgan Keegan mutual funds and other clients, or concerning the comparative performance or standing of the Adviser in relation to other investment advisers. Comparative information may be compiled or provided by independent ratings services or by news organizations. Advertisements may refer to opinions or rankings of the Adviser's overall investment management performance or the Fund's performance contained in third-party reports or publications. Performance information for the Fund or for other Regions Morgan Keegan funds or accounts managed by the Adviser may also be compared to various unmanaged indices or to other benchmarks, some of

Page **17** of **24**

Page 157 of 181

Tab 18, p. 17 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 17 of 97

which may not be available for direct investment. Any performance information, whether related to the Fund or the Adviser, should be considered in light of the Fund's investment objectives and policies, the characteristics and quality of the Fund, and the market conditions during the time period indicated, and it should not be considered to be representative of what may be achieved in the future. The Adviser may provide its opinion with respect to general economic conditions including such matters as trends in default rates or economic cycles.

The Fund's advertising materials may reference the history of the Adviser and its affiliates or information concerning key investment and managerial personnel including the portfolio manager. These materials may make reference to certain other open-end investment companies managed by the Adviser.

35.    The first paragraph of the management discussion on page 3 in the 2005 Annual Report reads:

RMK Advantage Income Fund, Inc.
Portfolio Commentary
March 31, 2005

MANAGEMENT DISCUSSION OF FUND PERFORMANCE

RMK Advantage Income Fund, Inc. (the "Fund") began trading on November 8, 2004 under the ticker symbol RMA after an initial public offering at $15 per share. The Fund had a total return of 7.30% for the period ended March 31, 2005, based on market price and reinvested dividends. The Fund had a total return of 3.53% for the period ended March 31, 2005, based on net asset value and reinvested dividends. From November 8, 2004 until March 31, 2005, the LEHMAN BROTHERS BA U.S. HIGH YIELD INDEX had a total return of -0.56%. The Fund's strong performance was primarily attributable to the Fund's relative yield advantage as evidenced by the monthly dividend distributions and the **relative net asset value stability produced by the Fund's allocation in a wide variety of asset types**.
(Emphasis added)

Page **18** of **24**

Page 158 of 181

Tab 18, p. 18 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 18 of 97

36.     The Funds misled investors by comparing the funds returns to the Lehman Ba Index which contains no mortgage backed securities – only corporate bonds. The Funds also falsely state that their relative NAV stability was due to their diversification when in fact the NAV stability was due to not marking to market their portfolios daily.

## IX.     Comparisons to the Lehman Ba Index Misrepresented the RMK Funds' Risk

37.     The Funds' Annual and Semi-annual Reports repeatedly compared their returns to the Lehman Brothers' Ba High Yield index despite that index containing no mortgage backed securities, no asset backed securities and no structured finance.

38.     As the Securities and Exchange Commission found in In Re Piper Jaffray, it is false and misleading to claim diversification benefits when the particular structure of the securities purchased by the fund aggravates the underlying risks so dramatically that the particular sub-segment of the fixed income asset class invested in and which generated the unlevered risk is not material.

39.     In the Piper Capital Management (PCM) case, the SEC Administrative Law Judge found:

> Further, the report states that PJIGX "is invested in more than 200 different securities which offset one another and help the fund to perform well in a variety of economic scenarios" …, again implying diversification in the familiar sense. Further undermining PCM's reliance on technical accuracy is the fact that Bruntjen's unorthodox strategy of purchasing a variety of CMO derivative securities at a discount and actively managing the cash flows as they accreted to par … mystified even peer fund managers.

Page **19** of **24**

Page 159 of 181

Tab 18, p. 19 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 19 of 97

… Finally, it was affirmatively misleading to characterize Bruntjen's cash flow management "diversification" and Fund leverage as risk/volatility hedges. …

40. PCM did not challenge the ALJ's conclusion on the materially misleading nature of PCM's diversification claims for PJIGX and so the Commission accepted the ALJ's findings on this point. The Defendants' repeated claims that the Funds were diversified rise and fall on the same failed hyper-technical defenses PCM advanced before the SEC. As with PJIGX, these Funds placed highly leveraged bets on credit risk – interest rate risk in the case of PJIGX - and were not "diversified" in the sense that the Prospectuses of these Funds represented.

41. In addition to the common structural features in most of the securities in the Funds, the assets ultimately underlying most of these Fund's holdings were housing and housing finance related. The Defendants did not analyze the portfolio holding sufficiently well prior to 2007 to justify the claimed diversification. After investors like the Plaintiffs lost billions of dollars in the RMK funds in 2007, the Defendants attempted to determine the nature of the underlying assets and found that the fund was more than 57% housing and housing finance.

42. In the case identified above, the SEC found that PCM's comparison of one of PJIGX's returns to an index that contained none of the asset type that dominated its holdings was materially false and misleading.

43. Piper Jaffray marketed PJIGX in the early 1990s to investors who wanted to invest in short and intermediate term fixed-income securities issued by the U.S. government and government agencies. Many of the securities PJIGX held were Collateralized Mortgage Obligations (CMOs) including

Page **20** of **24**

Page 160 of 181

Tab 18, p. 20 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 20 of 97

inverse floaters. These securities were especially poorly described by the risk characteristics Piper Jaffray reported to investors.

44. ==The Administrative Law Judge (ALJ) found that Piper Capital Management's choice of benchmark was material to investors and was misleading because it didn't contain the same type of securities as the mutual fund held and because the comparison implied a lower interest rate risk than the portfolio actually had.==

> "Similar reasoning would apply to PCM's use of the Merrill Lynch 3-5 Year Treasury Bond Index as a benchmark for Fund performance. PJIGX annual/Semi-annual Reports to shareholders systematically compared Fund performance to that index. … PJIGX marketing materials and sales presentations made similar comparisons. … I find and conclude that expressly comparing Fund performance to the Merrill Lynch 3-5 Year Treasury Bond Index establishes a substantial likelihood that reasonable investors would consider the comparisons important in making PJIGX investment decisions and would view the comparisons as significantly altering the total mix of available information. It follows that PPJIGX/Merrill Lynch 3-5 Year Treasury Bond Index comparisons were material to investors.

> The record casts doubt on PCM's claim that the Merrill Lynch 3-5 Year Treasury Bond Index was an appropriate risk/performance benchmark for PJIGX. The Fund's distinguishing feature was an extremely high proportion of CMO derivative securities. … The Merrill Lynch 3-5 Year Treasury Bond Index contained no CMOs/CMO derivative securities whatsoever. … Moreover, the record indicates that PJIGX exhibited *multiples* of the interest rate sensitivity exhibited by the Merrill Lynch 3-5 Year Treasury Bond Index. …" [6]

45. The Securities and Exchange Commission affirmed the ALJ's findings in a strongly worded Opinion that included the following.

> PCM further misled investors by comparing the Fund's performance to the Merrill Lynch three- to five-year Treasury Bond Index. The Merrill Lynch three- to five-year Treasury Bond Index, unlike the Fund, did not include CMOs. Thus, the Fund's increasing proportion of CMOs exposed it to

---

[6] *In the Matter of Piper Capital Management, Inc., et al.* Initial Decision Release No. 175 File No. 3-9657 November 30, 2000 available at www.sec.gov/litigation/aljdec/id175hpy.htm#P218_14823

Page **21** of **24**

Page 161 of 181

Tab 18, p. 21 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 21 of 97

interest-rate sensitivity not exhibited by the Merrill Lynch three- to five-year Treasury Bond Index. [7]

46.     Similarly in this case, more than 50% of the Funds' portfolio holdings were mortgage-backed securities, asset-backed securities and other structured finance and virtually all of these securities were at or near the bottom of the various investments' capital structure. The Lehman Ba index contained only corporate bonds. The current Defendants' comparison of the Funds to the Lehman Ba index in Annual Reports is identically analogous in all material respects to PCM's comparison of PJIGX's returns to the Merrill Lynch 3-5 Year Treasury Bond Index which the SEC found was materially false and misleading.

**X.     The Defendants Misrepresented the Volatility of the Funds**

47.     In the Annual Reports, the Defendants compared the Fund's net asset volatility to the Lehman Brothers Ba Index. This comparison was grossly false and misleading because the Defendants did not mark–to-market much of the Funds' portfolio holdings. By using stale and unchanging values for the fund's holdings, the Defendants understated changes from day to day in the Funds' net asset values. The Defendants then calculated volatilities based on the artificially smoothed net asset values, thereby significantly understating the fund's volatility.

48.     The Defendants were smoothing fluctuations in the market values of the securities held in the Funds by not marking–to-market a large portion of its portfolio on a daily basis. A mutual fund's Net Asset Value is simply the sum of the value of the fund's portfolio holdings divided by the number of fund units. By keeping constant the value placed each day on a

---

[7]     *In the Matter of Piper Capital Management, Inc., et al.,* Securities Act of 1933 Release No. 8276, August 26, 2003 available at http://www.sec.gov/litigation/opinions/33-8276.htm.

Page **22** of **24**

Page 162 of 181

Tab 18, p. 22 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 22 of 97

number of the fund's holdings, the Defendants smoothed daily changes in the NAV which in turn misrepresented the volatility of the Funds.

## XI.    Damages

49.    Between January 2005 and February 2010, the Plaintiffs invested $2,534,777 in the Funds and received $281,630 in sales proceeds from the sale of shares purchased after January 1, 2005. The Fund shares still held by the Plaintiffs on February 28, 2010 were worth $108. The Plaintiffs thus suffered capital losses of $2,253,039.

50.    The Plaintiffs received dividends distributions from the Fund shares purchased after January 1, 2005 of $762,847 and capital gains distributions of $54,840 and thus suffered net out-of-pocket losses of $1,435,352.

51.    If the identical cash investments and withdrawals had been made in a true high yield bond fund instead of the Funds, the Plaintiffs would have had a gain of $416,154 up through February 28, 2010 and so its losses adjusted for high yield bond market conditions are $1,851,506.

## XII.    Comments

52.    The misrepresentations and omissions listed above are illustrative, not exhaustive. The Funds' Prospectuses repeatedly misclassified and failed to disclose the magnitude of the Funds' investments in mortgage-backed securities and in asset-backed securities and the attendant risks. It is my understanding that discovery is still ongoing. My understanding of the facts in this case is based upon a preliminary assessment of the documents available to date. I am continuing to review these documents. To the extent that the facts of the case (after further review of the documents or further fact discovery) differ from my current understanding, my findings may change.

Page **23** of **24**

Page 163 of 181

Tab 18, p. 23 of 24
Pltf. Trial Exhibit 25
Cause No. 09-14448
Page 23 of 97

Craig J. McCann, Ph.D., CFA

# TAB 19

![SLCG — SECURITIES LITIGATION & CONSULTING GROUP]

# Craig McCann, Ph.D., CFA
**Principal**



CRAIGMCCANN@SLCG.COM
703-246-9381

## Key Qualifications

Dr. McCann is Principal, Securities Litigation and Consulting Group, Inc. He is experienced in securities class action litigation, financial analysis, investment management and valuation. Dr. McCann has taught graduate investment management at Georgetown University and at the University of Maryland, College Park. He held a Series 7 and a Series 63 NASD. Dr. McCann is a Chartered Financial Analyst.

Dr. McCann received a B.A. and an M.A. in Economics from the University of Western Ontario and a Doctorate degree in Economics from the University of California, at Los Angeles. Dr. McCann's fields of graduate study were industrial organization, mathematical economics and information and uncertainty. His dissertation examined the incidence of golden parachutes and their effect on stock prices. After receiving his doctorate degree, Dr. McCann taught economics at the University of South Carolina.

Prior to founding Securities Litigation and Consulting Group, Dr. McCann was Director at LECG and Managing Director, Securities Litigation at KPMG. Dr. McCann was a senior financial economist at the Securities and Exchange Commission. There he focused on investment management issues and contributed financial analysis to numerous investigations involving alleged insider trading, securities fraud, personal trading abuses and broker-dealer misconduct.

Dr. McCann was a Senior Consultant at a consulting firm where he managed projects involving alleged securities fraud, insider trading, and market manipulation. These projects included analysis of materiality, causation, damages and class certification. In addition, he has consulted on transfer pricing, breach of contract, labor and antitrust cases as well as on various regulatory matters.

Dr. McCann has published in the *Journal of Alternative Investments*, *Journal of Applied Corporate Finance, Journal of Asset Management, Journal of Business Valuation and Economic Loss Analysis, Journal of Derivatives, Journal of Derivatives & Hedge Funds, Journal of Financial Transformation, Harvard Business Review, Journal of Index Investing, Journal of Investing, Journal of Legal Economics, Journal of Retirement* and the *Journal of Risk.* He has testified in state and federal court, in NASD, NYSE, JAMS and AAA arbitration proceedings and before the United States Senate and has been quoted in the *New York Times, the Wall Street Journal,* t*he Washington Post, the Boston Globe, the Bond Buyer, American Banker, Money Magazine, Kiplinger Retirement Report* and *Crain's Investment News.*

Tab 19, p. 1 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

## Professional Experience

SECURITIES LITIGATION AND CONSULTING GROUP, INC.
2000 -          *Principal*
                Provides expert consulting and testifying in securities class actions, investment management, labor and valuation disputes.

Navigant Consulting, Inc. / LECG
1999-2000      *Director*
                Provided expert consulting and testifying in complex litigation.

KPMG llp
1997-1999      *Managing Director, Securities Litigation*
                Directed projects in complex litigation.

UNIVERSITY OF MARYLAND, COLLEGE PARK
1995-1998      *Adjunct Professor of Finance*
                Taught graduate investment management.

GEORGETOWN UNIVERSITY
1996           *Adjunct Professor of Finance*
                Taught graduate investment management.

NATIONAL ECONOMIC RESEARCH ASSOCIATES
1995-1997      *Senior Consultant*
                Directed projects in the economics of complex securities litigation.

VIRGINIA TECH
1995-1997      *Adjunct Professor of Economics*
                Taught graduate managerial economics.

U.S. SECURITIES AND EXCHANGE COMMISSION
1994-1995      *Professional Fellow and Acting Associate Chief Economist for Policy*
                Reviewed Commission initiatives and coordinated research in support of Chief Economist. Conducted research into portfolio performance, personal trading and quantitative risk measures. Provided financial analysis in support of enforcement.

ECONOMIC ANALYSIS CORPORATION
1993-1994      *Senior Economist*
                Directed projects involving analysis of vertical and horizontal practices, mergers, and general business damages.

U.S. SECURITIES AND EXCHANGE COMMISSION
1992-1993      *Academic Fellow*
                Conducted research into the valuation and expensing of employee stock options, reviewed policy proposals and supported enforcement actions.

UNIVERSITY OF SOUTH CAROLINA, COLLEGE OF BUSINESS
1987-1992      *Assistant Professor*
                Taught economics, antitrust and public policy towards business at undergraduate, masters, MBA and doctorate levels.

Tab 19, p. 2 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

## Education

UNIVERSITY OF CALIFORNIA, LOS ANGELES
1989  Ph.D., Economics
1986  M.A., Economics

UNIVERSITY OF WESTERN ONTARIO
1983  M.A., Economics
1982  B.A., Economics

Chartered Financial Analyst
Series 7 NASD Registration (1997-1999)
Series 63 NASD Registration (1997-1999)

## Professional Activities

American Economic Association
American Finance Association
Chartered Financial Analyst Institute
Washington Society of Investment Analysts

## Testimony, Depositions, Reports and Affidavits

### Federal Court

*Patsy Chambers, et al v North American Company for Life,* United States District Court for the Southern District of Iowa Central Division, No. 4:11-CV-00579-JAJ-CFB
  Expert Report, March 17, 2014.

*Vida F. Negrete, et al v. Allianz Life Insurance Company,* United States District Court, Central District of California, Case No: CV 05-6838
  Declaration, November 1, 2013.
  Deposition, May 1, 2012.
  Expert Report, March 9, 2012.
  Declaration, September 15, 2011.
  Deposition, May 27, 2011.
  Supplemental Declaration, March 31, 2011
  Deposition, October 29, 2008.
  Declaration, July 25, 2008.
  Second Supplemental Declaration, September 18, 2006.
  Supplemental Declaration, July 16, 2006.
  Declaration, May 26, 2006.

*The Municipal Corporation of Bremanger, et al v Citigroup, Inc.et al.* United States District Court, Southern District of New York, Civil Action, Civil Action No. 09-CV-7058.
  Declaration, July 13, 2012.
  Deposition, April 18, 2012.
  Rebuttal Expert Report, March 28, 2012.
  Expert Report, February 29, 2012.

*Bank of America, N.A. v JB Hanna et al.* United States District Court, Western District of Arkansas, Civil Action, Civil Action No. 10-5220
Deposition, April 16, 2012.
Expert Report, March 19, 2012.

*In re: Federal Home Loan Mortgage Corp. (Freddie Mac) Securities Litigation,* United States District Court, Southern District of New York, Civil Action 09-MD-2072 (MGC)
Hearing Testimony, October November December 2011.
Rebuttal Expert Report, September 14, 2011.
Deposition, August 2, 2011.
Expert Report, June 30, 2011.

*Susan Antilla v. L. J. Altfest & Co., Inc.,*, United States District Court, District of Connecticut, No. 3:09-CV-2128-VLB.
Deposition, December 20, 2011
Expert Report, August 12, 2011.

*In re : International Management Associates, LLC,* United States Bankruptcy Court, Northern District of Georgia, Atlanta Division, Case No. 06-62966.
Declaration, December 16, 2011.
Expert Report, July 7, 2011.

*Thomas Todd Martin, III et al v Wachovia Bank, NA et al,* United States District Court, Northern District of Alabama, Case No.: CV-09-902464
Expert Report, June 17, 2011.

*Corporate America Credit Union v Joseph Herbst, et al ,* United States District Court, Northern District of Alabama, Case No.: CV-09-J-2126-S
Rebuttal Expert Report, May 23, 2011.

*Sierra-Sonora Enterprises, Inc. et al v Domino's Pizza, LLC et al,* United States District Court, District of Arizona, NO. 2:10-cv-00105-JAT
Expert Report, August 24, 2010.

*Houston Police Officer's Pension System v. State Street Bank and Trust Company and State Street Global Advisors, Inc.* United States District Court, Southern District of Texas, Houston Division, No. 08-05442-RJH
Declaration, July 1, 2010.
Deposition, May 10, 2010.
Rebuttal Expert Report, March 19, 2010
Expert Report, January 15, 2010.

*Akanthos Capital Management, LLC, et al. v CompuCredit Holdings Corporation,* United States District Court, Northern District of Georgia, Atlanta Division, No. 1:10-CV-844-TCB
Declaration, May 7, 2010.

*Securities and Exchange Commission v. Kederio Ainsworth et al,* United States District Court, central District of California, Eastern Division, Civil Action No. EDCV08-1350 VAP(OPx)
Deposition, February 2, 2010.
Supplemental Expert Report, January 5, 2010
Expert Report, December 11, 2009.

*Florence Smith v National Western Life Insurance Company* United States District Court, Middle District of Pennsylvania, Civil Action no. 08-2119
Expert Report, January 4, 2010.

Tab 19, p. 4 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*City of Cedar Rapids and Cedar Rapids/Linn county Solid Waste Agency v. Wells Fargo Brokerage Services, LLC.* United States District Court, Northern District of Iowa, Cedar Rapids Division, No. ___
   Rebuttal Expert Report, December 2, 2009.
   Expert Report, September 3, 2009.

*Daniel G. Schmidt, III v Wachovia Bank, N.A.* United States District Court, Southern District of Texas, Houston Division, No. 08-05442-RJH
   Deposition, February 25, 2010.
   Expert Report, October 30, 2009.

*In Re Midland National Insurance Co. Annuity Sales Practices Litigation,* United States District Court, Central District of California, No. MDL No. 07-1825 CAS (MANx).
   Deposition, September 12, 2009.
   Supplemental Declaration, June 19, 2009.
   Deposition, January 8, 2008.
   Declaration, October 31, 2007.
   Deposition, July 27, 2007.
   Declaration, July 16, 2007.
   Declaration, July 2, 2007.
   Declaration, June 29, 2007.

*Securities and Exchange Commission v. Biovail Corporation et al*, United States District Court, Southern District of New York, Civil Action No. 08 CIV 02979 (LAK)
   Expert Report, July 2, 2009.

*CountryMark Cooperative, LLP, v Morgan Keegan & Company, Inc.,* United States District Court, Southern District of Indiana, Case No: 1:08-cv-00118-RLY-JMS
   Expert Report, April 6, 2009

*Amy J. Straily et al v UBS Financial services, Inc.,* United States District Court, District of Colorado, Case No: 07-cv-00884-REB-KMT
   Deposition, February 22, 2009.
   Supplemental Expert Report, January 16, 2009
   Expert Report, January 16, 2009

*Securities and Exchange Commission v. Competitive Technologies, et al*, United States District Court, District of Connecticut, Civil Action No. 304-CV-1331 JCH.
   Trial Testimony, October 7, 2008.
   Trial Testimony, November 15, 2007.
   Deposition, February 22, 2006.
   Expert Report, January 30, 2006.

*In Re American Equity Annuity Practices and Sales Litigation,* United States District Court, Central District of California, No. MDL No. CV-05-6735-CAS (MANx).
   Deposition, July 24, 2008.
   Declaration, April 21, 2008.

*In re Alstom SA Securities Litigation,* United States District Court, Southern District of New York, Case No: 03-CV-6595 (VM).
   Affidavit, January 4, 2008.

*Vida F. Negrete, et al v. Fidelity and Guaranty Life Insurance Company,* United States District Court, Central District of California, Case No: CV 05-6837.
   Declaration, January 22, 2008.
   Declaration, December 26, 2007.

Tab 19, p. 5 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

Page 170 of 181

Deposition, August 28, 2007.

Declaration, July 23, 2007.

*Youxin (Kevin) Ma et al v Merrill Lynch & Co., Inc. and Irene S. Ng,* United States District Court, Southern District of New York, Case No. 06 CV 15497.

Expert Report, December 24, 2007.

*Dale Sakai v Merrill Lynch Life Insurance Company,* United States District Court, Northern District of California, Case No: CV 06-2581.

Deposition, December 10, 2007.

Expert Report, October 26, 2007.

*Securities and Exchange Commission v. Louis E. Rivelli, et al,* United States District Court, District of Colorado, Civ. 05-CV-1039 RPM-MJW

Deposition, March 3, 2008.

Expert Report, October 8, 2007.

*Kevin Lamkin, et al v. UBS PaineWebber, Inc.,* United States District Court, Southern District of Texas, Civil Action No. H-02-0851

Deposition, February 28, 2007.

Expert Report, June 1, 2006.

*Carmen Migliaccio, et al. v. Midland National Life Insurance Company,* United States District Court, Central District of California, Case No: CV 05-6838.

Deposition, February 13, 2007.

Declaration, December 28, 2006.

*Gary Yokoyama, et al. v. Midland National Life Insurance Company,* United States District Court, District of Hawaii, Case No. 05-00303 MS KSC.

Deposition, November 20, 2006.

Declaration, November 10, 2006.

Declaration, May 4, 2006.

*Samuel Cooper, et al v. Pacific Life Insurance Company et al,* United States District Court, Southern District of Georgia, Case No. CV 203-131

Deposition, September 12, 2006.

Expert Report, July 5, 2006.

*United States of America v. Jamie Olis*, United States District Court, Southern District of Texas, Criminal Number H-03-217.

Expert Report, December 23, 2005.

*David Henderlight and Christine Henderlight v AmSouth Bank,* United States District Court, Eastern District of Tennessee, Knoxville Division Civil Action No: 3:02-CV-169.

Deposition Testimony, July 7, 2005.

Expert Report, January 18, 2005.

*United States of America v. Bernard J. Ebbers* United States District Court, Southern District of New York, Docket S4 02 Cr. 1144 (BSJ).

Expert Report June 8, 2005.

*In Re: Kaiser Group International, Inc. et al.*, United States Bankruptcy Court for the District of Delaware, Case Nos. 00-2263 to 00-2301 (MFW).

Declaration, May 29, 2005.

Tab 19, p. 6 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*United States of America v. Shawn P. McGhee* United States District Court, District of Eastern Virginia, Docket 04-495.
> Expert Report March 4, 2005.

*Walnut Capital Partners et al. v Key Bank / McDonald Investments, Inc.,* United States District Court, Western District of Pennsylvania, Case No. 03-CV-0284.
> Affidavit, February 14, 2005.
> Deposition Testimony, September 8, 2004.
> Supplemental Expert Report July 2, 2004
> Expert Report June 1, 2004

*Securities and Exchange Commission v. David Gane et al* United States District Court, Southern District of Florida Miami Division, Civil Action No:03-61553.
> Trial Testimony, December 10, 2004.
> Deposition Testimony August 2, 2004.
> Expert Report July 20, 2004.

*Simon Falic et al v Legg Mason Wood Walker, Inc.,* United States District Court, Southern District of Florida, West Palm Beach Division Civil Action No. 03-80377.
> Expert Report, October 19, 2004.

*Securities and Exchange Commission v. David W. Butler* United States District Court, Western District of Pennsylvania, Civil Action No. 00-1827.
> Trial Testimony September 21, 2004.
> Expert Report January 9, 2003.
> Deposition Testimony, October 26, 2001.
> Expert Report October 15, 2001.

*United States of America v. Franklin C. Brown* United States District Court, Middle District of Pennsylvania CR-02-146-02.
> Trial Testimony, August 6, 2004.
> Expert Report July 19, 2004.

*United States of America v. Jeffry R. Anderson* United States District Court, District of Eastern Virginia, Docket 1:03-CR-444.
> Expert Report January 2, 2004.

*United States of America v. Scott H. Miller* United States District Court, District of Eastern Virginia, Docket No. 03-443-A.
> Expert Report December 3, 2003.

*In re: World Access, Inc. Securities Litigation*, United States District Court, Northern District of Georgia Atlanta Division, 1:99-CV-0043-ODE.
> Rebuttal Expert Report August 8, 2003.
> Expert Report June 27, 2003.

*In re: Pediatric Services of America, Inc. Securities Litigation*, United States District Court, Northern District of Georgia Atlanta Division.
> Expert Report November 19, 2001.
> Affidavit, October 13, 2000.

*United States of America v. Paul F. Polishan* United States District Court, Middle District of Pennsylvania No.3: CR-96-274.
> Trial Testimony November 15, 2001.
> Expert Report November 5, 2001.

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*Kantishna Mining Company, Inc. et al v. Gail Norton et al* United States District Court, District of Alaska F98-007 CV.
> Declaration, June 1, 2001.
> Expert Report and Declaration, April 17, 2001.

*H. James Griggs et al v. Pace American Group, Inc., Coopers & Lybrand L.L.P., et al* United States District Court, District of Arizona.
> Trial Testimony, March 13, 2001.
> Deposition Testimony, December 4, 2000.
> Expert Report, November 14, 2000.

*David Lesser, et al v Quadramed Corporation* United States District Court, District of Eastern Virginia No: 00 Civ. 606-A.
> Expert Report, September 8, 2000.

*John Tenaglia and The Tenaglia Family Partnership v. A.F. Best Securities et al*, United States District Court, Southern District of Florida.
> Expert Report, March 31, 2000.

*UMG Recordings, Inc. et al v. MP3.com, Inc.,* United States District Court, Southern District of New York, No:00 Civ. 0472.
> Expert Report, August 8, 1999.

*Jonathan Bekhor et al v. Josephthal Holdings et al*, United States District Court, Southern District of New York, No: 96 Civ. 4156.
> Deposition Testimony, September 30, 1999.
> Expert Report, August 20, 1999.

*John Shane and Beth Goodman v. Tokai Bank*, United States District Court, Southern District of New York, No:96 Civ. 5187.
> Trial Testimony, October 23, 24 1997.
> Deposition Testimony, October 19, 1997.
> Expert Report, October 18, 1997.

## State Court

*Francis P. Maybank v BB&T Corporation, et al*, State of South Carolina, County of Greenville, Court of Common Pleas, C.A. No. 2011-CP-23-8578.
> Deposition, February 7, 2014

*Robert L. McDonald v Camarind, Mogey & Fife et al,* In The Court of Common Pleas of Allegheny County, Pennsylvania, Case No. CD-11-016862.
> Expert Report, July 11, 2013.

*Commonwealth v. Brett B. Weinstein, Esquire, et al.* No. 239 M.D. 2006, *Commonwealth v. Estate Planning Advisors Corp, et al.* No. 740 M.D. 2004, and *Commonwealth v. Brett B. Weinstein, Esquire, et al.* No. 576 M.D. 2001, Commonwealth Court of Pennsylvania.
> Expert Report, April 8, 2013.

*Firefighters Retirement System v Regions Bank et al,* State of Louisiana, Nineteenth Judicial District Court for the Parish of East Baton Rouge, Docket No. 56874, Division 25.
> Expert Report, November 1, 2012.
> Expert Report, July 20, 2012.

Page 173 of 181

Tab 19, p. 8 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*C. Randall Lewis, Receiver v. Steve Taylor,* District Court, Denver County, Co., Case No. 2011CV2071.
>Affidavit, November 1, 2012.
>Expert Report, October 8, 2012.


*In Re International Textile Group, Inc. Merger Litigation*, State of South Carolina, County of Greenville, Court of Common Pleas, C.A. No. 2009-CP-23-3346.
>Deposition, October 24, 2012.
>Supplemental Expert Report, October 19, 2012
>Supplemental Expert Report, July 27, 2012.
>Deposition Testimony, December 8, 2011.
>Expert Report, July 20, 2011.
>Deposition Testimony, May 13 and May 14, 2011
>Expert Report, April 1, 2011.

*Lennar Corporation et al v Briarwood Capital, LLC et al* Circuit Court, Miami-Dade County, CACE 08-55741 CA 40
>Deposition Testimony, September 18, 2012.
>Expert Report, August 16, 2012

*Susan W. Gore v Robert Gore et al* Chancery Court, Delaware, C.A. No. 4237-VCN
>Rebuttal Expert Report, September 7, 2012.
>Expert Report, June 27, 2012.

*Woodbridge Holdings, LLC v Prescott Group Aggressive Small Cap Master Fund et al,* Circuit Court, Broward County, CACE 09-64811.
>Trial Testimony, May 31, 2012.
>Rebuttal Report, May 23, 2011.
>Deposition Testimony, May 4, 2012.
>Rebuttal Report, April 24, 2011.
>Expert Report, April 2, 2011.

*Pursuit Partners, LLC and Pursuit Management, LLC v. UBS AG Securities LLC et al,* Superior Court, Judicial District of Stamford-Norwalk at Stamford No. X05-CV-08-4013452-S
>Deposition Testimony, June 7, 2011.
>Expert Report, May 5, 2011.

*Petition of Bank One Trust Company, N.A. For Instruction and Construction of Trust*, District Court, Tulsa County, State of Oklahoma, Case No. PT-2006-013
>Trial Testimony, April 19 and May 19, 2011.
>Supplemental Expert Report, November 16, 2009.
>Deposition Testimony, December 15, 2008.
>Expert Report, June 13, 2008.

*BB&T Asset Management, Inc., et al v Frederick V. Martin,* Virginia Circuit Court for the City of Norfolk Case No. CL07006153-00
>Expert Report, August 15, 2008.

*Ross Gampel et al v Northern Trust Bank of Florida,* Circuit Court, Broward County, CACE 05-18352 CA 31,
>Deposition Testimony, April 17, 2008.

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*Cynthia Weiss v Robert Sturman, et al* In The Court of Common Pleas of Philadelphia County, August Term, 2006 NO. 3332
       Expert Report January 23, 2008.

*Salix Affiliates et al v Lattimore, Black, Morgan & Cain, P.C.*, Chancery Court, Tennessee Case No. 06-1500-IV
       Deposition Testimony, December 5, 2007.
       Expert Report, September 21, 2007.

*Tafazzoli Family Limited, et al v. TradeStation Group, Inc. et al* Circuit Court, Miami-Dade County, CACE 03-19815 CA 40.
       Deposition Testimony, September 18, 2007.

*Glenn Wall, et al v. James F. Bottoms, et al* State Court of Fulton County, Georgia, Case No. 06VS091950F.
       Deposition Testimony, June 19, 2007.

*Andrew A. Allen Family Limited Partnership v. TradeStation et al* Circuit Court, Broward County, CACE 03-014229.
       Trial Testimony, May 4, 2007.
       Deposition Testimony, February 20, 2007.

*Remmora Investments v Robert Orr*, Circuit Court of Fairfax County, VA No. 187948
       Trial Testimony, November 20, 2006.
       Deposition Testimony, October 9, 2006.

*Gerardo Martin Demerutis Chaul, et al, v. Mohammed Abu-Ghazaleh, et al* Circuit Court, Miami-Dade County, CACE 02-31670 CA 32.
       Trial Testimony, November 6, 2006.
       Deposition Testimony, October 11, 2005.
       Expert Report July 15, 2005.

*Calomiris v Calomiris*, District of Columbia Superior Court, Civil Action No. 05-0004062
       Deposition Testimony, October 11, 2006.

*Jack Holtsberg and Elaine M. Holtsberg v. Citigroup et al* Circuit Court, Palm Beach County, CACE 50 2004CA000837
       Affidavit, August 28, 2006.

*Majestic Enterprises v. Northern Trust Bank of Florida* Circuit Court, Broward County, CACE 03-19243.
       Deposition Testimony, July 26, 2006.

*San Carlos Apache Tribe Government Employee's 401(K) v. A. Thomas Ullmann et al*, Superior Court of Arizona, Case No. CV2005-005942.
       Supplemental Expert Report, July 24, 2006.
       Expert Report, June 30, 2006.

*Patrick T. Noonan and Nancy J. Noonan v. Hackett Investment Advisors, Inc. et al*, Superior Court of Arizona, No. CV2005-010186.
       Deposition Testimony, June 21, 2006.

*Stephen F. Johnston et al v Baran Group et al*, Superior Court of Fulton County, State of Georgia, Case No. 2004CV89313.
       Deposition Testimony, June 28, 2006.
       Expert Report June 9, 2006.

Tab 19, p. 10 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

Page 175 of 181

*Carol Pomerantz et al v. Northern Trust Bank of Florida, et al* Circuit Court, Broward County, CACE 02-015246-08,
    Deposition Testimony, October 5 and October 12, 2005.

*Carney Family Irrevocable Trust of 1999 v State Street Global Advisors, et al* Superior Court of Commonwealth of Massachusetts, CIV. 03-2716 BLS 2
    Deposition Testimony, June 21, 2005.

*Trust Estate of Emanuel Rosenfeld, Settlor* In The Court of Common Pleas of Philadelphia County, Orphans' Court Division, O.C. NO. 1664 IV OF 2002
    Trial Testimony, May 3, 2005.
    Expert Report April 8, 2005.

*Evi U. Chamness et al v. Northern Trust Bank of Florida, et al* Circuit Court, Broward County, CACE 03-001939-12,
    Deposition Testimony, February 17 and February 18, 2005.
    Affidavit, November 19, 2004.

*Ponswamy Rajalingham et al v Urecoats International, Inc. et al*, Circuit Court, Broward County, CACE 02-009324,
    Deposition Testimony, March 1, 2004.

*William J. Kerley v. McCullough, Sherrill LLP, et al* State Court of Fulton County, State of Georgia, Civil Action No. 02VS028870E,
    Affidavit, March 12, 2004.
    Deposition Testimony, September 11, 2003.

*Plantation Sales, Inc. dba Plantation Nissan/Volvo v Northern Trust Bank of Florida*, Circuit Court, Broward County, CACE 02-006761 (05),
    Deposition Testimony, February 19, 2004.

*Century Business Services v Victor C. Moore*, Court of Common Pleas, Cuyahoga County, Case No. 469291,
    Trial Testimony, February 9, 2004.
    Deposition Testimony, January 19, 2004.

*Michael B. Holt, as Trustee of the Mark E. Munro Charitable Remainder Unitrust, v. Merrill Lynch Trust Co., et al* Superior Court of New Jersey, Docket # ESX-L-6713-02
    Deposition Testimony, January 15, 2004.
    Expert Report, September 8, 2003.

*Jack E. Forbes v. A.G. Edwards, et al* Circuit Court of Monongalia County, State of West Virginia, Civil Action No. 01-C-325
    Trial Testimony, December 11, 2003.
    Deposition Testimony, September 30, 2003.

*In re: Thompsons vs. Glenmede Trust Company*, Court of Common Pleas Philadelphia County, Pennsylvania February Term 2002, 004428
    Expert Report, August 25, 2003.

*In re: Moutsatsos vs. Glenmede Trust Company*, Court of Common Pleas Philadelphia County, Pennsylvania May Term 2001, 003659
    Expert Report, July 7, 2003.

*Nancy J. Needham et al v. Advanced Communications et al* Circuit Court of Florida, Fifteenth Judicial Circuit, Case No.: 00-0067-CA-HDH
    Affidavit, May 15, 2003.

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*JDN Realty et al v. McCullough, Sherrill LLP, et al* Superior Court of the State of Georgia, Civil Action No. 01-CV-39193,
>Deposition Testimony, April 8, 2003.

*Dezendorf v Riggs Bank*, District of Columbia Superior Court, Civil Action No. 00502-01
>Deposition Testimony, April 24, 2002.

*Ratcliff Family Charitable Remainder Trust et al v. Appletree Capital Management et al* Circuit Court of Collier County, Florida Case No.: 00-0067-CA-HDH
>Affidavit, August 22, 2001.

*Mahvash Sabet v. Olde Discount Corporation et al*, Superior Court of Arizona
>Affidavit, July 31, 2001.
>Trial Testimony, April 24 and April 25, 2001.
>Deposition Testimony, January 22 and January 23, 2001.
>Supplemental Expert Report, October 11, 2000.
>Expert Report, August 31, 2000.
>Affidavit, February 17, 2000.

*Pierce v van Beuren*, Circuit Court of Rappahannock County, VA
>Trial Testimony, January 24, 2001.

*Jason A. Forge et al v. National Semiconductor Corp. et al*, Superior Court of the State of California, County of Santa Clara CV 770082
>Deposition Testimony, May 18, 2000.

## International

*In the Matter of Jowdat Waheed and Bruce Walter,* before the Ontario Securities Commission
>Expert Report, December 24, 2012.

*In the Matter of Biovail Corporation et al,* before the Ontario Securities Commission
>Trial Testimony, April 9, 2009.
>Expert Report, February 27, 2009.

## AAA and JAMS Arbitrations

*Randal Golden v Genspring,* AAA Arbitration
>Expert Report, November 1, 2013.

*Richard Golden v Genspring,* AAA Arbitration
>Trial Testimony, June 6, 2012.
>Rebuttal Expert Report, May 21, 2012.
>Expert Report, April 6, 2012.

*St. Anthony Foundation vs. SCM Advisors, LLC* AAA Arbitration
>Trial Testimony, March 8, 2011.

*Stephen Tigerman v Heller Capital Resources, Inc. et al JAMS* Arbitration
>Trial Testimony, February 9, 2011.
>Deposition, January 6, 2011.

*Peter Fusco v Fisher Investments, Inc.* AAA Arbitration,
>Trial Testimony, September 16, 2010.

*Elliott C. Levinthal al v. First Republic Securities Company LLC et al* AAA Arbitration
>Trial Testimony, April 7, 2010.

Tab 19, p. 12 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

*Matthew Schoenberg et al v Wells Fargo Bank, N.A. et al* AAA Arbitration
Trial Testimony, January 11, 2010.
Deposition, January 5, 2010.
Expert Report, December 11, 2009.

*Robert Tandler et al v. First Republic Securities Company LLC et al* AAA Arbitration
Trial Testimony, August 25, 2009.

*CRG Partners, Inc. et al v Genesis Technology Group,* AAA Arbitration
Trial Testimony, December 4 and December 23, 2008.
Deposition Testimony, November 26, 2008 and December 19, 2008.
Supplemental Expert Report, December 18, 2008.
Expert Report, November 24, 2008.

*Anthony Ostlund & Baer, P.A. et al v Vigilant Investors L.P. et al.* AAA Arbitration
Trial Testimony, October 30, 2008.

*Dominion Terminal Associates v. CSX Transportation, Inc.,* AAA Arbitration
Deposition Testimony, June 23, 2006.
Expert Report, May 17, 2006.
Declaration, February 9, 2006.

*Bradley Markham and John Truchanowicz v Black Box Inc.,* AAA Arbitration
Trial Testimony, June 4, 2002.
Expert Report, May 22, 2002.

*Douglas Millar et al v Merrill Lynch, et al* JAMS Arbitration.
Trial Testimony, May 9, 2002
Supplemental Expert Report, April 10, 2002.
Expert Report, March 23, 2002.

*Raymond H. Stanton II and Raymond H. Stanton III v. Cendant Corporation*, AAA Arbitration,
Trial Testimony, October 16 and 18, 2000.
Expert Report, February 9, 2000.

## NASD, NYSE and FINRA Arbitrations

Dr. McCann has testified before more than 250 NASD, NYSE, and FINRA arbitrations.

## Miscellaneous Testimony

*In the Matter of Focus Capital and Nicolas Rowe. Respondent.* State of New Hampshire, Secretary of State, Bureau of Securities Regulation
Expert Report, December 7, 2012.

*In the Matter of: UBS Financial Services, Inc. Respondent.* State of New Hampshire, Secretary of State, Bureau of Securities Regulation
Expert Report, February 17, 2011.

*South Beach Securities Inc.* before the National Securities Clearing Corporation,
Hearing Testimony February 9, 2000.
Expert Report January 31, 2000.

*Report on The Adequacy of the SIPC Fund* to the Board of Directors of Securities Investor Protection Corporation, April 22, 1998.

Tab 19, p. 13 of 16

Page 178 of 181

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

Before the Subcommittee on Securities of the Senate Banking Housing and Urban Affairs Committee, "How (and Why) Companies Should Value Their Employee Stock Options" Senate Hearings No. 103-359, October 21, 1993.

## Publications and Working Papers (available at www.slcg.com)

"A Primer on Non-Traded REITs and Other Alternative Real Estate Investments" with Tim Husson and Carmen Taveras, forthcoming *Alternative Investment Analyst Review,* 2014.

"Dual Directional Structured Products" with Geng Deng, Tim Dulaney and Tim Husson, 2014. forthcoming *Journal of Derivatives and Hedge Funds.*

"Efficient Valuation of Equity-Indexed Annuities Under Levy Processes Using Fourier-Cosine Series" with Geng Deng, Tim Dulaney and Mike Yan, 2014, *submitted.*

"Structured Certificates of Deposit: Introduction and Valuation", with Geng Deng, Tim Dulaney and Tim Husson, 2013, forthcoming *Financial Services Review.*

"Ex-post Structured Product Returns: Index Methodology and Analysis" with Geng Deng, Tim Dulaney, Tim Husson and Mike Yan, 2014, forthcoming *Journal of Index Investing.*

"Valuation of Structured Products" with Geng Deng and Tim Husson, 2014, *Journal of Alternative Investments* Spring 2014, Vol. 16, No. 4: pp. 71–87

"Modeling a Risk-Based Criterion for a Portfolio with Options" with Geng Deng and Tim Dulaney, 2014, forthcoming *Journal of Risk.*

"Valuation of Reverse Convertibles in the Variance Gamma Economy" with Geng Deng and Tim Dulaney, 2014, forthcoming *Journal of Derivatives and Hedge Funds.*

"Structured Product Based Variable Annuities" with Geng Deng, Tim Dulaney and Tim Husson, 2014, forthcoming *Journal of Retirement.*

"Crooked Volatility Smiles: Evidence from Leveraged and Inverse ETF Options" with Geng Deng, Tim Dulaney and Mike Yan, 2014, forthcoming *Journal of Derivatives and Hedge Funds.*

"Private Placement Real Estate Valuation" with Timothy Husson, Edward O'Neil and Carmen Taveras, 2014, forthcoming *Journal of Business Valuation and Economic Loss Analysis.*

"Robust Portfolio Optimization with Value-at-Risk Adjusted Sharpe Ratios," 2013 with Geng Deng, Tim Dulaney and Olivia Wang forthcoming *Journal of Asset Management.*

"The Fall of Willow" with Geng Deng, 2014.

"Using EMMA to Assess Municipal Bond Markups" with Geng Deng, 2013.

"Municipal Bond Markups" with Geng Deng, 2013, *submitted.*

"Optimizing Portfolio Liquidation Under Risk-Based Margin Requirements" with Geng Deng and Tim Dulaney, *Journal of Finance and Investment Analysis,* vol. 2, no. 1, 2013, 121-153.

"The Priority Senior Secured Income Fund," with Tim Dulaney and Tim Husson, 2013.

"Large Sample Valuations of Tenancies-in-Common" with Timothy Husson, Edward O'Neil and Carmen Taveras, 2013.

"What is a TIC Worth?" with Tim Husson and Carmen Taveras, 2013.

"The Rise and Fall of Apple-linked Structured Products" with Geng Deng, Tim Dulaney and Mike Yan, 2013.

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

"Are VIX Futures ETPs Effective Hedges?" with Geng Deng and Olivia Wang, 2012, *Journal of Index Investing,* 3(3):35-48, Winter 2012.

"The Properties of Short Term Investing in Leveraged ETFs" with Geng Deng, *Journal of Financial Transformation.*

"Leveraged Municipal Bond Arbitrage: What Went Wrong?" with Geng Deng, 2012, *Journal of Alternative Investments*, Spring 2012, Vol. 14, No. 4: pp. 69–78.

"Isolating the Effect of Day-Count Conventions on the Market Value of Interest Rate Swaps" with Geng Deng, Tim Dulaney and Tim Husson, 2012.

"CLOs, Warehousing, and Banc of America's Undisclosed Losses" with Tim Husson and Olivia Wang, 2012.

"Using Monte-Carlo Simulation Techniques to Value Partial Interests in Trusts and Assess the Prudent Investor Standard" with Geng Deng and Tim Husson, 2012.

"Rethinking the Comparable Companies Valuation Method" with Paul Godek, Dan Simundza and Carmen Taveras, 2011.

"The Anatomy of Principal Protected Absolute Return Barrier Notes" with Geng Deng, Ilan Guedj and Joshua Mallett, 2011, *Journal of Derivatives,* Winter 2011, Vol. 19, No. 2: pp. 61-70.

"Modeling Autocallable Structured Products" with Geng Deng and Joshua Mallett, 2011, *Journal of Derivatives & Hedge Funds* 17, 326–340.

"What Does a Mutual Fund's Term Tell Investors?" with Geng Deng and Edward O'Neal, *Journal of Investing* Summer 2011 vol. 20.

"The VXX ETN and Volatility Exposure" with Tim Husson, 2011.

"Futures-Based Commodities ETFs" with Ilan Guedj and Guohua Li, *Journal of Index Investing,* Summer 2011 vol. 2, no. 1.

"What Does a Mutual Fund's Average Credit Quality Tell Investors?" with Geng Deng and Edward O'Neal, *Journal of Investing* Winter 2010 vol. 19, no. 4.

"Leveraged ETFs, Holding Periods and Investment Shortfalls" with Ilan Guedj and Guohua Li, 2010, *Journal of Index Investing* Winter 2010 vol. 1, no. 3.

"Charles Schwab YieldPlus" with Geng Deng, and Edward O'Neal, 2010.

"What TiVo and JP Morgan teach us about Reverse Convertibles", with Geng Deng, Edward O'Neal, and Guohua Li, 2010.

"The Risks of Preferred Stock Portfolios," with Guohua Li and Edward O'Neal, 2010.

"Auction Rate Securities" with Edward O'Neal, 2010.

"Structured Products in the Aftermath of Lehman Brothers" with Geng Deng and Guohua Li, 2009.

"Oppenheimer Champion Income Fund" with Geng Deng and Joshua Mallett, 2009.

"Regions Morgan Keegan and the Abuse of Structured Finance", 2009.

"An Economic Analysis of Equity-Indexed Annuities", 2008.

"A CMO Primer: The Law of Conservation of Structured Securities Risk", 2007.

"Are Structured Products Suitable for Retail Investors?" with Dengpan Luo, 2006.

"An Overview of Equity-Indexed Annuities" with Dengpan Luo, 2006.

Tab 19, p. 15 of 16

Page 180 of 181

Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97

"Annuities" with Kaye A. Thomas, 2005.

"Optimal Exercise of Employee Stock Options and Securities Arbitrations" with Kaye A. Thomas, 2005.

"Concentrated Investments, Uncompensated Risk and Hedging Strategies" with Dengpan Luo, , 2004.

"The Use of Leveraged Investments to Diversify a Concentrated Position" with Dengpan Luo, *Securities Arbitration 2004 Handbook* PLI.

"Detecting Personal Trading Abuses", 2003.

"Churning Revisited: Trading Costs and Control" with Dengpan Luo, *Securities Arbitration 2003 Handbook* PLI.

"The Suitability of Exercise and Hold," with Dengpan Luo, *Securities Arbitration 2002 Handbook,* PLI.

"Spreads, Markups, Sales Credits and Trading Costs," with Richard Himelrick, Esq.

"The Prudent Investor Rule, Uniform Prudent Investor Act and Financial Theory," 2000.

"Economic Analysis in Broker Customer Disputes Involving Allegations of Churning," *Journal of Legal Economics* 9:1 Spring/Summer 1999.

"A Comment on Accelerated Trading Models Used in Securities Class Action Lawsuits," with David Hsu, *Journal of Legal Economics* 8:3 Winter 1998-1999.

"How (and Why) Companies Should Value Their Employee Stock Options," *Journal of Applied Corporate Finance* Summer 1994, Volume 7 number 2, page 91.

"Perspectives: Taking Account of Stock Options," *Harvard Business Review* January-February 1994, Volume 72 number 1, page 27.

"Golden Parachutes: A Theoretical and Empirical Investigation," unpublished Ph.D. dissertation, UCLA, 1989.

## Presentations at Conferences and Colloquia

Dr. McCann has been invited to speak on prudent investment management practices, financial analysis in securities arbitrations, securities class action lawsuits and antitrust litigation on more than 50 continuing legal education panels around the country.

May 14, 2014

Tab 19, p. 16 of 16
Pltf. Trial Exhibit 25A
Cause No. 09-14448
Page 25-40 of 97